## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| |
|---|
| UNITED STATES OF AMERICA |
| |
| **v.** |
| |
| JOHN J. O'BRIEN, |
| ELIZABETH V. TAVARES, and |
| WILLIAM H. BURKE, III, |
| Defendants. |

**No. 4:12-cr-40026-FDS-2**

## MEMORANDUM OF LAW IN SUPPORT OF
## TAVARES' MOTION FOR SEVERANCE[1]

Elizabeth Tavares ("Tavares") moves for severance pursuant to Federal Rule of Criminal Procedure 14. A joint trial would violate her Sixth Amendment rights and prevent the jury from making a reliable judgment. At trial, the government would introduce sworn statements made by Tavares's co-defendant, William H. Burke, III ("Burke"). The government would use these statements to support its case against the defendants. However, these statements are admissible only against the declarant, and their introduction at a joint trial would violate Tavares's rights to confront his accusers as guaranteed by the Sixth Amendment. *See Bruton v.United States*, 391 U.S. 123, 135-37 (1968); *Crawford v. Washington*, 541 U.S. 36 (2004).

### I.        STATEMENTS COMPELLED BY "STAR CHAMBER"

At the time of the alleged conduct, John J. O'Brien ("O'Brien") was Commissioner of the Massachusetts Probation Service, and Tavares and Burke were two of his deputies. All three have been charged in a 30 count indictment that includes racketeering, mail fraud, and

---

[1] The instant memorandum was originally drafted as a joint memorandum on behalf of all three (3) defendants.

bribery charges.  The essence of these charges is the allegation that the defendants conducted a "sham hiring" system at Probation to obscure the fact that they were hiring candidates who were recommended by powerful state legislators rather than the "most qualified" candidates. These charges developed from an administrative inquiry into Probation hiring practices triggered by a newspaper article.

On May 23, 2010, a *Boston Globe* article criticized hiring at Probation as politically motivated.  The next day, Chief Justice of the Supreme Judicial Court Margaret Marshall and Chief Justice of Administration and Management Robert Mulligan issued a press release:

> The recent media coverage of the Office of the Commissioner of Probation raises serious issues concerning the hiring and promotion of probation officers and other management practices within the Probation Department of the Trial Court.  We are deeply concerned with not only the proper administration of the Probation Department, but with how such reports may affect the public's perception of the integrity of all aspects of the judicial branch. The reporting by the *Boston Globe* Spotlight Team requires a full, prompt and independent inquiry.

The SJC simultaneously issued an order establishing an administrative inquiry:

> It has come to the attention of the Justices that the hiring and promotion of employees within the Probation Department of the Trial Court allegedly are based on reasons other than merit, which is a matter of concern to the public and to all members of the judicial branch. Certain other alleged practices and management decisions within the Probation Department have also been called into question. The Chief Justice and the Justices of this Court, concerned not only with the proper conduct of judicial administration, but also with the public's perception of the integrity of all aspects of the judicial branch, have determined that a prompt, full inquiry into the practices and procedures of the Probation Department as they relate to these allegations should be undertaken immediately. Now therefore, pursuant to the constitutional and statutory powers of general superintendence of the Justices of this Court,
>
> IT IS ORDERED that:
>> (1) Paul F. Ware, Jr., Esquire of Boston  be, and hereby is, appointed Independent Counsel with the powers of Special Master and Commissioner to conduct a prompt and thorough administrative inquiry into alleged improprieties with respect to the hiring and promotion of employees within the Probation Department, as well as other practices and management decisions within the

Probation Department that have been called into question, and to file with this
Court within ninety days of this date, or as soon as possible, a report of his
findings, conclusions, and recommendations;

(2) the Independent Counsel shall also make such recommendations as he may
deem appropriate to the Justices of the Supreme Judicial Court with respect to
indications or findings of misconduct, if any, on the part of any employee of
the judicial branch; and

(3) the Independent Counsel shall have, in addition to the usual powers of
a Special Master and Commissioner, the power to subpoena witnesses
and to administer oaths.

This order empowered "Independent Counsel" to compel *ex parte* sworn testimony from witnesses and to issue a report regarding wrongdoing by Probation employees. The inquiry was the quintessential Star Chamber—the order contained no provision for Probation employees to cross examine witness or to respond or present contrary evidence or conclusions. *See, e.g., United States v. Hubbell*, 530 U.S. 27, 34, n.8 (2000) (describing the process of the Star Chamber as "'the inquisitorial method of putting the accused upon his oath and compelling him to answer questions designed to uncover uncharged offenses, without evidence from another source'" (quoting *Doe v. United States*, 487 U.S. 201, 212 (1988))). The order limited the investigation to Probation and judicial branch employees, exempting the judges themselves from scrutiny. The language and timing of the press release and order suggest that the results were preordained—scapegoat agency bureaucrats, while glossing over or ignoring their judicial overseers. It is not surprising that the interrogation of witnesses consisted of primarily leading and badgering questions targeted at creating grounds to terminate O'Brien and Tavares, who were still employed by Probation.

