# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **NO. 12-CR-40026-WGY** |
| | ) | |
| **JOHN J. O'BRIEN, ET AL.** | ) | |

## DEFENDANT TAVARES' MOTION AND
## INCORPORATED MEMORANDUM OF LAW FOR
## JUDGEMENT OF ACQUITTAL

Defendant Elizabeth Tavares, by and through undersigned counsel, hereby respectfully moves, pursuant to Fed. R. Crim. P. 29, this Honorable Court to enter a judgment of acquittal on all charges brought against her because the government has failed to carry its burden of persuasion and no reasonable jury could find her guilty of any of the crimes charged.

## STANDARD

Rule 29 of the Federal Rules of Criminal Procedure allows the defendant to move for a judgment of acquittal if the government cannot or has not proved every element beyond a reasonable doubt. *United States v. Marston*, 694 F.3d 131, 134 (1st Cir. 2012). "In reviewing a Rule 29 motion for judgment of acquittal, a district court must consider the evidence, both direct and circumstantial, 'in the light most favorable to the prosecution' to determine whether the 'body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt.'" *U.S. v. Lopez-Diaz*, 940 F.Supp.2d 39, 44 (D.P.R. 2013) (quoting *United States v. Lara*, 181 F.3d 183, 200 (1st Cir.1999)). A Rule 29 motion, therefore, should be denied only when "the total

1

evidence, including reasonable inferences, when put together is sufficient to warrant a jury to conclude that defendant is guilty beyond a reasonable doubt." *United States v. Doe*, 921 F.2d 340, 343 (1st Cir.1990).

## ARGUMENT

The government failed to introduce one single scintilla of evidence, either testimonial or documentary, suggesting, let alone establishing, Tavares *knew* that false certifications to the Chief Justice of Administration and Management ("CJAM") were made or that bribes/gratuities were being given, or that she *intended* to defraud or bribe anyone.  The government appears to rely solely on the fact that Tavares was Second (and later, First) Deputy Commissioner to gap-fill all of the evidentiary holes in their case.  At most, the government proved the following: (1) that Tavares passed names, at the direction of Commissioner O'Brien, of O'Brien's preferred candidates to Regional Administrators or Deputy Commissioners at both the local and final round interviews,[1] (2) that she occasionally responded to calls when interview panelists had difficulties getting names through to the next round and in each instance advised them, in essence, "not to worry about it," and (3) that her (stamped) signature appeared on both local interview panel scheduling sheets and on candidate rejection letters.  As a general matter, these facts are simply insufficient to satisfy the requisite elements for any of the substantive crimes, the racketeering conspiracy, or any of the racketeering acts charged.

---

[1] As will be more fully argued below, there is a dearth of evidence that Tavares passed *particular* names.  Only 1 or 2 witnesses can recall, with specificity, that it was Tavares, and *only* Tavares that passed along the name of a particular charged hire.  On the other hand, the vast majority of witnesses state that the name of the charged hire they received could have been Tavares, but it also could have been Janet Mucci, Edward Ryan, Francis Wall, or William Burke.  Even assuming, *arguendo*, that the passing of names is sufficient to satisfy 18 USC § 2 (aider and abettor liability) for purposes of mail fraud and bribery, no rational jury could find, beyond a reasonable doubt, that Tavares (as opposed to some other alleged co-conspirator) passed the particular names of the majority of the charged hires.

## A.      Conspiracy to Commit Racketeering

To be convicted of a conspiracy to commit racketeering, under 18 U.S.C. 1962(d), a jury must find, beyond a reasonable doubt "(1) the existence of an enterprise engaged in interstate commerce; (2) the existence of a conspiracy to conduct and participate in the affairs of the enterprise through a pattern of racketeering activity; and (3) that the defendant intentionally joined that conspiracy and knew of and agreed to the overall criminal purpose of the RICO offense."  The government, while ignoring that the unindicted predecessor First Deputy Jack Cremens served as her direct superior for eight (8) of the ten (10) years covered by the indictment, appears to suggest that since Tavares was as high-ranking as she was within the Probation Department, she must have known or should have known about the conspiracy.  Put another way, the government wants to use her honest, high-ranking position within the Probation Department to gap-fill all of the evidentiary holes riddled throughout their case.  Beyond that, the passing of names or fielding of complaints from panelists, acts that are not criminal of themselves, cannot establish, beyond a reasonable doubt, that Tavares "knew of and agreed to the overall criminal purpose of the RICO offense."

