IN  THE  UNITED  STATES  DISTRICT  COURT
FOR  THE  DISTRICT  OF  MASSACHUSETTS

UNITED STATES OF AMERICA

v.

JOHN J. O'BRIEN, ET AL.

No. 12-CR-40026-WGY

**MEMORANDUM  IN  SUPPORT  OF  MOTION  FOR  JUDGMENT  OF  ACQUITTAL
AND/OR  FOR  MISTRIAL**

The defendant, John O'Brien, respectfully submits this Memorandum in support of his

motion for entry of a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a)

as well as the Fifth and Sixth Amendments to the Constitution.  On July 11, 2014, after nearly 40

trial days, the government and the defense rested.  O'Brien made this motion after the

government rested and renewed it when all of the evidence closed.  The Court deferred argument

and ruling to Monday, July 14, 2014.  O'Brien also moved for mistrial at various times in

connection with the Court's evidentiary rulings and has renewed those motions as well.

The government failed to prove each and every element of the charged offenses.  The

evidence, taken in the light most favorable to the government, is insufficient to permit a rational

jury to find O'Brien guilty of any of the charges beyond a reasonable doubt.  Certain specific

legal and factual deficiencies, without limitation, are highlighted in this memorandum.

**I.      ISSUES  REGARDING  THE  CHARGED  RICO  CONSPIRACY  AND
BRIBERY/GRATUITY  RACKETEERING  ACTS.**

This Court's apparent preliminary conclusion that the evidence could support a

conspiracy among O'Brien and others (presumably including DeLeo and Mirasolo) to provide

ELMO jobs in 2007 and 2008 in exchange/reward for supporting DeLeo in his 2009 Speakership

race is a prejudicial variance from the charges in the indictment returned by the grand jury.

Proceeding to the jury on that theory would violate O'Brien's Fifth and Sixth Amendment rights.

Further, the government has not elicited sufficient evidence to reach the jury on the specific bribery/gratuity racketeering acts that are charged, under *Sun-Diamond* and its progeny.

Count 1 charges the defendants with participating in a racketeering conspiracy in violation of 18 U.S.C. §1962(d).  Count 2 charges O'Brien and Tavares with substantive racketeering in violation of 18 U.S.C. §1962(c).  These counts include two distinct types of conduct: 1) actions related to specified permanent hires at Probation; and 2) conduct related to specified temporary hires into Probation's electronic monitoring program (ELMO) in 2007 and 2008.  The indictment alleges that both types of hiring decisions are part of a unitary racketeering conspiracy, whose goal was "to curry favor with members of the Massachusetts legislature and others who were in a position to impact the enterprise[1] through legislation, budget authorizations, and in other ways."  Dkt. #139 at 7.  Prior to trial, the defendants filed a motion to sever counts and racketeering acts, arguing that the charges related to ELMO and the charges related to permanent hiring were separate alleged schemes and should be tried separately.  Dkt. #311.  The defendants argued that joinder was inappropriate and would prejudice the defendants.  *Id.*  This Court granted the motion in part; it severed the charges that solely alleged bribery and conspiracy to commit bribery into a second trial.  Dkt. #319.  However, the Court's severance order left substantive racketeering and racketeering conspiracy in the first trial.  These counts included alleged bribery/gratuity racketeering acts related to the ELMO hires and the permanent hires.

Toward the end of the trial, the Court, began to separate the ELMO-related charges from the permanent-hiring-related charges.  At the same time, the Court repeatedly indicated that it had rejected the bribery- and gratuity-based racketeering acts related to permanent hiring, with

---

[1] The indictment defines the "enterprise" as the Office of the Commissioner of Probation.  Dkt. #139.

the possible exception of gratuity in the hire of Kathleen Petrolati.  The Court also stated that there was not enough evidence to show that Tavares or Burke could be culpable for any bribery or gratuity offenses.  In the final week of trial, the Court began to instruct the jury that witnesses who testified about ELMO hiring, and about Probation's budget or legislation generally, should only be considered as to O'Brien.  These decisions are also reflected in the Court's draft verdict form.  This form permits the jury to consider the bribery/gratuity racketeering acts (the ELMO hires and the hiring of Petrolati) only against O'Brien.  This mid-trial division[2] of the charges requires a mistrial or, at the very least, dismissal of the conspiracy count and the racketeering acts related to bribery and gratuity.

> **A.**     **The Court's Conception of Bribery-Related Charges (in connection with the election of Speaker DeLeo) as Separate from the Charged Conspiracy is a Prejudicial Variance.**

The government has always maintained that counts 1 and 2 encompass a single, unitary conspiracy and racketeering endeavor.  The indictment charges the permanent hiring actions and the ELMO hiring actions as schemes that the defendants devised to "maintain their positions within the enterprise, to increase the budget and resources of the enterprise, and to aggrandize power to themselves" by means of hiring and promoting individuals recommended by legislators.  Dkt. #139 at 7.  Likewise, as to specific racketeering acts of bribery/gratuity, the indictment charges that jobs were given as bribes "to favorably influence the decisions of those

---

[2]  The mid-trial introduction of a theory of conspiracy that the government never alleged or argued, prejudiced O'Brien.  There are arguments and testimony that O'Brien would have elicited but for the fact that he understood the allegations to be that ELMO jobs were distributed to curry favor with the legislature on behalf of Probation, not that they were distributed to help DeLeo win the Speakership race.  For example, O'Brien would have elicited testimony from Gannon that she received a call from Ryan asking her if she knew anyone who would be interested in the ELMO jobs.  As an aide to Senate President Murray, Gannon had no influence in the Speaker's race, and her testimony would have strongly rebutted the allegation that these positions were offered because of the Speaker's race.

legislators regarding legislative matters affecting the Probation Department," dkt #139 at 20, and as gratuities "for or because of . . . decisions regarding legislative matters affecting the Probation Department." Dkt #139 at 22. When the defendants moved to sever the ELMO hires from the permanent hires, the government filed an opposition and argued that joinder was proper because there was only one scheme at issue: "[T]he ELMO RAs and counts are properly joined in the Indictment because they constitute predicate acts committed in furtherance of the RICO enterprise and conspiracy charged in Counts One and Two. Likewise, the three defendants are properly joined as participants in the same RICO enterprise and conspiracy." Dkt. #314 at 8.

This Court's recent rulings and statements indicate that this Court believes that there were two separate conspiracies — the broad racketeering conspiracy alleged in the indictment and a separate conspiracy, involving only O'Brien among the defendants, related to the bribery/gratuity charges associated with the ELMO hires. The Court's rulings also suggest that it believes specific alleged bribes/gratuities had a different object than the one set forth in the indictment, and therefore cannot be used as a basis to find Tavares and Burke guilty of the racketeering conspiracy charged in count one.

The defendants understand that, in light of the evidence, the Court conceives there to be sufficient evidence of an alleged conspiracy to give representatives the opportunity to recommend people for ELMO jobs in exchange for (or as a reward for) their votes for DeLeo for Speaker. This conspiracy would have ended when DeLeo was elected.[3] The government has never charged such a conspiracy. Indeed, even in the bribery conspiracy that was severed from this trial (count 13), the government described a conspiracy "to give jobs and salaries to

---

[3] At a recent sidebar, this Court stated that it believed that any conspiracy related to ELMO ended when DeLeo was elected Speaker. This comment is indicative of the extent to which this Court views the ELMO charges as distinct from the permanent hiring charges.

candidates for employment sponsored by a member of the Massachusetts legislature in order to influence those members of the legislature and others who were in a position to affect the defendants through legislation, budget authorizations, and in other ways."  Dkt. #139 at 33.

Nor has the government charged a bribery/gratuity crime (racketeering act) where the DeLeo Speakership is alleged to be the object of the bribe/gratuity.  The government has always characterized its references to DeLeo in the indictment as an explanation of why, in the government's view, the opportunity to recommend a candidate was a "thing of value" to DeLeo; that is, as *proof of an element* of the charged bribery/gratuity racketeering acts and RICO conspiracy, *not as a separate conspiracy or bribery/gratuity crimes*.  While the government perhaps could have charged a "Speakership conspiracy" — alleging that O'Brien conspired with Mirasolo and DeLeo to give jobs to representatives in exchange for (or as reward for) their support to DeLeo – but it did not do so.  The Court's conception of the case as encompassing two separate conspiracies, including one to influence legislators in their decision of whom to vote for as Speaker, is a prejudicial variance that substantially complicates the question of what is being sent to the jury.  *Cf. United States v. Pacheco*, 434 F.3d 106 (1st Cir. 2006).