On July 22, 2010, William Burke appeared at the inquest pursuant to a subpoena.  He was compelled to answer questions.  He was not represented by counsel.  *See* Exhibit A; July 2010 transcript of Burke's testimony before the Ware Commission.[2]

## II.   THE INTRODUCTION OF BURKE'S TESTIMONY AT A JOINT TRIAL WOULD COMPROMISE TAVARES'S CONSTITUTIONAL RIGHTS.

Rule 14(a) of the Federal Rules of Criminal Procedure states: "if the joinder of . . . defendants in an indictment . . . appears to prejudice a defendant or the government, the court may . . . sever the defendants' trials . . . ."  Severance is appropriate when there is "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro v. United States*, 506 U.S. 534, 539 (1993); *see also United States v. O'Bryant*, 998 F.2d 21, 25 (1st Cir. 1993). Severance may be necessary when "[e]vidence that is probative of a defendant's guilt but technically admissible only against a codefendant" would be introduced at a joint trial. *Zafiro*, 506 U.S. at 539.  The introduction of Tavares's statements at a joint trial would prevent the jury from making a reliable determination and would compromise Tavares's Sixth Amendment right to confront his accusers.  *See Crawford v. Washington*, 541 U.S. 36 (2004); *Bruton v. United States*, 391 U.S. 123, 135-37 (1968).

"It is well established that a codefendant's out-of-court statement is admissible against that codefendant as a 'party admission.'  But that same statement is inadmissible hearsay and raises Confrontation Clause concerns with respect to another defendant being prosecuted in a joint trial." *United States v. Cruz-Diaz*, 550 F.3d 169, 178-79 (1st Cir. 2008) (internal citations omitted).  In the past, courts tried to remedy the Confrontation Clause

---

[2] In accordance with the Protective Order signed by Chief Magistrate Judge Sorokin on April 19, 2012, Exhibit A is being filed under seal.

problems by "instructing the jury not to consider the statements against any defendant other than the codefendant-declarant." *Id.* at 179.  However, the Supreme Court has held that "such a limiting instruction will not effectively remedy hearsay and Confrontation Clause problems if the codefendant's statement is 'so powerfully inculpating of the other defendants that there would be substantial doubt as to whether the jury could abide by a limiting instruction.'" *Id.* (quoting *United States v. Vega Molina*, 407 F.3d 511, 519 (1st Cir. 2005)); *see also Richardson v. Marsh*, 481 U.S. 200, 207 (1987) (noting that jury cannot be trusted to follow instructions "'where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial'" (quoting *Bruton*, 391 U.S. at 135-36)).  A statement is "powerfully incriminating" if "it is inculpatory on its face." *Vega Molina*, 407 F.3d at 520.

The introduction of Burke's statements at a joint trial would seriously prejudice Tavares's important constitutional rights.  The government's theory of the case is that whenever there was a job opening at Probation, O'Brien received names of "sponsored candidates" from members of the legislature.  O'Brien, with the help of Tavares and Burke, allegedly structured the hiring system to hire these "sponsored candidates" without regard to whether they were the "most qualified" candidates.  The prosecution alleges that this system was a sham, and that the defendants perpetrated this fraud so that Probation would receive favorable legislative treatment from the sponsoring legislators.  The Government will use Burke's testimony to support their theory of the case.  Under leading and badgering questioning from Independent Counsel, Burke stated that Tavares participated with O'Brien in a hiring system in which recommendations from legislators, judges, and other prominent individuals were considered as part of the process.  Tavares testified that O'Brien received

10

these recommendations and that they were then filtered down, via Tavares, to the interview

panels.  These statements cannot be redacted to avoid reference to Tavares.  Some quotations

from his testimony are illustrative:

> Q. Did you have conversation with Mr. O'Brien in which he personally recommended to you candidates?
> A. No.
> Q. On no occasion?
> A. On no occasion did Jack O'Brien ask me to put anybody on a list or ask me for if I thought somebody was good, I would tell Liz or Frannie and say, this guy is outstanding; this lady is outstanding.  But he has never, never.
> Q. When you were given names which you understood to have come from the Commissioner that came through principally Liz Tavares?
> A. Frannie or Eddie Ryan.
> Q. Ed Ryan?
> A. Fran all.
> Q. And Liz Tavares?
> A. Liz Tavares, right.
> Q. Those were the individuals who passed along names from the Commissioner to you or to Regional Administrators or to interview panels, right?
> A. Correct.
> Q. Did you ever have any conversation with Commissioner O'Brien with respect to his meetings with legislative leaders for funding?
> A. No.
> Q. You understood, didn't you, that while it wasn't written down, the legislature was funding Probation generously because Probation was responding to legislative requests for hiring, among other things, isn't that right?
> A. I'd say yeah.
> Q. So you understood that one of the reasons Probation under the auspices of Jack O'Brien could get the funding it needed was that Jack O'Brien was being responsive to the hiring requests of legislative leaders?
> A. And judges.
> Q. But certainly legislative leaders, correct? A. Yeah, correct.
> Q. And who are the legislative leaders that had the most clout in terms of getting jobs within Probation?
> A. Don't have a clue. I'm sure it's the Speaker or, you know, I don't know. As I said, I'm a hundred miles from here.
> Q. Well, you're not a hundred miles from Representative Petrolati, correct? A. Correct.
> Q. And you knew that he, with respect to Western Massachusetts and specifically Hamden County, had a lot of clout as regards hiring and Probation, isn't that true?
> A. He had some clout, yeah.