## B.      Substantive RICO Charge

"Five elements must coalesce to make out a substantive RICO violation. The government must show: '(1) an enterprise existed; (2) the enterprise participated in or its activities affected interstate commerce; (3) the defendant was employed by or was associated with the enterprise; (4) the defendant conducted or participated in the conduct of the enterprise; (5) through a pattern of racketeering activity.'"  *United States v. Nascimento*, 491 F.3d 25, 31 (1st Cir. 2007) (quoting *United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002)). To satisfy the statute of limitations for a substantive RICO violation, the government must prove at least one Racketeering Act ("RA")

that occurred within five years of the indictment.[2] *See United States v. Torres Lopez*, 851 F.2d 520, 525 (1st Cir. 1988).  Both the RICO conspiracy and the substantive RICO count requires the government to prove that the defendants engaged in a "pattern of racketeering activity."   To establish such a pattern, the government must prove "'at least two acts of racketeering activity' over a period of ten years." *U.S. v. Brandao*, 539 F.3d 44, 54 (1st Cir. 2008) (quoting 18 U.S.C. § 1961(5)).

>    i.    *RICO Elements*

No reasonable jury could find with regard to Tavares that required elements (1), (3), and (4), the failure of any one of which requires a finding of not guilty, of the substantive racketeering charge has been proved beyond a reasonable doubt.  The government alleged in the indictment that the *entire* Probation Department, itself, was the enterprise.  This is incorrect and the government simply failed to prove it:   An enterprise "need only be a group of persons associated together for a common purpose of engaging in a criminal course of conduct." *United States v. Connolly*, 341 F.3d 16, 28 (1st Cir.2003) (citations and internal quotation marks omitted).  However, the "common purpose" of the Probation Department is not to commit crime; it is a law enforcement agency..   It existed long before 2000 when the government alleges the "enterprise" came into existence.  Moreover, the government did *not* prove that each employee of the Massachusetts Probation Department (or even all those working within the Office of the Commissioner of Probation) was a member of the alleged RICO enterprise.  It is, therefore, a

---

[2] The first indictment for this case issued on March 22, 2012.  *See* Dkt. # 2.  If Tavares is acquitted of all of the RA's that occurred within 5 years of March 22, 2012 (i.e., RA's after March 22, 2007), Tavares must also be acquitted of the substantive RICO charge, and all attendant RA's, as well because they would be time-barred by the statute of limitations.  The RA's that occurred after March 22, 2007 are: Patrick Lawton, Melissa Melia, Patricia Mosca, Kelly Manchester, Lisa Martin, Michael White, Kevin O'Brien, Maria-Elena Sanchez, Antonio Mataragas, and all ELMO hires.

misnomer to suggest that the Probation Department, itself, is the "enterprise."    Instead, the enterprise, to the extent there was one, must have been comprised of a smaller subset of the Probation Department as a whole.

To this end, Tavares' mere employment in the Probation Department cannot, in and of itself, satisfy this element.    Instead, Tavares was employed by the Commonwealth of Massachusetts, *not* the "enterprise," and no evidence was presented that she derived any income from the enterprise.    To the extent she was "associated" with the "enterprise," it was merely incidental due to the fact that she held a legitimate position within the Probation Department, the duties of which occasionally related to the hiring of probation employees.    That incidental association is simply insufficient to establish that Tavares knowingly and intentionally associated herself with the "enterprise."  *See Libertad v. Welch*, 53 F.3d 428 (1st Cir. 1995) (where plaintiff alleged civil-RICO claim, plaintiff failed to prove defendant was a member of the RICO enterprise even where defendant "planned and participated" in one of the alleged RA's and where defendant spoke with other person alleged to be in the enterprise "as often as every other day about their groups' activities").

ii.       *Mail Fraud – General Arguments*

The government has alleged 22 RA's that are premised on mail fraud (i.e. violations of 18 U.S.C. § 1341), 10 of which are also charged substantively.    The government has failed to carry its burden with respect to these mail fraud RA's and substantive charges.    "The elements of mail fraud are: (1) devising or attempting to devise a scheme or artifice to defraud; (2) knowing and willful participation in the scheme with the specific intent to defraud; and (3) the use of the United States mails in furtherance of that scheme."  *United States v. Stergios*, 659 F.3d 127, 132-