The following table helps to illustrate the variance:

| Conspiracy description, scope, and timeframe | Conspirators | Thing of value given (the "quid") | Recipients of bribe/gratuity | Object of bribe/gratuity (the "quo") |
|---|---|---|---|---|
| Indicted RICO Conspiracy, including bribery/gratuity racketeering acts, *and* mail fraud racketeering acts (2000-2010) | O'Brien, Tavares, and Burke, plus unindicted co-conspirators, including, allegedly (now, belatedly), DeLeo and Mirasolo[4] | Opportunity to recommend for both permanent Probation jobs and temporary ELMO jobs | Members of House *and* Senate | Favorable action on Probation budget and legislation affecting Probation |
| Uncharged "Speakership Conspiracy" (2007-2009) | O'Brien (but NOT Tavares or Burke), plus other unindicted co-conspirators, including DeLeo and Mirasolo | Opportunity to recommend for temporary ELMO jobs, only. | Specified members of House, only | Support to DeLeo in Speakership race |

"A variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proves different facts than those alleged in the indictment." *United States v. Dellosantos*, 649 F.3d 109, 116 (1st Cir. 2011) (internal quotation marks omitted). In the case of a conspiracy charge, a variance occurs when the government charged a single conspiracy, but the evidence at trial proved multiple conspiracies. *Id.* The First Circuit has explained the applicable

> In determining whether a prejudicial variance exists in the instant case, we first discuss the legal principles that govern whether criminal activity constitutes multiple conspiracies, as opposed to a single conspiracy. Next, we address whether the evidence in the case at hand supported a finding of a single overarching conspiracy, encompassing both Defendants and all the relevant nefarious conduct, to distribute both cocaine and marijuana. After concluding that the evidence did not support such a conclusion, but rather that the evidence established at least two distinct conspiracies, we analyze whether the evidence was sufficient for a jury to have found the Defendants guilty of joining either of

---

[4] Originally, the government took the position that DeLeo and Mirasolo were unindicted co-conspirators *only* as to the now-severed Count 13 bribery allegations. When this Court asked them for a list of unindicted co-conspirators related to this trial, the government did not provide their names. Now, however, the government apparently takes the position that they were also unindicted members of the charged RICO conspiracy. As discussed below, they cannot be members of the charged RICO conspiracy as they were not employed by or associated with the charged enterprise, which is, in the broadest possible conception of the case, the Office of the Commissioner of Probation.

the two conspiracies that were actually proven by the government and, if so, we then determine whether the variance (between the conspiracy charged and the conspiracy for which there was sufficient evidence that the Defendants actually joined) unfairly prejudiced the Defendants.

*Id.* at 117.

The First Circuit explained that: "In determining whether the evidence supports the existence of a single conspiracy, we ultimately look at the totality of the evidence. There are three factors this court has found particularly helpful in evaluating the evidence: (1) the existence of a common goal, (2) interdependence among participants, and (3) overlap among the participants. *Id.* (internal quotation marks and citations omitted). A common goal can be as general as "selling cocaine for profit or furthering the distribution of cocaine." *Id.* (internal quotation marks omitted). Interdependence "concerns whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme. More specifically, [e]ach individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key." *Id.* (internal quotation marks and citations omitted). "The pervasive involvement of a single core conspirator, or hub character" can satisfy the third factor. *Id.* (internal quotation marks omitted).

As stated above, the government has always maintained that this case involves a single, unitary conspiracy, and that the permanent hires and the ELMO hires were two different ways by which the defendants intended to obtain favorable treatment for Probation from the legislature. The government's opening statement made this clear. The government did not mention the Speakership race in its opening; it argued that O'Brien committed the alleged bribery with the intent of currying favor with the legislature in order to obtain favorable budget treatment for Probation. This Court's conception that the evidence could support a conspiracy involving O'Brien (but not Tavares and Burke) to influence legislators in their votes for Speaker, is a

7

prejudicial variance from the indictment and the government's theory.  The sole connection between the two possible conspiracies is that O'Brien, among the defendants, allegedly participated in both.  However, the participants in the two conspiracies are otherwise different, and O'Brien is not a "hub character" in any conspiracy to influence the Speaker's election.  The two conspiracies do not have the same goal (gaining the goodwill of the legislature on behalf of Probation versus influencing votes for Speaker of the House), and they are not interdependent.

Further complicating these issues is the fact that a single *RICO* conspiracy is charged. Given the structure of the charges, should the jurors return conviction(s) on racketeering conspiracy, there is no way to know which conspiracy the jurors found to have existed, or if they were unanimous in their analysis.  Further, if only two of the defendants were acquitted, there would be no way to determine with whom or for what purposes the remaining defendant conspired.  Because the government has charged this as a *racketeering* conspiracy, a single defendant can only be convicted if the jury finds that this defendant conspired with someone else who also was a member of the enterprise.  *See United States v. Shifman*, 124 F.3d 31, 35 (1st Cir. 1997).  The broadest possible definition of the charged "enterprise" is the Office of the Commissioner of Probation, so finding a conspiracy with a non-Probation employee like Mirasolo or DeLeo does not satisfy the elements of a *RICO* conspiracy.  The government charged a single conspiracy, this Court declined the defendants' request to sever the conspiracy on precisely these grounds, and the Court cannot now divide the charges.

Put simply, because the Court has concluded that the evidence would only support ELMO-related bribery/gratuity crimes or conspiracy with the DeLeo Speakership as the object, and because no such crimes or conspiracy were charged in the indictment, the Court should enter a judgment of acquittal as to all of the bribery/gratuity racketeering acts charged in the

8

indictment.  Similarly, this alleged conduct, purportedly aimed at securing the Speakership,

cannot support a conviction for the charged racketeering conspiracy, purportedly aimed at

securing legislative benefits for Probation.  *See United States v. Pappathanasi*, 383 F.Supp.2d

289, 291, 295-97 (D. Mass. 2005) ("The mere collateral effects of jointly agreed-to activity, even

if generally foreseeable, are not necessarily an object of the conspiracy"; "[A] conspiracy

between Pappathanasi and Foundas is not the conspiracy alleged in the Superseding Indictment.

Allowing Pappathanasi to be convicted of this narrower conspiracy would violate his substantial

rights and would, therefore, be impermissible.").  Given the amount and prejudicial nature of

testimony that was admitted on these issues, the only way to ensure that the jury does not convict

on an improper basis is to enter a judgment of acquittal as to count 1.

II. **ALL BRIBERY- AND GRATUITY- BASED CHARGES MUST BE DISMISSED BECAUSE THE GOVERNMENT FAILED TO PROVE A SUFFICIENTLY PARTICULAR CONNECTION BETWEEN A CHARGED H IRE AND ANY LEGISLATIVE ACT BENEFITTING PROBATION.**

A. **Insufficiency as to Bribery and Gratuity Charges in General.**

Count 2 details 40 instances in which the defendants allegedly violated the state bribery

and gratuity statutes — M.G.L. c. 268A, § 2(a)(1) and M.G.L. c.268A, § 3(a).  These 40 hires (22

permanent hires and 18 ELMO) are charged as racketeering acts.  Racketeering acts 23(a)

through 44(a) and 23(b) through 44(b) allege that the defendants violated M.G.L. c. 268A, §

2(a)(1) and M.G.L. c. 268A, § 3(a), respectively, in connection with the Probation hires.

Racketeering acts 45(a) through 62(a) and 45(b) through 62(b) allege that the defendants violated

M.G.L. c. 268A, § 2(a)(1) and M.G.L. c. 268A, § 3(a), respectively, in connection with the

ELMO hires.  Count 1 alleges that the racketeering conspiracy included all of this conduct as

well as the alleged mail fraud.  The government did not present sufficient evidence for any of the

bribery/gratuity racketeering acts to go to the jury, and this Court should enter a judgment of acquittal as to these acts.  Critically, the government did not present sufficient evidence of a link between the alleged bribe or gratuity and a specific official act.

"Chapter 268A is a comprehensive measure designed to prevent the improper use of influence on public officials."  *Scaccia v. State Ethics Commission*, 431 Mass. 351, 355-56 (2000).  Chapter 268A § 2(a)(1) prohibits bribery, and c.268A § 3(a) prohibits gratuities.  To satisfy the bribery statute, the government must prove that the defendant corruptly gave, offered, or promised anything of value to a public official with the intent to influence an official act. M.G.L. c.268A § 2(a)(1).  The gratuity statute requires the government to prove that "something of 'substantial value' [was] given, offered, or promised to a public official 'for or because of any official act performed or to be performed' by such public official."  *Scaccia*, 431 Mass. at 354. The government must prove "a link between a gratuity and an official act."  *Id.* at 355 (citing *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 414 (1999)).  "A gratuity violation is, essentially, a lesser included offense of bribery."  *Id.* at 356.  The SJC has explained the conceptual difference between bribery and gratuities:

> Bribery also typically involves a quid-pro-quo, in which the giver corruptly intends to influence an official act through a "gift," and that "gift" motivates an official to perform an official act. In effect, what is contemplated is an exchange, involving a two-way nexus. A gratuity in violation of the statute, in contrast, can either be provided to an official as a reward for past action, to influence an official regarding a present action, or to induce an official to undertake a future action.  Only a one-way nexus need be established for a gratuity violation.