Q. You participated on some occasions in facilitating names coming from Representative
Petrolati to the Commissioner's office, correct? A. As I said, a couple to three.

Q. But you were aware that he was communicating directly with the Commissioner's office, as you said earlier, names that weren't channeled through you, correct?

A. I was not aware of it, but I'm sure it happened. Q. Fair enough.  You assume it happened?

A. Yeah.

Q. And your understanding, given what you know about the process and the system, was that Representative Petrolati was giving names to Fran Wall or Eddie Ryan or Liz Tavares, isn't that correct?

A. I'd say yes.

Q. You said earlier that you're confident that if Commissioner O'Brien were still actively running Probation at this time that there wouldn't have been layoffs?

A. I honestly believe that, yeah.

Q. And what you meant by that, if I understood you, was that he had the ability to go to the legislature and get the money that was needed, is that right?

A. Correct, yeah.

Q. Do you know that he did that while you were Deputy Commissioner?

A. I know he did it up until the last year because Judge Mulligan forbid him to go over there.

Q. And prior to that last year when Judge Mulligan intervened, what was the process, as you understood it, by which Commissioner O'Brien got funding for Probation?

A. He grew up with a lot of them. I mean, he grew up with Tommy Finneran. Finneran introduced him to a lot of people.  I mean, it's politics.  It's who you know.

Q. And so your understanding is that Commissioner O'Brien would meet with legislative leaders and would present the financial needs of Probation or desires of Probation?

A. Mm hmm.

Q. The legislature would respond, and they would respond in part because Commissioner
O'Brien in turn would meet the legislature's job needs, is that correct? A. Ask the Commissioner.  I mean, I didn't hire one person.

Q. I understand that, but you've been around a long time. A. Yes, I have.

Q. You've been Deputy Commissioner a long time. A. Yeah.

Q. You know politics; you know the real world; you know Massachusetts. A. Yeah.

Q. The way in which it worked was one hand, you know, washed the other? A. Washes the other.  Yeah, I know. I know what you're talking about.

Q. And the way it worked particularly with Probation was Mr. O'Brien would get his funding, and the legislature would get some jobs, isn't that right?

A. Yeah, I would say so, yeah.

Q. That's what you know as a human being and as a guy experienced in both politics and

Probation, isn't that so?
A. That's correct.  But most of those people were probably the most qualified people, too. Q. Well, they may or may not have been, and maybe that's evident on paper from their credentials and their experience.
A. Right.
Q. But the fact is, whether qualified or not, they were being preferred because names were being given by the Commissioner's office, isn't that so?
A. Yes.

Exhibit A, 7/22/10, at 78-83.  These statements clearly implicate O'Brien in the conduct that the government alleges is criminal, and their introduction at a joint trial would violate O'Brien's Sixth Amendment rights.

The prejudice that would flow from the introduction of these statements at a joint trial is compounded by the circumstances under which these statements were made.  "[T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused.  It was these practices that the Crown deployed in notorious treason cases . . . ; that English law's assertion of a right to confrontation was meant to prohibit; and that the founding-era rhetoric decried."  *Crawford*, 541 U.S. at 50.  The statements at issue in this case are precisely the "evil" with which the Confrontation Clause is concerned.  Burke was questioned *ex parte* by Independent Counsel, he did not have counsel present, and there was no judicial officer overseeing the proceedings.  As the excerpts show, Independent Counsel was able to repeatedly ask leading questions, to misrepresent the Burke's responses, to testify through questions, and to mold the testimony to provide the answers he wanted.

The introduction of testimony taken in these circumstances at a joint trial would compromise Tavares's Sixth Amendment right to confront the witnesses against him and would prevent the jury from rendering a reliable verdict.  Rule 14 requires severance.

## CONCLUSION

For the foregoing reasons, Ms. Tavares respectfully requests her motion to sever be granted.

Dated: November 1, 2013

Respectfully submitted,
ELIZABETH V. TAVARES
By and through her attorneys,

 /s/ *R. Bradford Bailey*
R. Bradford Bailey, BBO#549749
Jeffrey A. Denner, BBO#120520
DENNER♦PELLEGRINO, LLP
Four Longfellow Place, 35th Floor
Boston, Massachusetts 02114
Tel.    617.227.2800
Fax.    617.973.1562
bbailey@dennerpellegrino.com
jdenner@dennerpellegrino.com

### Certificate of Service

I, R. Bradford Bailey, hereby certify that on this the 1st day of November 2013, I caused a true copy of the foregoing *Memorandum of Law in Support of Tavares' Motion for Severance* to be served upon all necessary parties to this matter by virtue of electronically filing the same via the CM/ECF system.

 /s/ *R. Bradford Bailey*
R. Bradford Bailey