33 (1st Cir. 2011). The government must prove that the defendants had the "specific intent" to defraud, "which excludes false statements honestly believed to be true and promises or predictions made in good faith." *United States v. Mueffelman*, 470 F.3d 33, 36 (1st Cir. 2006). A defendant has an "intent to defraud" when she has "act[ed] knowingly with the intent or the purpose to obtain, deceive, or cheat [the government agency] out of money or property." *U.S. v. Dubon-Otero*, 292 F.3d 1, 12 n. 15 (1st Cir. 2001). "Good faith is a complete defense and it is the government's burden to disprove it beyond a reasonable doubt." *United States v. Callipari*, 368 F.3d 22, 33 (1st Cir. 2004). The alleged fraud must include a "misrepresentation or concealment of material fact." *Neder v. United States*, 527 U.S. 1, 22-25 (1999). "In general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed.'" *Id*. at 17 (internal citations omitted).

The government has failed to prove, beyond a reasonable doubt, any of the above-described elements of mail fraud. The government's evidence fails to show that Tavares committed each of the discrete elements of mail fraud.[3] Therefore, and to the extent the government intends to rely upon either *Pinkerton* or aider/abetter liability under 18 U.S.C. § 2, any failure by the government to prove an essential element as to *O'Brien* is necessarily fatal to the government's case against Tavares as well. *See U.S. v. Celestin*, 612 F.3d 14, 24 (1st Cir. 2010) (*Pinkerton* liability requires "another coconspirator [to have] committed the crime in furtherance of [the] conspiracy"). In particular, the government's evidence fails in a number of important ways: (1) the government presented no evidence that Tavares was not acting in good

---

[3] For example, at no point has the government even suggested that Tavares, herself, made any false statements of fact or misrepresentations. Tavares never signed the certifications; Tavares never made a claim that the hires were based solely on merit. Indeed, Mulligan did not even mention Tavares' name once during his testimony.

faith during the discharge of her duties as Second and First Deputy Commissioner; (2) the government presented no evidence that Tavares formed the *specific* intent to defraud; (3) the certifications made by O'Brien to Mulligan contained no misrepresentations; (4) the certifications made by O'Brien to Mulligan were not material; (5) the government failed to prove, beyond a reasonable doubt, that O'Brien did not believe the certifications were true; (6) the government presented no evidence that Tavares aided and abetted any of the *particular* hires charged.

As for Tavares' good faith and intent, ample evidence was presented, and numerous interviewer-witnesses testified, that any of the persons to whom Tavares gave names were considered to be Commissioner O'Brien's designee, or representative, on the interview panel in question.  Indeed the Hiring Policies and Procedures Manual, section 4.302(E) states that the local panel is to consist, in part, "of the Commissioner of Probation (Chair) or his/her designee."[4] Ex. 41.  Tavares acted entirely in good faith when she passed names, at the direction of O'Brien, along to interviewers on the panel because, even in the light most favorable to the government, it is implicit that she would have understood they were O'Brien's designees.  If O'Brien, the Commissioner of Probation who had exclusive appointing authority for the entire agency, wanted his designee to move along a particular candidate, there is no basis to assume that Tavares could not rely, in good faith, on that preference, *especially* where *no* evidence was

---

[4] The government simply cannot make the argument that Tavares was unaware of this provision or did not have it in mind when passing names.  It is a central thesis to the government's case that the defendants were aware of the requirements of the Manual and O'Brien knowingly and intentionally misrepresented his compliance with them.  No evidence was presented tending to show (or rebut) Tavares' knowledge of the Manuals' provisions.  Therefore, if the inference to be drawn that Tavares knew of the 'most qualified' provision, the inference that she also knew about section 4.302(E) must likewise be drawn.

presented that Tavares was ever aware of so-called sponsor lists or that legislators were backing the Commissioner's preferred candidate(s).