*Id.* (internal citation omitted); *see also Sun-Diamond*, 526 U.S. at 404 (explaining same distinction between federal bribery and gratuity statutes).

The SJC's interpretation of these statutes follows the Supreme Court's approach to the similar federal statutes.  *See Scaccia*, 431 Mass. at 354-55.  Both courts have held that bribery

and gratuity convictions must be supported by a link between the thing given and a specific official act. A bribery conviction requires proof that there was a *quid pro quo*; that thing of value was given in exchange for the performance of a specific official act. *See id.* at 356; *Sun-Diamond*, 526 U.S. at 404-05 ("[F]or bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act."). In *Sun-Diamond*, the Supreme Court reversed the trial court's determination that the gratuity statute, "unlike the bribery statute, did not require any connection between respondent's intent and a specific official act." *Sun-Diamond*, 526 U.S. at 406. *Sun-Diamond* held that a gratuities conviction requires proof that the alleged gift was connected to a specific official act and not given just because of the public official's position or "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." *Id.* The SJC followed suit, holding that to establish a gratuities violation, "there must be proof of a linkage to a particular official act, not merely the fact that the official was in a position to take some undefined or generalized action, such as holding a hearing on proposed legislation that, if passed, could benefit the giver of the gratuity." *Scaccia*, 431 Mass. at 356.

The government elicited some testimony that Probation hired certain candidates in order to curry favor with the legislature and to ensure favorable budget treatment. This testimony does not suffice to prove a *quid pro quo* or the required linkage between the thing of value and the official act (whether performed or hoped-for). At the most, these statements suggest that the defendants took the alleged actions "by reason of the recipient's mere tenure in office" or "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." *Sun-Diamond*, 526 U.S. at 408. As *Sun-Diamond* and *Scaccia* held, the statutes require proof that the defendants sought to influence or reward a

specific legislative act by giving a particular thing of value.  No testimony linked any particular

job to a specific legislative act.[5]

### B.  Insufficiency as to the Alleged Kathleen Petrolati Bribery/Gratuity.

This Court cited the permanent hire of Petrolati in November, 2000 as an instance in

which the government may have elicited sufficient evidence of a *quid pro quo* to get to the jury

on an alleged violation of the state gratuity statute.  On closer scrutiny, however, there is not

sufficient evidence of linkage.  The government elicited testimony from James Kennedy that a

book of proposed budget amendments, containing more than 1,000 entries, indicated that

Representative Petrolati *proposed* an amendment to the FY 2001 budget that would have funded

certain Probation positions.  (Exhibit 93.1)  Testimony and documents also were offered to show

that Representative Petrolati's wife was hired by Probation to work in the electronic monitoring

program more than six months after the House's budget process.  The government offered no

evidence that the amendment proposed by Petrolati ever passed.  Further, there was no evidence

as to why Representative Petrolati sponsored this amendment, no evidence that O'Brien knew

that Representative Petrolati sponsored this amendment, no evidence that O'Brien sought this

amendment, and no evidence that anyone at Probation knew who Kathleen Petrolati's husband

was at the time that she was hired.  Moreover, in the same set of proposed amendments,

Representative Petrolati also sponsored amendments appropriating money to various courts in

---

[5] The government's reliance on cases suggesting a "stream of benefits" theory of bribery is misplaced.  These cases arise in the context of honest-services mail fraud charges in the wake of *Skilling*, not stand-alone bribery charges.  Moreover, there is no authority to suggest that the Massachusetts courts would apply that reasoning to the construction of the state bribery and gratuity statutes.  Indeed, the indictment here is already beyond the outer edge of any bribery or gratuity charge ever treated in a Massachusetts state case.  To find, as alleged here, that a bribery or gratuity charge can be based on an "exchange" of acts within the scope of authority of government officials would, quite literally, criminalize politics.  Ordinary political horse-trading — "I will vote for the appropriation on your pet project if you vote for the appropriation on my pet project" — would become criminal.

Western Massachusetts.  On the available evidence, then, if there was any bribe or gratuity to Petrolati it appears equally likely to have been provided by CJAM Dortch-Okara, who approved Ms. Petrolati's appointment. There is not sufficient evidence of a connection between the proposed amendment and the hiring decision to send this alleged racketeering act to the jury.

### C.  Insufficiency as to the ELMO Hires Generally.

The government did not present sufficient evidence to send the ELMO-based racketeering acts to the jury.  As discussed above, the government has never charged or argued that O'Brien gave ELMO jobs to DeLeo so that those jobs could be given to other legislators in exchange for their votes for DeLeo for Speaker.  Permitting the case to go to the jury on such a theory would be a prejudicial variance.  The government has used the Speaker's race solely as an explanation for why the jobs were a thing of value when O'Brien allegedly gave them to DeLeo. Instead, the government has argued that O'Brien allegedly gave jobs to DeLeo because he wanted to curry favor with DeLeo in order to obtain favorable treatment on the budget and other legislation.  There was no testimony regarding specific legislative acts that O'Brien sought, obtained, or rewarded in exchange for any particular hires.

### D.  Insufficiency as to John Langone ELMO Hire

One of the charged ELMO hires that preliminarily appears to "survive" on the Court's draft verdict slip is John Langone.  However, the only testimony concerning Langone was that Ed Ryan mentioned his name as somebody who had been hired in the ELMO program.  Unlike other putatively "surviving" ELMO hires, the government elicited no testimony that Langone was hired at the recommendation of a legislator.  Nor is there any basis for the jury to find that the hiring of Langone was a bribe/gratuity connected to the Speakership race or any legislative act benefitting Probation.  Therefore, the Langone hire should not go to the jury.

### III.   *PETROZZIELLO* ISSUES REQUIRE A MISTRIAL.

Throughout the trial, the government elicited a large amount of hearsay from a variety of witnesses.  Much of this hearsay was conditionally admitted as co-conspirator hearsay under Rule 801(d)(2)(E).  Under *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1997), a "district court[ ] should only admit out of court declarations of co-conspirators under Fed. R. Evid. 801(d)(2)(E) if 'it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy.'"  *United States v. Ciampaglia*, 628 F.2d 632, 637 (1st Cir. 1980) (quoting *Petrozziello*, 548 F.2d at 23).  In making this decision, the court does not make inferences in favor of the government; it must "weigh the evidence and assess its credibility."  *Earle v. Benoit*, 850 F.2d 836, 842 (1st Cir. 1988).  Because the government has not sufficiently proven a conspiracy, none of these statements should have been admitted.  Substantial hearsay was admitted, and because no limiting instruction could cure its admission, a judgment of acquittal should be entered.  *See Pappathanasi*, 383 F.Supp.2d at 299-300.

Although O'Brien urges this court to find that none of the proffered co-conspirator hearsay was properly admitted, he focuses his argument on the admission of out-of-court statements by two particular individuals: Janet Mucci and Leonard Mirasolo.[6]

Over repeated objections by the defendants, the Court admitted a taped recording of voicemails left by Janet Mucci purportedly informing Ed Dalton about names of people who needed to make it to the next round of interviews.  These messages were left at a time that the Commissioner did not have the authority to appoint probation officers, and the recordings did not

---

[6]  This Court also admitted the out-of-court statements of DeLeo.  This Court stated that these statements were not admitted as co-conspirator hearsay but rather as statements of then-present intention.  O'Brien argues that these statements were not properly admitted under any exception, and could not have been properly admitted as co-conspirator hearsay.

relate to charged hires.  When the Court permitted these tapes to be played, it stated that the

result of their introduction could be a mistrial if the government did not prove that Mucci was a

co-conspirator.  The government did not so prove.  Mucci testified that her role in Probation

hiring was that of a "paper pusher."  She had no memory of making the recorded call, and she did

not make such calls regularly. She had no responsibility for choosing the successful candidates;

she did not interview people; she did not receive calls form or otherwise communicate with

legislators; she had no knowledge of what legislators or others said to O'Brien about candidates;

and she had no supervisory authority over the people who conducted interviews.  In short, she

had absolutely no substantive role in hiring and no input into the appointment decisions.  Nor is

there any evidence that she shared common intent with other alleged conspirators.  Throughout

the process she simply made sure that the correct paperwork went where it needed to go.  This

Court has expressed doubt regarding Tavares and Burke's roles in this conspiracy; Mucci had a

far less substantive role in the hiring process than either of them.  The government introduced no

evidence that Mucci conspired with anyone to do anything, and the admission of the recordings

of her statements requires a mistrial.