As for the certifications themselves, it is clear that O'Brien never made a false statement of *fact*. Almost every witness that testified about the hiring process stated that the determination of who was the "most qualified" candidate was entirely subjective. Some witnesses testified that they placed greater weight on whether a candidate would be a "good fit" in the particular court; other witnesses testified that they placed greater weight on how the candidates interviewed; and still other witnesses testified that they placed greater weight on their job and educational experience. For example, the ranking of individual candidates on the interviewers' scoring sheets could be wildly different. There is simply no principled way to determine who the "most qualified" candidate is, especially where the manual itself gives no guidance on how to weigh the various qualifications for any given candidate. Indeed, the manual itself does not even *require* a merit-only based system; it merely states that "the *objective* of the hiring process is to select the most qualified candidate" and "the practice and appearance of... favoritism in the hiring process are to be *avoided*." Ex. 41 at 1, 6 (emphases added). Moreover, the promulgating authority of the manual, *himself*, made non-merit based hires. For example, Elizabeth Cerda was hired to a high ranking position within his staff without a formal interview process, without a job being posted, and on the same day she applied. Mulligan also stated he hired one court officer because "he has a soft spot" for Vietnam war veterans. Simply put, to premise criminal liability on such an amorphous concept as a "merit-based system," especially where the promulgating authority of the manual (and the person to whom the alleged false statements were directed) does not strictly follow it for his own hires, stretches the use of the mail fraud statute well beyond its intended bounds.

Even assuming the certifications were false, they were immaterial to the decision-making body (Mulligan) to whom they were directed.  Substantial evidence was presented, both on direct and cross examination, that Mulligan was aware of problems (at least as Mulligan perceived them) in the hiring process within the Probation Department very early on in his tenure as CJAM, but he did nothing about them.  There was also testimony and other evidence that clearly illustrated that the certifications were virtually meaningless and perfunctory to Mulligan.  Mulligan testified that O'Brien had the authority to select from among *any* of the applicants that were sent up from the local round, and that it was not his authority to second-guess O'Brien's decision.  Finally, and perhaps most importantly, no evidence was presented suggesting Tavares' involvement in, or awareness of, the certification process (e.g. the sole point in time that any false statements are alleged to have been made).[5]  To the extent there were any false statements of fact, had Mulligan became aware of them, they presented no "natural tendency to influence, or [was] capable of influencing, the decision of the decision-making body to which it was addressed no."

Central to the defendants' argument throughout the trial was that O'Brien believed he had absolute authority to appoint whomever he wanted.  The yearly budget passed by the legislature (which was introduced by the government and discussed on direct examination *ad nauseum*) between 2001 and 2010 stated "notwithstanding the provisions of any general or special law, rule or regulation to the contrary, said commissioner, subject to appropriation, shall have exclusive

---

[5] Given how attenuated the evidence was with respect to Tavares' involvement with the certification process (and, for that matter, false statements generally), liability cannot and should not be premised on *Pinkerton*.  *See, e.g., United States v. Sanchez*, 917 F.2d 607, 612 n.4 (1st Cir. 1990) (citing *United States v. Sperling*, 506 F.2d 1323, 1341-42 (2d Cir. 1974)) (noting an agreement among other circuits that the Pinkerton charge should not be given in "marginal case[s]... particularly where the jury is being asked to make the converse inference; that is, to infer, on the basis of a series of disparate criminal acts, that a conspiracy existed").

authority to appoint... probation officers."  O'Brien's view of this language was made crystal clear from the numerous letters that were sent by him to Mulligan (which were introduced as exhibits by the government).  The government introduced no evidence tending to suggest that O'Brien did not, in fact, have this view.  Although O'Brien may have been incorrect about his interpretation, mail fraud cannot be premised upon "false statements honestly believed to be true and promises or predictions made in good faith."  *Mueffelman*, 470 F.3d at 36.  The government failed to rebut, beyond a reasonable doubt, this good faith defense.  *See Callipari*, 368 F.3d at 33.

   iii.      *Mail Fraud – Aider and Abettor Liability*

   The government has also charged Tavares with aider and abettor liability with respect to the mail fraud charges.  An aider and abettor is punishable as a principal if, first, someone else actually committed the offense and, second, the aider and abettor "became associated with the endeavor and took part in it, intending to ensure its success."  *United States v. Spinney*, 65 F.3d 231, 235 (1st Cir. 1995).  In other words, "a person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission."  *Rosemond v. U.S.*, --- U.S. ---, 134 S. Ct. 1240, 1245 (2014).  "The central requirement of the second element is a showing that the defendant consciously shared the principal's knowledge of the underlying criminal act, and intended to help the principal."  *U.S. v. Lyons*, 740 F.3d 702, 715 (1st Cir. 2014) (internal citations and quotation marks omitted).  "[T]he vital element to be proven is that the aider and abettor shared in the principal's essential criminal intent."  *U.S. v. Ayala-Vazquez*, 751 F.3d 1, 12 n. 10 (1st Cir. 2014) (internal quotations omitted).