Also over objections by the defendants, the Court admitted hearsay statements by

Mirasolo, one of DeLeo's aides.  A single witness, Ed Ryan, testified regarding Mirasolo's role in

the alleged and uncharged conspiracy to use ELMO jobs to encourage legislators to (or reward

legislators for) voting for DeLeo for Speaker.  Ryan, a cooperating witness who was given

immunity, was an utterly incredible witness.  He repeatedly changed his testimony over the

course of just a few minutes.  Much of what he said, particularly his testimony about the timing

of certain actions, contradicted every other piece of evidence introduced during trial, including

the documentary record.  His report of Mirasolo's out-of-court statement is the sole piece of

evidence that there was a conspiracy involving O'Brien and Mirasolo to impact the Speaker's

race with ELMO jobs.  This weak evidence cannot suffice to establish, to a preponderance, that

Mirasolo and O'Brien were co-conspirators.  No other witness gave any testimony indicating that

there was any conspiracy involving ELMO jobs and the Speaker's race.  In fact, everyone else

who testified about the Speaker's race testified that they had never heard of any connection to the

ELMO jobs, and dismissed any such connection as fanciful and absurd.  On this record,

Mirasolo's out-of-court statements should not have been admitted, and the extremely prejudicial

nature of the statements that were wrongly admitted requires a mistrial.

### III.   SPECIFIC CHARGED HIRES MUST BE DISMISSED DUE TO PARTICULAR DEFICIENCIES OF EVIDENCE.[7]

In addition to the herein applicable to all counts, the government failed to introduce

sufficient evidence to send the following counts/racketeering acts to the jury.

#### A.   Patrick Lawton Mail Fraud.

The government did not introduce sufficient evidence to establish mail fraud on this

count/racketeering act because the evidence showed that Mulligan did not rely on and was not defrauded

by the certification or any other documents related to this hire.  The testimony at trial indicated that Judge

Sabaitis and CPO LaFrance, who were on the second round panel, were concerned about hiring Lawton

because he had resigned from the local DA's office after having sent a personal email from his work

computer.  Sabaitis expressed her concerns to the Chief Judge of the Probate court, who, in turn,

expressed those concerns to Mulligan.  Wall, who sat on the final panel, stated that it was easy to score

---

[7] As reflected in the Court's draft verdict slip, the Court already has signaled that certain charged
hires will not be put to the jury, either because the government affirmatively represented that
those hires were "dropped" or because no evidence was presented as to those hires:  Lisa
Martin, Edmund Nadeau, Antonio Mataragas' 2008 transfer, Joseph Dooley's 2006 CPO
promotion, Carmine Guiggio, Daniel Collins, Brandon McLaughlin, Gia Coleman, Michael
Gemme, Robert Wilson, Fabienne Pierre-Mike, Robert Donnelly, and Kimberly Brunelle.

Lawton high because he had a law degree.  6/12/14 Tr. at 100-01.  He also stated that Lawton articulated

his answers to the questions well and that his scores did not need "embellishing."

Mulligan confirmed that he had been informed of Sabaitis's concerns and that he

therefore investigated Lawton's appointment.  He testified that he knew who Lawton's father

was.  He also stated that when he investigated the appointment, he concluded that Lawton was an

appropriate appointment because Lawton had a law degree, which Mulligan believed was an

excellent credential for a probation officer in Probate court.  He testified as follows:

> I remember there was an issue relative to Lawton, Patrick Lawton.
> Q. Okay. But you approved him though, right?
> A. I did. He was a lawyer. He was going to probate and family court. Probation
> officers in probate and family court mediate cases, that's what their duty is.
> Q. And you thought a law degree was potentially good experience for that?
> A. I thought it was excellent experience. Most professional mediators are lawyers.

7/8/14 Tr. Excerpt at 30.  In approving the Lawton hire, Mulligan did not rely on the certification

or on any score sheets; he reviewed the hiring and made an independent judgment.  He made this

judgment while being fully aware of Sabaitis's concerns about Lawton.  Even if he had relied on

any of the documents submitted, they were true and accurate; no one testified that they falsified a

score sheet in connection with this hire.  There was simply no material misrepresentation made

in connection with this hire because Mulligan did not rely on any statements made by the

defendants when he decided to approve Lawton's hire.

### B.      Elzy Tubbs Mail Fraud.

The government did not introduce sufficient evidence to establish this racketeering act.

Dalton testified that when Tubbs arrived late for his interview, Dalton was in favor of

interviewing Tubbs, but the judge on the panel irrationally refused to do so.  Dalton did not take

this position because he was given Tubbs's name, but because he knew Tubbs and his work and

felt he deserved a chance to interview.  Because the judge would not interview Tubbs, a second

local panel was convened.  Lucci participated on the reinterview panel as the Commissioner's designee, and he testified that he did *not* receive any names.  There was no testimony from anyone on the final panel.  There was no evidence of the alleged fraud, and this count should not be sent to the jury.  Additionally, Tubbs was a minority candidate, a fact that multiple witnesses testified had to be factored into the appointment calculus.  There was no evidence presented regarding recommendations for Tubbs, and any seemingly preferential treatment can be explained by the fact that he was a minority candidate.  A judgment of acquittal should enter on this racketeering act.

### C.      Mari Elena Sanchez Mail Fraud.

Like Tubbs, Sanchez was a minority candidate.  Multiple witnesses testified that O'Brien was required to consider this fact as an element of his appointment decisions.  Any seemingly preferential treatment can be explained by the fact that she was a minority candidate.  The government did not introduce sufficient evidence to establish this count/racketeering act, and a judgment of acquittal should enter.

**D.      Amy Parente Mail Fraud.**

There was no testimony that any scores related to this hire were falsified or altered in any way.  CPO Alpers was the sole member of the second round panel to testify.  He stated that Burke told him "we like Parente."  However, Alpers stated that his scoring was not impacted by this information—he ranked Parente eighth.  In fact, the judge in the second round panel ranked Parente the highest.  No member of the final round panel that interviewed Parente (Walsh and Horne) testified.  Accordingly, there was no evidence of any fraud related to this hiring, and a judgment of acquittal must enter as to this racketeering act.

**E.      Joseph Dooley Mail Frauds**

There is insufficient evidence to support the racketeering acts based on Dooley's promotions to first assistant chief probation officer and to chief probation officer.

No one from the second round panel that interviewed Dooley for the first assistant chief job testified that they received his name.  There was no evidence that the second round scores were anything other than legitimate.  Therefore, the evidence shows that Dooley made the final round on his own merits.  Wall testified that he would have increased Dooley's scores.  However, the final round was not required, and, as Mulligan testified, O'Brien had the discretion to pick anyone who was passed on by the second round panel.  Because there was no evidence that Dooley was passed on as the result of fraud, a judgment of acquittal should enter on this racketeering act.

Every member of the second round panel that interviewed Dooley for the chief probation officer job ranked Dooley number one.  A single panelist, Murphy, testified that he remembered receiving a name, but could not remember what name he received.  Five of the six candidates interviewed at the second round (with the exception of one candidate that every panelist ranked

last), advanced to the final round.  The final round panel was conducted by O'Brien and

Cremens.  As Mulligan testified, as appointing authority, O'Brien could select from the

candidates properly advanced by the second panel.  Given that O'Brien conducted the final

interviews himself, he was certainly entitled to make that judgment himself.  A judgment of

acquittal must enter on this racketeering act.

> **F.     Brian Mirasolo Mail Fraud.**

The sole member of the second round panel who testified about Mirasolo's hiring,

Murphy, stated that he did not remember getting Mirasolo's name.  There was no evidence that

Mirasolo moved on to the final round panel based on anything other than merit.  Wall testified

that he would have embellished Mirasolo's scores.  However, as Mulligan testified, as appointing

authority, O'Brien had the authority to select anyone who was passed on by the second round

panel.  There was no evidence that Mirasolo moved on due to fraud of any sort, and a judgment

of acquittal must enter as to this racketeering act.

> **G.     Bernard Dow Mail Fraud.**

No one on the second round panel stated that they received Dow's name.  Judge LoConto

testified that Dow was properly among the top candidates interviewed.  CPO Mattei stated that

Dow was actually the most qualified person interviewed, but Mattei scored him lower than he

deserved because of Mattei's personal feelings about Dow.  Wall testified that he would have

inflated Dow's score.  However, as Mulligan testified, as appointing authority, O'Brien had the

authority to select anyone who was passed on by the second round panel.  There was no evidence

that Dow moved on due to fraud of any sort, and the CPO who had worked most closely with the

applicants for this job testified that Dow was the most qualified candidate.  A judgment of

acquittal must enter as to this racketeering act.