Going through each of the charged mail fraud hires, it is clear that virtually no evidence was presented that Tavares took any affirmative steps with respect to the *particular* charged hires:

Patrick Lawton Hire:

The three members of the local interview panel were Michael LaFrance (CPO), Catherine Sabaitis (judge), and Francis Campbell[6] (OCP).  The original list of the top 8 candidates did not originally include Lawton, but was subsequently expanded to include Lawton after Campbell made a phone call to Francis Wall.  No one testified that they received Lawton's name from Tavares, including Francis Wall who conducted the final interview.  Instead, LaFrance stated he received Lawton's name from Campbell, but did not indicate from whom Campbell received the name.   LaFrance testified that he called Tavares to report what had happened the day *after* the interviewing took place, *after* the scoring was conducted, and *after* the list was expanded to include Lawton.  Nothing in that phone call established any role by Tavares, either directly or indirectly, in Lawton's ultimate hiring.  Indeed, from this single after-the-fact phone call between Tavares and LaFrance *no* evidence was presented regarding Tavares' involvement with Lawton's hire, in any respect.   Insufficient evidence was introduced to establish Tavares took *any* affirmative steps in furtherance of Lawton's hire, knew he would be hired, or shared the requisite intent with the principal. *See United States v. Morillo*, 158 F.3d 18, 22 (1st Cir.1998) ("[W]here an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, 'a reasonable jury must necessarily

---

[6] Frank Campbell did not testify because he is, unfortunately, deceased.

entertain a reasonable doubt.'" (quoting *United States v. Flores-Rivera*, 56 F.3d 319, 323 (1st Cir.1995)) (internal quotation marks omitted)).[7]

<u>Melissa Melia & Patricia Mosca Hires</u>:

The local round interview panel consisted of Francis Campbell (OCP), Thomas Morris (CPO), and Thomas Brownell (judge).  Morris testified that he received Melia's and Mosca's name before the interview from Campbell; he did not indicate from whom Campbell received those names.  Brownell testified that he did not receive anyone's name ahead of the interviews.  As for the final panel, Wall testified that he had no memory whatsoever of the Melia/Mosca set of interviews, and stated he could not recall from whom he received their names, if at all.  The only mention of Tavares with respect to these hires was from Brownell when he said that he "assumed" he received the initial interview schedule from Tavares.  Insufficient evidence was introduced to establish that Tavares took *any* affirmative steps in furtherance of Melia's and Mosca's hires, let alone that she shared the requisite intent with the principal.

<u>Kelly Manchester Hire</u>:

The local round interview panel consisted of Francis Campbell (OCP), James Casey (CPO), and Elizabeth LaStaiti (judge).  Casey testified that he received Manchester's name before the interview from Campbell; Casey did not indicate from whom Campbell received those names.  LaStaiti did not testify she got a name from Tavares (or anyone else for that matter).  As for the final panel, McDermott testified that he spoke to Tavares and explained to her that Manchester was "wholly insubstantial."  McDermott testified that Tavares just "dismissed" what

---

[7] Mulligan testified that he believed Lawton to be an excellent candidate and well qualified for the job.  In that way, this hire fails for another reason: O'Brien's certification that Lawton hired the most qualified candidate is literally true (at least as far as the decision-making authority to whom the certification was directed is concerned).

he had to say and said "don't worry about it"; he also testified that she did not tell him to pass the name along or threaten him in any way.  Notably, at this time, Christopher Bulger and Anthony Sicuso, and not Tavares, were McDermott's direct supervisors.   Tavares' statement that McDermott should not "worry about it" is insufficient to establish that she took an affirmative step in furtherance of Manchester's hire.  Even if it was, that evidence is insufficient to establish that she shared the requisite intent with the principal.