H.      **Kathleen Petrolati Mail Fraud.**

There was no evidence presented that Petrolati was not the most qualified candidate for this job.  Lucci testified that he received Petrolati's name, but he could not name a single candidate who was more qualified for the job than she was (other than Joseph Gagnon, who was hired at the same time for the equivalent position in Boston).  Lucci testified regarding another candidate, Carofaniello, but Lucci urged Carofaniello to withdraw because Lucci thought that his career prospects and job satisfaction would be better as a probation officer than in the nascent ELMO program.  Carofaniello withdrew, and there was no evidence that anyone who applied for the Springfield ELMO position was more qualified than Petrolati.  There is, therefore, no evidence that any certification was false, even assuming the government's understanding of the meaning of the certification.  A judgment of acquittal must enter as to this racketeering act.

IV.     **THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE MAIL FRAUD CHARGES.**

The government did not present sufficient evidence to permit a rational jury to convict on any of the mail fraud charges, and a judgment of acquittal must be entered as to each of them.

"The elements of mail fraud are: (1) devising or attempting to devise a scheme or artifice to defraud; (2) knowing and willful participation in the scheme with the specific intent to defraud; and (3) the use of the United States mails in furtherance of that scheme." *United States v. Stergios*, 659 F.3d 127, 132-33 (1st Cir. 2011).  The government must prove that the defendants had the "specific intent" to defraud, "which excludes false statements honestly believed to be true and promises or predictions made in good faith." *United States v. Mueffelman*, 470 F.3d 33, 36 (1st Cir. 2006).  The alleged fraud must include a "misrepresentation or concealment of *material* fact." *Neder v. United States*, 527 U.S. 1, 22-25 (1999).  Section 1341 penalizes mail fraud aimed at depriving someone of money or property; it does not criminalize the deprivation

of intangible rights.  *See Skilling v. United States*, --- U.S. ---, 130 S.Ct. 2896, 2927 (2010).

**A.      Mailed Rejection Letters Were Not "In Furtherance" of the Charged Scheme.**

To establish that the defendants used the mails in furtherance of the charged scheme, the government must prove that "the mails . . . further or assist in carrying out the scheme." *United States v. LaPlante*, 714 F.3d 641, 644 (1st Cir. 2013).  "[T]he use of the mails need not be an essential element of the scheme but need only be 'incident to an essential part of the scheme' or 'a step in the plot.'" *Stergios*, 659 F.3d at 133 (quoting *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989)).  However, "'[t]he federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.'" *Schmuck*, 489 U.S. at 710 (quoting *Kann v. United States*, 323 U.S. 88, 95 (1944)).  In connection with all of the substantive mail fraud charges, the government alleges that the mailing element is satisfied because Probation sent rejection letters to unsuccessful applicants.[8]  The connection between rejection letters and the alleged scheme is too attenuated; the mail fraud charges cannot proceed based on the assertion that rejection letters were sent.

The Supreme Court explored the necessary connection between the alleged scheme and the use of the mails in *Schmuck*, 489 U.S. 705.  In *Schmuck*, the defendant was accused of buying used cars, rolling their odometers back, and selling the cars to retail car dealers.  *Id.* at 707.  When these unwitting dealers resold the cars to purchasers who relied on the falsified odometer readings, the dealers sent a title-application form to the state department of transportation.  *Id.*  Without the title, the dealer could not complete the sale to the retail customer.

---

[8] There are three racketeering acts for which the government posits a different mailing as the basis of the alleged mail fraud.  These instances will be discussed below.

*Id.* The Court held that these forms satisfied the mailing element because if they had not been sent, Schumuck's scheme, which rested on his ability to sell cars to dealers who could resell them, would have collapsed:

> Under these circumstances, we believe that a rational jury could have found that the title-registration mailings were part of the execution of the fraudulent scheme, a scheme which did not reach fruition until the retail dealers resold the cars and effected transfers of title. Schmuck's scheme would have come to an abrupt halt if the dealers either had lost faith in Schmuck or had not been able to resell the cars obtained from him. These resales and Schmuck's relationships with the retail dealers naturally depended on the successful passage of title among the various parties. Thus, although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme.

*Id.* at 714.

*Schmuck* distinguished three cases in which the Supreme Court held that mailings were not in furtherance. *Id.* at 712-14. In *Kann*, the defendants set up a dummy corporation to funnel the proceeds of a legitimate corporation to themselves. 323 U.S. at 90. As part of the scheme, the defendants cashed checks at local banks. *Schmuck*, 489 U.S. at 713. The government alleged that the mailing element was satisfied because the local banks mailed the checks to the drawee banks for payment. *Id.* The Court held that these mailings were not in furtherance because when the local banks mailed the checks, "[t]he scheme in each case had reached fruition. The persons intended to receive the money had received it irrevocably. It was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank." *Kann*, 323 U.S. at 94. In *Parr v. United States*, 363 U.S. 370 (1960), the defendants were charged with "the unauthorized use of a credit card issued to the school district which employed them." *Schmuck*, 489 U.S. at 713. The alleged mailing occurred when the credit card company sent a bill to the school district and when the school district mailed the credit card company payment. *Id.* The *Parr* Court, relying on *Kann*, held that these mailings

were not in furtherance because the defendants' scheme was done and the defendants did not care how the credit card company collected payment. *Parr*, 363 U.S. at 393. The defendant in *Maze v. United States*, 414 U.S. 395, 396-97 (1974), was accused of using a stolen credit card to pay for motel rooms. The alleged mailing in furtherance occurred when the hotels sent invoices to the credit card company and the company sent a bill to the card holder. *Id.* The Court held that these mailings were not in furtherance of the scheme because the defendant's "scheme reached fruition when he checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss." *Id*. at 402.

The *Schmuck* Court explained that the mailings in *Kann*, *Parr*, and *Maze* were not in furtherance of the charged schemes because they were "little more than post-fraud accounting among the potential victims of the various schemes, and the long-term success of the fraud did not turn on which of the potential victims bore the ultimate loss." *Schmuck*, 489 U.S. at 714. The Court held that *Schmuck* was different because "[t]he mailing of the title-registration forms was an essential step in the successful passage of the title to the retail purchasers" and "a failure of this passage of title would have jeopardized Schmuck's relationship of trust and goodwill with the retail dealers upon whose unwitting cooperation his scheme depended." *Id.*

The allegations in this case fit the *Kann-Parr-Maze* mold. The rejection letters alleged to be in furtherance of the alleged scheme were not sent until the alleged scheme already had reached fruition. Mucci testified that rejection letters were sent after the CJAM had approved the appointment of the successful candidate. Indeed, the Trial Court Manual requires this, stating that rejection letters "should be sent *after* the receipt of the letter from the [CJAM] approving the appointment of the successful candidate." Exhibit A § 4.301(E) (emphasis added). As in *Kann*, *Parr*, and *Maze*, this mailing occurred after the alleged fraud (hiring a candidate recommended

24

by the legislature) was completed, and was a ministerial or administrative communication directed to individuals who had not been hired.  Unlike in *Schmuck*, these mailings had no role in preserving any relationship necessary to the alleged fraud.  No one testified that the CJAM ever saw the rejection letters, no one testified that the rejection letters were important in any way, and there was simply no evidence that these letters had any role in perpetuating the alleged fraud.  Mucci testified that the rejection letters were form letters that were stamped and sent without being seen or considered by anyone involved in the alleged conspiracy.

The indictment alleges that the mailings in furtherance of all of the substantive mail fraud charges were rejection letters sent to unsuccessful applicants.  However, in connection with three alleged racketeering acts specified in count two, the indictment alleges a different mailing in furtherance.  The hire of Doug MacLean is based on the mailing of an appointment letter to a chief probation officer.  The hires of Frank Glenowicz and Kathleen Petrolati are based on the mailing of applications for employment.  The government elicited testimony from Sheila Dintaman that she mailed her application for the job that Glenowicz received.  However, there was no testimony that anyone received an appointment letter by mail in the case of MacLean.  Nor was there any testimony that anyone mailed a letter in connection with the job that Petrolati received.  The racketeering acts related to mail fraud in connection with the hiring of Glenowicz and Petrolati cannot go to the jury because the mailing element was not met.

A judgment of acquittal must enter on all of the mail fraud counts and racketeering acts (except for that concerning the Glenowicz hire), because the government did not provide sufficient evidence that there were mailings made in furtherance of the alleged scheme.