Lisa Martin Hire:

The government chose not to proceed on this hire and presented no evidence in connection therewith.  All RA's and substantive charges, whether it be mail fraud or otherwise, related to Lisa Martin's hire should be dismissed.


Michael White & Kevin O'Brien & Maria-Elena Sanchez & Antonio Mataragas Hires:

The local round interview panel consisted of Richard Antonelli (CPO), Brian Murphy (OCP), and Gail Garinger (judge).  Antonelli did not testify; Garinger did not state she had any discussions with Tavares.  Brian Murphy testified that while he "generally" received names of preferred candidates from either Ed Ryan or Tavares, he could not recall specifically from whom he received the names of the preferred candidates for this round.  He was asked *numerous* times on direct and cross examination whether he received the names from Ryan or Tavares, but could not recall.  As for the final round, Wall stated that while he received their names ahead of the panel, he did not affirmatively state from whom he received them.  No reasonable jury could find that Tavares took an affirmative step in furtherance of these hires; a 50/50 shot that it was Tavares (as opposed to Ryan) who passed the name along to Murphy is simply insufficient.  *See Morillo*, 158 F.3d at 22.

Edmund Nadeau Hire:

The local round interview panel consisted of Joe Dooley (CPO), Mark McHale (OCP), and Kevan Cunningham (judge). Dooley and McHale did not testify. Cunningham only testified about the hiring related to Dooley, not Nadeau. Absolutely no evidence was presented regarding Tavares' involvement with this hire.

Antonio Mataragas (Peabody District Court) Hire:

The government chose not to proceed on this hire and presented no evidence in connection therewith. All RA's and substantive charges, whether it be mail fraud or otherwise, related to Antonio Mataragas' hire in Peabody District Court hire should therefore be dismissed.

John Chisholm Hire:

The local round interview panel consisted of Marguerite Riley (CPO), Richard O'Neil (OCP), and Merrill Chouteau (judge). Riley testified that he was given Chisholm's name by O'Neil; O'Neil testified he received Chisholm's name from Tavares. As for the final round, Wall did not testify he received Chisholm's name from Tavares. This charge should also be dismissed. Although this is an instance (one of the very few) wherein a witness could recall that he received a particular candidate's name from Tavares, this, in and of itself, is not sufficient to establish an affirmative step. Even if it does, the evidence is insufficient to establish Tavares took *any* affirmative steps in furtherance of Chisholm's hire, or knew he would ultimately be the one hired, or shared the requisite intent with the principal.

Brian Mirasolo Hire:

The local round interview panel for Mirasolo in 2005 consisted of Sandy Stillwell (CPO), Nilda Rios (OCP), and Francis Campbell (OCP).  None of these panelists testified in this case. As for the final round, Wall testified he received Mirasolo's name directly from O'Brien. Insufficient evidence was introduced to establish that Tavares took *any* affirmative steps in furtherance of Mirasolo's hire, let alone that she shared the requisite intent with the principal.

Douglas MacLean Hire:

The local round interview panel consisted of LaStaiti, Casey, and O'Neil.  O'Neil did not state he received MacLean's name from Tavares, but did state he got the name ahead of the interviews; O'Neil, in turn, passed MacLean's name onto Casey and LaStaiti.  As for the final round, Wall testified that he received MacLean's name from O'Brien.  Insufficient evidence was introduced to establish that Tavares took *any* affirmative steps in furtherance of MacLean's hire, let alone that she shared the requisite intent with the principal.

Christopher Hoffman Hire:

No witness testified that they received Hoffman's name before an interview from Tavares.[8]  In Hoffman's final round, Wall stated he received Hoffman's name from Burke, not Tavares.  Insufficient evidence was introduced to establish that Tavares took *any* affirmative steps in furtherance of Hoffman's hire, let alone that she shared the requisite intent with the principal.

Amy Parente Promotion:

---

[8] Based on the evidence presented, the jury would not be able to discern who, exactly, was on the local round interview panel for Hoffman.  Exhibit 16.2 indicates that interview instruction letters were sent to Paul Kingston (CPO), DeAngelis, and Francine Ryan, however the signatures on the ranking sheet for the local round (Exhibit 16.4) reflects a different panel.  There was no testimony regarding who, precisely, sat on this panel.