**B.     The Government Failed to Prove Specific Intent to Defraud.**

A judgment of acquittal must also enter on the mail fraud charges because the

government failed to provide evidence that O'Brien had the specific intent to defraud anyone.
There was repeated testimony that recommendations had been made by legislators for decades,
and that over the years there had been a connection between trial court and Probation hiring and
legislators.  Old appointment letters were sent directly to the legislature, people had been
requesting and receiving legislative support since before O'Brien first became a probation
officer, and these practices were not a secret.  Given this background, O'Brien did not have any
intent to defraud, and because Mulligan also knew this background and practice, he could not
have relied on any untrue representation in the certification.

  This background also requires a judgment of acquittal based on the vagueness doctrine
and the rule of lenity.  The rule of lenity provides that "ambiguity concerning the ambit of
criminal statutes should be resolved in favor of lenity." *Skilling*, 130 S. Ct. at 2932.  "This
interpretive guide is particularly appropriate" in construing fraud statutes because "mail and wire
fraud are predicate offenses under the Racketeer Influenced and Corrupt Organizations Act." *Id.*
(internal brackets and quotation marks omitted).

  The "void for vagueness" doctrine requires that a penal statute define the criminal offense
with sufficient definiteness that ordinary people can understand what conduct is prohibited and in
a manner that does not encourage arbitrary and discriminatory enforcement.  *See Kolender v.
Lawson*, 461 U.S. 352, 357 (1983).  This doctrine "addresses concerns about (1) fair notice and
(2) arbitrary and discriminatory prosecutions."  *Skilling*, 130 S. Ct. at, 2933 (2010).  The First
Circuit has warned of the potential vagueness problems inherent in the mail fraud statute, in
particular:

> The broad language of the mail and wire fraud statutes are both their blessing and their
> curse.  They can address new forms of serious crime that fail to fall within more specific
> legislation.  On the other hand, they might be used to prosecute kinds of behavior that,
> albeit offensive to the morals or aesthetics of federal prosecutors, cannot reasonably be

expected by the instigators to form the basis of a federal felony.

*United States v. Czubinski*, 106 F.3d 1069, 1079 (1st Cir. 1997).

Any application of the alleged conduct to the criminal charges alleged should be rejected

under the rule of lenity and vagueness doctrines.   In particular, given the repeated statements by

the Massachusetts legislature that the Commissioner had exclusive hiring authority, O'Brien

could not have known that they were required to conduct hiring in any particular way, and

certainly could not have anticipated that they could be subject to federal criminal prosecution for

their failure to do so.  Further, given the fact that legislative recommendations had been

considered for decades in Probation and trial court hiring, O'Brien could not have had any intent

to defraud when they considered such recommendations in hiring.  Under the rule of lenity, any

"close calls" in resolving legal questions in this motion should be resolved in the defendants'

favor.  Under the vagueness doctrine, the Court should find the charged statutes invalid as

applied to the conduct alleged here.  *See Skilling*, 130 S. Ct. at 2927  (warning against construing

a "'statute in a manner that leaves its outer boundaries ambiguous and involves the federal

government in setting standards of disclosure and good government for local and state officials'"

(quoting *McNally v. United States*, 483 U.S. 350, 360 (1987))).

**C.     The Commissioner's Exclusive Hiring Authority Requires Acquittal on Mail
         Fraud Charges.**

In their motion to dismiss, the defendants argued that the Massachusetts statutory scheme

gave O'Brien the exclusive authority to hire Probation employees and did not permit the CJAM

to set policy for Probation.  Dkt. #171 at 4-7, 18-24, 29-30.  Those arguments are incorporated

here by reference.  Generally, not only did the legislature amend M.G.L c.276 §83 in 2001, every

budget enacted between 2001 and 2011 included language in Probation's line item stating that

the Commissioner had "exclusive authority to appoint" Probation employees "notwithstanding

27

the provisions of any general or special law, rule or regulation to the contrary."  2001 Mass.

Legis. Serv. Ch. 117 (H.B. 4800), line 0339-1001.  This "notwithstanding" language

unambiguously indicates that the Commissioner had unfettered authority to appoint without

regard to powers granted by any other statute or restrictions contained in the Trial Court Manual.

*See BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory

interpretation requires us to 'presume that [the] legislature says in a statute what it means and

means in a statute what it says there.'  Thus, our inquiry begins with the statutory text, and ends

there as well if the text is unambiguous." (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S.

249, 253-54 (1992))); *Attorney General v. Commissioner of Ins.*, 450 Mass. 311, 319 (2008)

("'The use of such a "notwithstanding" clause clearly signals the drafter's intention that the

provisions of the "notwithstanding section override conflicting provisions of any other section.'

A 'clearer statement is difficult to imagine.'" (quoting *Cisneros v. Alpine Ridge Group*, 508 U.S.

10, 18 (1993)) and *Liberty Maritime Corp. v. United States*, 928 F.2d 413, 416 (D.C. Cir.

1991))); *Bresnahan v. City of Gloucester*, 82 Mass. App. Ct. 1108, *2 (Mass. App. Ct. 2012)

("The use of 'notwithstanding' in the introductory sentences of Chapter 449 and other special

acts 'clearly signals the drafter's intention that the provisions of the "notwithstanding" section

override conflicting provisions.'" (quoting *Attorney General v. Commissioner of Ins.*, 450 Mass.

at 319-20))); *Field v. Napolitano*, 663 F.3d 505, 511 (1st Cir. 2011) (applying the same rule

regarding "notwithstanding" clauses and quoting *Cisneros*).  The SJC did not consider this

"notwithstanding" language in either *First Justice of Bristol Div. of Juvenile Court Dept. v.

Clerk-Magistrate of Bristol Div. of Juvenile Court Dept.*, 438 Mass. 387, 388 (2003) or *Anzalone

v. Administrative Office of the Trial Court*, 457 Mass. 647, 653-55 (2010).

     The mail fraud statute requires the government to prove that the defendants devised a

scheme to defraud that included a "misrepresentation or concealment of *material* fact." *Neder*,

527 U.S. at 22-25.  "[A] false statement is material if it has 'a natural tendency to influence, or

[is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'"

*Neder*, 527 U.S. at 16 (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)).  Liability for

mail fraud cannot be premised on a certification made by the Commissioner to the CJAM

asserting that the Commissioner had complied with the Trial Court Manual.  The Commissioner

had absolute hiring authority, and was not bound by the provisions of M.G.L. chapter 211B or the

Trial Court Manual.  The certification could not have influenced the CJAM, because the CJAM

had no authority to make decisions related to Probation hiring.  This certification was

unnecessary[9] and immaterial as the decision-making process rested solely with the

Commissioner.  Because the CJAM did not have a role in the Probation hiring process,

statements to the CJAM regarding that process were not "capable of influencing" the CJAM and

cannot be the required material misrepresentation. A judgment of acquittal must enter on the mail

fraud counts, as well as on the substantive racketeering and racketeering conspiracy charges.

### D.    The Certifications to the CJAM Were True and Accurate, Not Fraudulent.

Apart from the question of whether the CJAM had any authority to review the

Commissioner's appointments, the certification was factually true.  A true statement cannot be

the material misrepresentation underlying a mail fraud charge or support a finding that the

defendants had the specific intent to defraud.  *See United States v. Rowe*, 144 F.3d 15, 21 (1st Cir.

1998) ("[A]n answer to a question is not fraudulent if there is an objectively reasonable

interpretation of the question under which the answer is not even false."); *Boufford v. United

States*, 239 F.2d 841, 844 (1st Cir. 1956) ("[I]f the defendant did not make a 'false statement,' as

---

[9]  There was much testimony indicating that the certification was a token form, not a meaningful representation.  Mucci testified that the certifications were generally stamped, and O'Brien did not see them.  Although required to do so, Mulligan never signed these documents.

charged in the indictment, he could not be convicted of 'knowingly' making a false statement.").

The certification was not false and cannot support mail fraud charges.

The certification read as follows:

In accordance with the established personnel standards, enclosed are:
\_\_\_\_      The <u>Applicant Interview and Hiring Record</u> (F4).
\_\_\_\_      The <u>Applicant Flow Record</u> (F17).
\_\_\_\_      A copy of all applications of the candidates who were interviewed.
\_\_\_\_      A copy of the notice of vacancy (job posting).
\_\_\_\_      The Jobs Hotline Confirmation letter (F3) (if on the Hotline).
\_\_\_\_      The <u>Employment Eligibility Verification Form 19</u> (F 16) & supporting
                documentation (new hires only).
\_\_\_\_      The <u>SSA-1945 Statement Concerning Employment in a Job not Covered</u>
                <u>by Social Security</u> (F 30) (new hires only).
\_\_\_\_      The <u>Consent to Criminal Record Check</u> (F 23) (new hires only).
\_\_\_\_      The <u>Application for Allied Service Credit</u> (F 26) (Probation Officer
                positions only).
I certify that I have complied with the Trial Court's personnel standards and that
sufficient funding exists in the current fiscal year budget to support this position.
_____
Appointing Authority

The indictment characterizes the Commissioner's signature as the "appointing authority" on this

form as a false statement that "the candidate for employment had been hired pursuant to the

procedures mandated by the [Trial Court] Manual." 2d Sup. Ind. at 9.