The local round interview panel consisted of Stephen Alpers (CPO), Robert Calagione (judge), and Francine Ryan.  Neither Francine Ryan nor Judge Calagione testified.  Alpers testified that he spoke to Burke prior to the interview regarding Parente; no mention of Tavares was made.  In the final round, Wall did not testify about Parente's hire.  Insufficient evidence was introduced to establish that Tavares took *any* affirmative steps in furtherance of Parente's promotion, let alone that she shared the requisite intent with the principal.

Frank Glenowicz Promotion:

The local round interview panel consisted of Burke (OCP), Frank Siano (CPO), and Berta Josephson (judge).  Siano testified that he received Glenowicz's name ahead of the interviews from Burke.  As for the final round, Wall testified that he had a conversation with Burke prior to Glenowicz's interview during which Burke advised Wall that Glenowicz was a preferred candidate.  No evidence was introduced whatsoever indicating Tavares' involvement with this hire.  Insufficient evidence was introduced to establish Tavares took *any* affirmative steps in furtherance of Glenowicz's promotion, she knew he would be the one ultimately hired, or that she shared the requisite intent with the principal.

Joseph Dooley (FACPO) Promotion:

Aside from a passing comment by Slaney that she was called by Tavares and was informed Burke would be taking over for Slaney on the local round interview panel, no evidence was introduced indicating Tavares' involvement with this hire.  No evidence was introduced that Tavares decided that Burke would be the one to do the interviews or that Dooley was to be a preferred candidate.  Informing Slaney she would not be performing the interview of Dooley, in and of itself, cannot constitute an "affirmative step" in furtherance of the hire and it should be

dismissed.   Moreover, Wall testified that O'Brien instructed him to select Dooley in the final round.

Joseph Dooley (CPO) Promotion:

The local round interview panel for this promotion consisted of Brian Murphy, Mark McHale, Kevan Cunningham, and Paul Dawley (judge).   Murphy testified that he could not recall who he received a name from in advance of the interview, but that he did receive one. McHale and Dawley did not testify.   Cunningham never mentioned Tavares.   Insufficient evidence was introduced to establish that Tavares took *any* affirmative steps in furtherance of Dooley's promotion to CPO, let alone that she shared the requisite intent with the principal.

Bernard Dow Promotion:

The local round interview panel consisted of William Mattei (CPO), Burke (OCP), and Paul LoConto (judge).   LoConto is the only person from this round to testify and he had absolutely no memory of what transpired.   Tavares was not mentioned at any point during LoConto's testimony.   No witness testified about the final round interview in connection with this promotion.   Insufficient evidence was introduced to establish that Tavares took *any* affirmative steps in furtherance of Dow's promotion, let alone that she shared the requisite intent with the principal.

Elzy Tubbs Promotion:

Evidence regarding this hire revealed that two separate sets of interviews at the local level were conducted.   Edward Dalton was on the initial panel and he testified that he received Tubbs' name from Tavares in advance of the panel.   Tubbs did not arrive until all of the interviews had been conducted.   When he did arrive, Judge Joseph Reardon refused to interview

him.  A phone conversation between Tavares and Dalton occurred and it was eventually decided to redo the interviews altogether, out of fairness to Tubbs.  Dalton was replaced with Paul Lucci on a new interviewing panel and Judge Reardon was replaced with Judge Rosemary Minehan. Lucci testified that he did *not* receive any names of preferred candidates in advance of the re-interview process.  No witness gave testimony regarding the final round interview for Tubbs. Although Tavares gave Dalton Tubbs' name ahead of the interview, and subsequently told Dalton he would no longer be on the panel, Tavares performed no affirmative steps in furtherance of this hire because, ultimately, the local round interview panel was not passed any names according to Lucci and the credible evidence Tubbs made it through on his own merit, expressed in light of testimony regarding minority preference(s).