The certification does not aver that the Commissioner complied with or even considered

the Trial Court Manual, much less the hortatory language in the Manual about "merit" hiring.

Mulligan acknowledged that the Manual was not mandatory—when questioned about his failure

to approve O'Brien's appointments within the 14 days provided by the Manual, he stated that this

apparently requirement was merely "hortatory," and his failure to comply with it did not

invalidate a hiring decision.  The provision that Mulligan described as "hortatory" is clear and

unambiguous; the CJAM has 14 days in which to review and approve appointments.  By

contrast, the provisions discussing "merit" hiring and hiring the "most qualified" are undefined

and unclear.  If the CJAM's failure to comply with a definite rule laid out in the Manual does not

violate the Manual, neither does the Commissioner's alleged decision to factor recommendations

into the "merit" hiring calculus.  The Manual does not prohibit considering recommendations,

and it does not define its standards in a way that would permit a consistent understanding of what

can and cannot be factored into the hiring decision.  Additionally, Mulligan knew that legislators

and other powerful people made job recommendations.  He considered the same type of

recommendations in his own hiring decisions.  In fact, he even created a job for the wife of a

legislator a month before the Trial Court received a multi-million dollar budget supplement.

Because he knew that such recommendations were made and considered, he did not rely on a

representation that they were not, and the certification is not a material misstatement.

 The certification simply avers that the Commissioner complied with the Trial Court

"*personnel standards*."  This reference to "personnel standards," a commonplace human

resources term of art, does not encompass the entire Trial Court Manual.  "Personnel standards"

are mentioned once in the Trial Court Manual, in the section entitled "Approval Process":

> Upon selecting a final candidate to fill a position on a permanent basis, the appointing
> authority [*i.e.*, the Commissioner] must certify compliance with the *personnel standards*
> of this section, must certify that sufficient funding is available in the current fiscal year
> budget to support the position, and must submit the following material to the Human
> Resources Department:
>> T. the <u>Appointment Documentation</u> form (Appendix C, Form F5);
>> U. the <u>Applicant Interview and Hiring Record</u> (Appendix C, Form F4);
>> V. the <u>Applicant Flow Record</u> (Appendix C, Form F17);
>> W. a copy of the application of the final candidate and the applications of
>> all who were interviewed and, if required, the resume of the final
>> candidate;
>> X. a copy of the notice of vacancy;
>> Y. the <u>Jobs Hot Line Confirmation Letter</u> (Appendix C, Form F3);
>> Z. the <u>Employment Eligibility Verification Form I-9</u> (Appendix C, Form
>> F16) and supporting documentation (new hires only);
>> AA. the <u>Consent to Criminal Record Check</u> (Appendix C, Form F23).

Exhibit A § 4.400(A) (emphasis added).  Arguably this portion of the "Approval Process" section

does not even apply to Probation. Subsection B of the "Approval Process" is a similar provision specifically directed at Probation hiring, and it does not require any certification or mention "personnel standards." *Id.* at § 4.400(B). In *First Justice*, the SJC defined "personnel standards" as "deal[ing] expressly with job posting, newspaper advertising, review of applications, interviewing applicants, reference checks, verification of eligibility to work in the United States, and criminal record checks." 438 Mass. at 394.

The "personnel standards" of the Trial Court are administrative requirements of the hiring process; they relate to human resources record keeping and to ensuring that the chosen candidate is eligible to work in the United States and does not have a criminal record. The Trial Court Manual is broader in scope than "personnel standards." The certification does not mention the Trial Court Manual or M.G.L. c. 211B, § 8. The Commissioner's stamped signature on this line indicated that someone had posted the job, reviewed applications, interviewed applicants, conducted the proper records checks, and assembled the correct paperwork, *not* that he hired pursuant to the Trial Court Manual or had selected the "most qualified" candidate.

Defining "personnel standards," as the minimum, administrative qualifications required for a certain job, is consistent with its use as a term of art in employment law. *See, e.g., Acevedo-Diaz v. Aponte*, 1 F.3d 62, 68, n.5 (1st Cir. 1993) (discussing "personnel standards" as "the established minimum qualifications" for a given job (citing *Hiraldo-Cancel v. Aponte*, 925 F.2d 10, 14 (1st Cir. 1991))); *see also First Justice*, 438 Mass. at 404, n.10 (noting that the CJAM could revise the "personnel standards" by creating "stricter minimum qualifications for Trial Court positions"). It is also consistent with the statutory role of the CJAM vis-à-vis Probation. The CJAM had administrative responsibilities in connection with Probation, but did not have any authority to set Probation's hiring policy or to review its hiring decisions.

There is no allegation that the defendants violated the administrative personnel standards mentioned in the certification.  The certifications were true, and they cannot serve as the material misrepresentation necessary to support the mail fraud charges.

**E.      The Government Failed to Prove Deprivation of Tangible Property.**

To prove that the defendants committed mail fraud in violation of 18 U.S.C. § 1341, the government must establish that the defendants participated in a scheme to defraud someone of tangible property.  *McNally v. United States*, 483 U.S. 350, 360 (1987) (§ 1341 is "limited in scope to the protection of property rights").  A separate statute prohibits fraud aimed at depriving someone of the intangible right of honest services.  *See* 18 U.S.C. § 1346; *Skilling*, 130 S. Ct. at 2927.  This honest-services fraud statute criminalizes only bribes or kickbacks.  *Id.* at 2931.  The government failed to establish mail fraud in violation of § 1341 because: 1) "jobs and salaries" were not obtained as a result of the alleged scheme; and 2) any such deprivation does not involve a tangible right to money or property.

*1.      The alleged scheme did not "obtain" jobs and salaries.*

As Mucci explained, before advertising for an open job, Mr. O'Brien submitted documentation detailing probation officer workloads and the necessity of hiring a new probation officer to the CJAM.  If the CJAM approved a request to appropriate funding for a job slot, AOTC human resources would post it on the job hotline, and candidates could apply.  There was no evidence that there was any fraud or deceit involved in this process.  The hiring process did not begin until the decision that a given job and its attendant salary would be allocated to Probation had been made.  The hiring process existed to determine who would work and be paid that salary, but when the hiring process began, the financial appropriation and decision to pay that salary to someone had already been made.  At the time funding for the slot was approved,

Probation did not know who would apply, and could not have known who would ultimately be hired or what credentials that individual would have.

The process by which Probation "obtained" the job and the process by which it assigned that job to a particular candidate are separate. The mail fraud statute contemplates a scheme related to how property is obtained, not how it is allocated it if has been obtained legitimately. *See McNally*, 483 U.S. at 360-61 (noting that defendants had not been charged with depriving state of its money where they had been accused of misconduct in distributing state funds that would have been spent anyway). The government has not alleged a scheme to defraud that involved obtaining property, and the mail fraud charges therefore must be dismissed.

> 2.      *The purported scheme did not involve deprivation of tangible property.*

The mail fraud charges cannot stand because the government did not prove that anyone was deprived of tangible property. The government has never identified who was allegedly deprived of jobs and salaries. Three possible theories are: 1) the defendants deprived the CJAM of jobs and salaries; 2) the defendants deprived unsuccessful applicants of jobs and salaries; and 3) the defendants deprived the citizens of Massachusetts of the "most qualified" probation officers. None of these apparent possibilities would support the mail fraud charges.

The theory that the defendants deprived the CJAM of jobs and salaries cannot support the mail fraud charges. The CJAM did not possess the jobs or salaries. There was no testimony that there was any fraud in connection with the process by which the CJAM determined that Probation could hire for a given position. The CJAM had no authority to review Probation hiring decisions, and the defendants did not deprive him of any such opportunity. Moreover, even if the CJAM were deprived of the ability to fully review Probation hiring decisions, that opportunity is not a tangible property right.