Kathleen Petrolati Hire:

Tavares' name is not even mentioned in connection with this hire.  Wall not only sat on the interview panel but admitted to passing Petrolati's name to Lucci, the Commissioner's representative on the panel; what is more, Lucci also testified he received Petrolati's name from Wall.  There was no final round interview and no inference or suggestion whatsoever that Tavares was involved.

iv.     *Mail Fraud – Pinkerton Liability*

To establish liability under *Pinkerton*, the government must to prove (1) that a conspiracy existed, (2) that a substantive crime was committed by a co-conspirator in furtherance of that agreement, and (3) that the substantive crime was a reasonably foreseeable consequence of the agreement between the conspirators.  *See United States v. Vázquez-Botet*, 532 F.3d 37, 62 (1st Cir. 2008).  For the reasons argued above (*see infra*, Part A), the government has failed to prove

that a conspiracy existed and that Tavares joined that conspiracy.  The government has also failed to prove elements (2) and (3).  For example, it is not entirely clear how the trading of jobs would be foreseeable if the purpose of the conspiracy is merely to curry favor with the legislature in exchange for favorable budgetary consideration.  Moreover, and most importantly, the government failed to prove when, exactly, she joined the conspiracy.  *See United States v. O'Campo*, 973 F.2d 1015, 1021 (1st Cir. 1992) ("An individual cannot in any sensible use of the words be held reasonably to have "foreseen" actions which occurred prior to his entrance in the conspiracy and thus are historical in nature.").  No evidence was introduced indicating when she first made this alleged agreement, when she took her first act in furtherance of it, or when she even became aware of its existence.  It is, therefore, impossible to discern, based upon the evidence introduced at trial, which crimes she could, in theory, be responsible for under *Pinkerton*.

> v.  *Bribery and Gratuity Charges*

This Honorable Court instructed the jury the testimony of William Marchant, Toby Morelli, William Kennedy, Garret Bradley, Michael Moran, Charles Murphy, and part of Edward Ryan's testimony regarding a conversation with Leonard Mirasolo, was limited only as to O'Brien.[9]  Those witnesses' testimony related specifically and primarily to the bribery/gratuity charges.  None of the other witnesses that have testified about the alleged bribery/gratuity scheme(s) (i.e., Ed Ryan, Francis Wall, Janet Mucci, Francine Gannon, and all of the legislators that have testified) suggested Tavares was even aware of O'Brien's interactions and dealings with the legislature; indeed there is no evidence at all suggesting Tavares had any contact or connections with any legislators.  No witness has testified that Tavares was present at any

---

[9] This Court has also prevented counsel for Burke and Tavares to cross-examine these witnesses.

meeting between O'Brien and a legislator (or their aid).  No witness has testified that she was even aware of the so-called sponsor-lists maintained by Janet Mucci.    Moreover, it is unchallenged that the ELMO hires were not interviewed (except for Petrolati about whom there is no evidence regarding Tavares).  As a result, even were the jury to conclude that testimony about Tavares passing names in general is sufficient (which Tavares contends it is not) the evidence at trial is contrary to any claim, inference or suggestion that names were passed (by Tavares or otherwise) in connection with the ELMO hires.  There is insufficient evidence to establish that Tavares formed the requisite *specific* intent (let alone a more general knowledge) required for the various charges, or that she took any affirmative steps in furtherance thereof. This Honorable Court should therefore enter a judgment of acquittal in favor of Tavares on any and all substantive charges and RA's against Tavares related to the giving of a bribe or gratuity, be it under state or federal law, as charged in the indictment.[10]

## <u>CONCLUSION</u>

For the reasons set forth above, and in the interests of justice, Tavares respectfully requests that this Honorable Court enter a judgment of acquittal on all charges.

---

[10] To the extent the government attempts to premise criminal liability on 18 U.S.C. § 2(a) for these charges, the arguments described above regarding particular hires applies with equal force.

Dated: July 13, 2014

Respectfully submitted,

ELIZABETH TAVARES
By and through her attorneys,

/s/ R. Bradford Bailey
R. Bradford Bailey, BBO#549749
Jeffrey A. Denner, BBO#120520
Adamo L. Lanza, BBO#689190
Four Longfellow Place, 35th Floor
Boston, Massachusetts 02114
Tel.    617.227.2800
Fax.    617.973.1562
bbailey@dennerlaw.com
jdenner@dennerlaw.com
alanza@dennerlaw.com

<u>CERTIFICATE OF SERVICE</u>

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing [NEF] and paper copies will be sent to those indicated as non-registered participants.

/s/ Adamo Lanza