The theory that the defendants deprived unsuccessful applicants of jobs and salaries cannot support the mail fraud charges.  The unsuccessful applicants had no tangible property right to a job at Probation.  Probation received hundreds of applications for each job, and no candidate had a right to a job.  There was no testimony that any particular unsuccessful candidate would necessarily have been hired in the absence of the alleged scheme.  At most, the unsuccessful applicants were deprived of a hiring process in which recommendations played no role.  Job applicants do not have a right to an "honestly" conducted hiring process.  *See United States v. Doherty*, 867 F.2d 47, 55 (1st Cir. 1989) (holding that mail fraud indictment cannot be based on deprivation of policeman's "right to have 'promotional examinations, and law enforcement appointments and promotions, conducted honestly'" or applicant's "right to have promotions and examinations 'conducted honestly'").  Participation in a "fair" hiring process is not a property right that can support mail fraud charges.

Finally, the theory that the defendants deprived Massachusetts citizens of the "most qualified" probation officers cannot support the mail fraud charges.  As explained above, the legislature gave the Commissioner exclusive hiring authority; there were no restrictions placed on this authority that would give the citizens of the Commonwealth any expectation or right that probation officers would be hired in any particular way or that the hired applicants would be the "most qualified officers."  At the time of the alleged conduct, the statute giving the Commissioner hiring authority read:

> Subject to appropriate, the commissioner of probation may appoint, dismiss and assign such probation officers to the several sessions of the trial court as he deems necessary.

M.G.L. c. 276, § 83 (version effective 2001 through 2011).  Nothing in this language requires the Commissioner to hire the "most qualified" candidates, or creates the expectation that such candidates would be hired.

This legal landscape is quite different from the authorities present in cases in which courts have concluded that alleged fraud in a hiring process did constitute a deprivation of property.  In *Doherty*, the defendants were policemen accused of stealing copies of the civil service exam and selling "them to policemen so they could cheat and obtain promotions."  867 F.2d at 51.  The First Circuit held that the indictment "validly charges a conspiracy to defraud the government of money" where it stated "that it was a 'further objective of the conspiracy for the conspirators to illegally assist relatives, friends and associates in obtaining appointment to or promotion within police departments in . . . Massachusetts so that those relatives, friends and associates would receive the benefits of such appointment or promotion; which benefits included in the salary or increased salary by reason of appointment to or promotion within the police department and whatever pension benefits would accrue by reason of the appointment to or promotion within the police department.'"  *Id.* at 55-56.

Underlying this theory is the fact that the hiring and promotion of police officers was controlled by the civil service provisions of M.G.L. c. 31.  One of these statutes requires that police officers can only be hired and promoted "after competitive examination."  M.G.L. c. 31, § 59.  This chapter also requires the compilation of a list of individuals eligible for civil service provisions based on the results of this examination, and dictates how individuals can be hired from those lists.  *See* M.G.L. c. 31, §§ 6, 27.  Because of these statutes, when the legislature allocates money to a civil service agency, it has an expectation as to how hiring at that agency will proceed.  In *Doherty*, the legislature had required that police officers be hired in a certain way, and the defendants personally profited from selling a stolen exam in order to subvert the legislature's dictates.

*United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008), is similar to *Doherty*.  In *Sorich*, the

defendants worked for the mayor of Chicago and were accused of "dol[ing] out thousands of city civil service jobs based on political patronage and nepotism."  523 F.3d at 705.  The government asserted that "the defendants concealed what they were doing by falsely assuring city lawyers that their hires were legitimate, and then shredding evidence and hiding their involvement once a criminal investigation began."  *Id.*  The Court rejected the contention that the jobs at issue were not property because "the city paid for, and was cheated out of, qualified civil servants."  *Id.* at 713.  The court was able to assert that the city paid for qualified civil servants because "[t]his all went on despite the existence of multiple laws and personnel regulations forbidding the use of political considerations in hiring for civil service jobs, and mandating the awarding of those jobs on merit."  *Id.* at 706.  Those statutes enabled the legislature to expect that civil servants would be hired in a particular manner and without regard to politics.

At the time of the alleged conduct here, there was no statute or other regulation that gave the Massachusetts legislature or populace any reason to expect that probation officers would be hired in a certain manner or that those officers would be the "most qualified" under any metric. The statute in effect at the time gave the Commissioner the absolute appointment authority.  See M.G.L. c. 276, § 83 (version effective 2001 through 2011).  In 2011, and perhaps as a result of these allegations, the legislature amended this statute to impose stringent restrictions on Probation hiring, including requiring Probation to administer a written examination to applicants, to confer with the court administrator and CJAM regarding hiring, and to not consider recommendations until after the exam and interview process.  *See* M.G.L. c.276 § 83.  That the legislature has passed such requirements in 2011 further indicates that earlier, in their absence, the Commonwealth had no tangible right to probation officers hired in any particular way.

Nor do any of the statutes or manuals discussed in the indictment give Massachusetts a

tangible right to a certain type of probation officers.  As detailed above, neither chapter 211B nor

the Trial Court Manual apply to Probation.  That chapter and the policies promulgated under it

concern the seven trial court departments: "the superior court department, the housing court

department, the land court department, the probate and family court department, the Boston

municipal court, the juvenile court department and district court department."  M.G.L. c.211B, §

1.  The Trial Court Manual applies only to employees of those departments, and cannot create an

expectation that Probation officers would be hired under its auspices.  Because the legislature

gave the Commissioner exclusive hiring authority without conditions, neither it, nor the citizens

of Massachusetts, have any tangible right to expect that probation officers would be hired in any

particular way.  Unlike in *Doherty* and *Sorich*, the defendants could not have deprived the state

of any tangible property right in salaries being paid to the "most qualified" employees.

Because the government did not prove the deprivation of a tangible property right, a

judgment of acquittal must enter on the mail fraud charges.

## V.   THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CHARGES OF RACKETEERING AND RACKETEERING CONSPIRACY.

Count 1 charges the defendants with participating in a racketeering conspiracy in

violation of 18 U.S.C. § 1962(d), and count 2 charges O'Brien and Tavares with a substantive

RICO violation contrary to 18 U.S.C. § 1962(c).  "Five elements must coalesce to make out a

substantive RICO violation. The government must show: '(1) an enterprise existed; (2) the

enterprise participated in or its activities affected interstate commerce; (3) the defendant was

employed by or was associated with the enterprise; (4) the defendant conducted or participated in

the conduct of the enterprise; (5) through a pattern of racketeering activity.'"  *United States v.

Nascimento*, 491 F.3d 25, 31 (1st Cir. 2007) (quoting *United States v. Marino*, 277 F.3d 11, 33

(1st Cir. 2002)).  To satisfy the statute of limitations for a substantive RICO violation, the

government must prove at least one racketeering act that occurred within five years of the indictment.  *See United States v. Torres Lopez*, 851 F.2d 520, 525 (1st Cir. 1988).  The elements of a RICO conspiracy are distinct, but include overlapping concepts.  "For a defendant to be found guilty of *conspiring* to violate RICO, the government must prove '(1) the existence of an enterprise affecting interstate commerce, (2) that the defendant knowingly joined the conspiracy to participate in the conduct of the affairs of the enterprise, (3) that the defendant participated in the conduct of the affairs of the enterprise, and (4) that the defendant did so through a pattern of racketeering activity by agreeing to commit, or in fact committing, two or more predicate offenses.'"  *United States v. Shifman*, 124 F.3d 31, 35 (1st Cir. 1997) (quoting *Aetna Cas. Sur. Co. v. P&B Autobody*, 43 F.3d 1546, 1561 (1st Cir. 1994)).

Both RICO counts require the government to prove that the defendants engaged in a "pattern of racketeering activity."  To establish such a pattern, the government must prove "'at least two acts of racketeering

As explained above, the government has not adequately proven the charged racketeering acts.  In connection with the mail fraud charges, the government has not sufficiently proven a material misrepresentation, a mailing in furtherance, or a scheme that deprived someone of property rights.  As to the state law bribery and gratuity charges, the government has not sufficiently proven that the alleged bribe or gratuity was linked to a specific legislative action.  Nor has the government provided sufficient evidence that O'Brien had the intent or knowledge necessary to commit either of these offenses.  The government has not sufficiently proven any racketeering acts, it cannot prove a pattern of racketeering activity, and it has not established the required mens rea, so the RICO counts therefore must be dismissed.

## Conclusion

For the foregoing reasons, Mr. O'Brien asks this Court to enter a judgment of acquittal as to all charges, and/or, in the alternative, to grant a mistrial.

Respectfully submitted,

JOHN J. O'OBRIEN
by his attorneys

 /s/ William W. Fick
Stylianus Sinnis, Esq.
William W. Fick, Esq.
Christine DeMaso, Esq.
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061
STELLIO_SINNIS@FD.ORG
WILLIAM_FICK@FD.ORG

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 14, 2014.

/s/ William W. Fick