UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Crim. No. 12-CR-40026-WGY |
| JOHN J. O'BRIEN, | ) |
| ELIZABETH V. TAVARES, and | ) |
| WILLIAM H BURKE, III, | ) |
| | ) |
| Defendants. | ) |

GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTION FOR
JUDGMENT OF ACQUITTAL AND/OR A NEW TRIAL

The defendants concede, as they must, that the appropriate standard to be applied by the Court in considering a motion for a judgment of acquittal is whether the evidence, both direct and circumstantial, supports the conviction when "viewed in the light most favorable to the prosecution." *See United States v. Lara*, 181 F.3d 183, 200 (1st Cir. 1999). Counsel for the defendants, however, miserably fail to apply this standard and argue the evidence "in the light most favorable to their clients." The defendants' briefs contain the same old and tired arguments that they have unsuccessfully made throughout the litigation in this case. While the tenor of these arguments may have been appropriate during pre-trial litigation and during the trial of this matter, they now lack force and vitality in the face of the jury's verdict.

In the alternative, the defendants request a new trial. The First Circuit has consistently, and repeatedly, emphasized that there are "definite limits upon a district court's right to upset a jury verdict. To protect the fragile power given to the jury, we must ensure that the remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice. This Court has emphatically stated that a trial judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result." *United States v. Rothrock*, 806

F.2d 318, 322 (1st Cir. 1986) (citations and internal marks omitted); *accord, United States v. Ruiz*, 105 F.3d 1492, 1501-02 (1st Cir. 1997); *United States v. Conley*, 249 F.3d 38, 45 (1st Cir. 2001); *United States v. Rivera Rangel*, 396 F.3d 476, 486 (1st Cir. 2005); *United States v. Sampson*, 486 F.3d 13, 50 (1st Cir. 2007); *United States v. Garcia-Alvarez*, 541 F.3d 8, 16-17 (1st Cir. 2008).

Moreover, when a motion for a new trial is predicated on the district court's evaluation of the weight of the evidence, the district court must "refrain from interfering unless it is quite clear that the jury has reached a seriously erroneous result." *Rothrock*, 806 F.2d at 322 (citations and internal marks omitted); *accord*, *Ruiz*, 105 F.3d at 1501; *Rivera Rangel*, 396 F.3d at 486.

It is not sufficient to show that the evidence "gave rise to competing plausible inferences, some pointing to guilt and others to innocence," because "[t]he jury is charged with choosing between such inferences." *Ruiz*, 105 F.3d at 1502 (citation omitted).   When the evidence is "freighted with contradictions," those contradictions are "grist for the jury's mill." *Sampson*, 486 F.2d 3d at 50 (citation omitted).

In sum, even if "reasonable people could have found otherwise, a trial judge ... may [not] set aside a verdict merely because he would have reached a different result." *Ruiz*, 105 F.3d at 1502. (citation omitted).  The "correct standard" for a Rule 33 new trial motion is whether "conviction would result in a miscarriage of justice." *Rothrock*, 806 F.2d at 322.  The defendants have not come close to satisfying that high standard and have not remotely shown that the evidence "preponderates *heavily* against the verdict." *See United States v. Villarman-Oviedo*, 325 F.3d 1, 15 (1st Cir. 2003) (emphasis added; citation omitted).

For the reasons set forth below, the defendants' motions should be denied.

I.      **The Evidence Of A Racketeering Conspiracy And Of Each Defendant's
        Involvement In That Conspiracy Was Overwhelming**

   A.   **The Evidence At Trial Established Each Defendant's Participation In The
        Racketeering Conspiracy**

The United States called approximately sixty witnesses at the defendants' trial. The vast

majority of these witnesses established either directly or circumstantially the existence of a

scheme to advance politically connected job applicants to a final round interview where the

rankings were fabricated in a fashion that would support the appointment of those candidates by

the defendant O'Brien. In their factual recitations, the defendants routinely ignore the most

significantly incriminating evidence against their clients.

A parade of high ranking officials of the Massachusetts Department of Probation

(hereinafter "Probation" or "Probation Department") testified about various aspects of the rigged

hiring scheme. They included:

1. Deputy Commissioner Francis Wall;
2. Deputy Commissioner Edward McDermott;
3. Regional Administrator and Acting Commissioner Ellen Slaney;
4. First Deputy Commissioner John Cremens;
5. Regional Administrator Edward Driscoll;
6. Regional Administrator Richard O'Neil;
7. Chief Probation Officer James Casey;
8. Chief Probation Officer Frank Siano;
9. Chief Probation Officer Marguerite Riley;
10. Regional Administrator Edward Dalton;
11. Director Of Personnel Janet Mucci;
12. Legislative Liaison and Regional Program Manager Edward Ryan; and
13. Regional Administrator Nicholas DeAngelis.

The testimony from these individuals convincingly established that:

1. They received names of individuals from the defendants who were to be
   passed along to the final round interview;

2. The reason that these individuals received preferential treatment was due to
   their political connections, most often with members of the legislature;

3. These individuals were not the "most qualified" job applicants;

4. Complaints from underlings who were disturbed by the process were generally ignored by the defendants;

5. The preferred candidates were always ranked in the top spots in the final interview regardless of their performance in order to insulate the defendant O'Brien from scrutiny and justify his appointments;

6. The motive for appointing politically connected candidates who were not the most qualified job applicants was to obtain favorable treatment from the legislature regarding budgets and legislation that affected the Probation Department; and

7. The mails were routinely utilized during the hiring process – rejected applicants received letters via the mail from the defendants Tavares and O'Brien.

Particularly, Fran Wall testified that then Speaker of the House Thomas Finneran was instrumental in changing the appointment authority for probation officers from members of the judiciary to the defendant O'Brien in 2001. This legislation was included in the fiscal year 2002 budget upon the agreement between O'Brien and Finneran that O'Brien would support patronage requests from the legislature. Wall also testified, as did several other Probation managers, that O'Brien believed that he could influence legislative decision making by catering to their patronage requests.

Wall testified that between 2004 and 2010, he was the chairperson of the final interview committee. Wall received the names of candidates personally selected by the defendant O'Brien and the order in which those candidates were to be ranked. He received those names from both defendants Tavares and O'Brien as well as Ed Ryan. He passed the information from O'Brien to the other member of the committee – usually Deputy Commissioners Patricia Walsh or Edward McDermott. The committee members embellished and/or changed the answers of the sponsored candidates to ensure that they ranked in the order that O'Brien directed. McDermott described

this practice as "stretch scoring."  According to Wall, the committee members received names 100% of the time.

Wall also testified that he was familiar with the sponsor lists maintained by Probation. He testified that the names that he had been given to score highest represented individuals associated with members of the legislature.  Wall explained that O'Brien told him that Probation needed to accommodate the legislature to receive favorable budget treatment.

Wall testified that the final round interview was created by Tavares and O'Brien to insulate O'Brien from scrutiny.  Wall identified one of the areas where O'Brien needed insulation was at grievance proceedings when an appointment was challenged.  The false final round rankings were used to support O'Brien's decision, and O'Brien was not required to testify because he did not participate in the final interview.  When Wall and Walsh expressed concerns that they would have to commit perjury at arbitration hearings if called to testify, O'Brien told them that "it was more important that the [interview] process remain in effect to have a good relationship with the legislature."  Wall Tr. 6/11/14 at 45.[1]  Tavares was also present at this meeting.  As a result of this directive, Wall and Walsh committed perjury at arbitration proceedings to protect the rigged hiring system,

> We participated in arbitration and we did lie under oath about the process being a fair process and, um, how we judged the people, et cetera.

*Id.*  When asked about why he was willing to commit perjury, Wall stated,

> The Commissioner [O'Brien] had promoted me and thanking him and being loyal to him, I was promoted in the Superior Court to a position of Chief Probation Officer and then Deputy Commissioner and, um, with my loyalty to him I agreed to do it.

---

[1]  The final step in the grievance process was a decision by an arbitrator.

*Id.* at 48.  Similarly, CJAM Mulligan testified that Walsh lied to him about the final interview

process when Mulligan questioned Walsh about the appointment of John Chisolm.

So too, Ed Ryan testified that he was assigned by O'Brien to field telephone calls and

other communications from members of the legislature who proposed certain candidates for

employment or promotion at the Probation Department.  Ryan maintained detailed lists of

candidates and their legislative "sponsors."  These lists were used by O'Brien to determine

which candidates would be appointed or promoted.  This decision was generally made before the

interview process commenced.  Ryan passed the names of these candidates to members of the

various interview panels.  O'Brien made these decisions without the benefit of candidates'

resumes and applications and without the results of any interviews.

Thus, the evidence clearly established that the defendants engaged almost the entire

management team of the Probation Department to fraudulently appoint politically connected

candidates rather than more qualified candidates despite the requirements of the Trial Court's

*Policies and Procedures Manual* (hereinafter "Manual")*.*  As was the case with Francis Wall, the

government believes that the evidence clearly demonstrated that these managers participated in

this corrupt system to preserve their own highly paid positions in the Probation Department, to

avoid retribution from O'Brien, and/or out of misguided loyalty to O'Brien.

The evidence also established that the defendant O'Brien falsely certified to

CJAM Mulligan that he had complied with the Manual in making Probation Department

appointments.  Such a certification was required by statute.  *See* M.G.L. Ch. 211B, §8.

Further, the evidence established that this certification included the fact that the

appointment was a merit-based decision.  *See Manual* §4.00 (only "the most qualified

individuals" should be hired);  §4.304 (requiring that "all appointments be made solely on

the basis of merit"); *First Justice of Bristol Division of Juvenile Court Dept. v. Clerk Magistrate of the Bristol Division of the Juvenile Court Dept.*, 780 N.E.2d 908, 922-23 (Mass. 2003) ( In the meantime the CJAM is to monitor and ensure that appointments falling under the statutes *are made on their merits* in conformity with governing requirements (emphasis added)).  Furthermore, CJAM Mulligan testified that he relied on O'Brien's certifications and that those certifications included a certification that O'Brien's appointments were based on merit.

The motive and intent of the defendants was highlighted by their willingness to violate state laws prohibiting the solicitation of political contributions from state employees and doing so on state property.  *See* M.G.L. Ch. 55, §§13 and 14.  Several witnesses testified that they were frequently solicited to attend the annual fundraiser for Representative Thomas Petrolati, who was very influential in Probation Department hiring in western Massachusetts.[2]  Thus, not only did the defendants utilize the management structure of the Probation Department to effectuate the scheme to defraud, they also violated certain state laws which were intended to keep political fundraising separated from state employees and state offices buildings.  Of particular note was the evidence at trial of the close relationship between the defendant Burke and Representative Petrolati.  Burke actually collected cash donations in excess of $50 from Probation Department employees on behalf of Petrolati.  This conduct also violated M.G.L. Ch. 55, § 9.[3]

Although the defendant O'Brien was the architect of the RICO conspiracy, both

---

[2]     Petrolati's wife was employed by Probation's electronic monitoring division ("ELMO").  The defendant O'Brien was convicted of giving an illegal gratuity to Petrolati by hiring Petrolati's wife after Petrolati sponsored legislation to create and fund ELMO.

[3]     Burke's daughter was also hired to work at ELMO at the same time Petrolati's wife was hired.  They staffed a Springfield office which was not necessary for the operation of ELMO.

defendants Tavares and Burke were key participants in effectuating the conspiracy.  Tavares essentially managed the entire hiring regime from start to finish.  She organized interview panels, sent candidate packages to the members of the interview panels, passed the names of sponsored candidates to certain members of these panels, dealt with issues that arose during the course of interviews, fielded complaints from members of the panels who questioned the integrity of the process, and signed letters sent to unsuccessful job applicants.

Similarly, Burke passed the names of sponsored candidates to certain members of interview panels who conducted interviews for Probation positions in western Massachusetts. Wall testified that Burke, who was the Deputy Commissioner for western Massachusetts, was very influential in hiring in that area and closely aligned with Thomas Petrolati.  Wall also testified that when Wall went to western Massachusetts to conduct interviews, Burke already had the name(s) of the sponsored candidate(s).  Both Regional Administrators Ed Driscoll and Nick DeAngelis testified that they received names from Burke.  In fact, Driscoll testified that when he complained to Burke about the rigged hiring system, Burke claimed "I wrote the book on that stuff."  Chief Probation Officer Stephen Alpers testified that he received Amy Parente's name from Burke for the Assistant Chief's position in Milford.  Parente received the promotion despite the fact that Karen Jackson was the best candidate.  Most troubling was the testimony of Assistant Chief Probation Officer Frank Glenowicz who testified that after he was promoted, Burke and Petrolati met Glenowicz at a local bar and Burke told Glenowicz to thank Petrolati for the job.

Documentary evidence created by the Probation Department to track the interview process corroborated much of the testimony and illustrated the systemic fraud utilized to conceal O'Brien's illegitimate appointments.  Comparisons of sponsored candidate rankings between the

final and second rounds stunningly established the essence of the conspiracy.

Finally, recorded telephone messages left by Director of Personnel Janet Mucci for

Regional Administrator Edward Dalton left no doubt that the RICO conspiracy was ongoing as

far back as 2000.  Mucci explained the motive for the conspiracy,

> But Jack had a meeting over at the State House yesterday and
> I think, or the day before and again that triggered a lot of this.
> You know [*whispering*] when he got everything he wanted
> this year in the budget moneywise, so they feel like they did
> that for him, you know, and obviously he needs to do this for
> them.

Exhibit No. 49.1.

In conclusion, the evidence overwhelmingly proved that the defendants were participants

in a RICO conspiracy.  They used their management positions in the Probation Department to

engage in a pattern of racketeering activity (mail fraud and illegal gratuities) to accomplish the

scheme to defraud alleged in the Indictment, *i.e.*, to appoint politically connected candidates who

were not the most qualified candidates and falsely represent that they complied with the hiring

requirements of the Manual which required merit based appointments.

### B.  The Evidence At Trial Established A Single Racketeering Conspiracy And Did Not Constitute A Variance

The defendants argue that the hiring scheme involving the appointment and promotion of

probation officers and the scheme involving the appointment and promotion of ELMO

coordinators constituted two separate conspiracies.  *See* O'Brien Brief at 3-11.  They state,

> Further complicating these issues is the fact that only a single
> *RICO* conspiracy was charged.  Given the structure of the charges,
> there is no way of knowing which conspiracy the jurors found to
> have existed, or if they were unanimous in their analysis, when
> they rendered a verdict of guilty as to Count 1.

*Id.* at 10.

This argument demonstrates a fundamental misunderstanding of RICO conspiracy.

RICO makes it a crime to conspire to commit a substantive RICO offense.  In other words, the object offense of a RICO conspiracy is the crime of racketeering – not the particular predicate acts alleged in the substantive RICO charge.  *See United States v. Starrett*, 55 F. 3d 1525, 1543-44 (11th Cir. 1995) (the focus is on the agreement to participate in the enterprise through the pattern of racketeering activity, not on the agreement to commit the individual predicate acts); *accord, United States v. Delgado,* 401 F.3d 290, 296 (5th Cir. 2005); *United States v. Posada-Rios,* 150 F.3d 832, 857 (5th Cir. 1998); *United States v. To*, 144 F.3d 737, 744 (11th Cir. 1998); *United States v. Sutherland*, 656 F.2d 1181, 1192-93 (5th Cir.), *cert. denied*, 455 U.S. 949 (1982).  The pleading in Count One of the Indictment specifically states,

> [the defendants] …being persons employed by and associated with the Office of the Commissioner of Probation (OCP), an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, *did unlawfully and knowingly conspire, confederate and agree to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity as set forth in paragraph 12 below*.

Indictment at §11 (emphasis added).  Paragraph 12 of the Indictment states,

> The pattern of racketeering activity, as that term is defined by Title 18, United States Code, Sections 1961(1) and 1961(5), through which the defendants and their coconspirators agreed to conduct and participate directly and indirectly in the conduct of the affairs of the enterprise, *consisted of multiple acts of mail fraud indictable under Title 18, United States Code, Section 1341 and multiple acts involving bribery in violation of Massachusetts General Laws, Chapter 268A, Sections 2(a)(1) and 3(a).*

Indictment at §12 (emphasis added).

Thus, the defendants incorrectly conflate the pattern of racketeering with the charge of RICO conspiracy.  Moreover, it is not unusual for the pattern of racketeering in a RICO case to

include multiple separate conspiracies.[4]  In *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert.*

*denied*, 439 U.S. 953 (1978), the Court concluded that the effect of RICO "is to free the

government from the strictures of the multiple conspiracy doctrine and to allow the joint trial of

many persons of diversified crimes" when the defendants agreed to participate in the affairs of

the enterprise and those crimes related to the same enterprise.  *Id.* at 900.  The Court explained,

> The gravamen of the conspiracy charge in this case is not that each
> defendant agreed to commit arson, to steal goods from interstate
> commerce, to obstruct justice, and to sell narcotics; rather it is that
> each agreed to participate, directly and indirectly, in affairs of the
> enterprise by committing two or more predicate crimes.  Under the
> statute, it is irrelevant that each defendant participated in the
> enterprise's affairs through different, even unrelated crimes, so
> long as we may reasonably infer that each crime was intended to
> further the enterprise's affairs.

*Id.* at 902-03.  Thus, the defendants' attempt to apply traditional conspiracy law to a RICO

conspiracy fails in this regard.

The defendants extrapolate a variance claim from their belief that the hiring of ELMO

employees and the hiring of probation officers constituted two different conspiracies.  For the

reasons set forth above, this concept is meritless.  Furthermore, Count One of the Indictment

clearly set forth in great detail that the hiring of ELMO employees was part of the RICO

conspiracy.

> 26.     During 2007 and 2008, the defendant **O'BRIEN** gave the
> then Chairman of the House Ways and Means Committee the
> opportunity to fill numerous positions at the Clinton ELMO
> facility with individuals chosen by the Chairman.  The Chairman
> and a member of his staff subsequently contacted approximately
> ten members of the House of Representatives who provided the
> names of candidates for ELMO positions within the Probation

---

[4]      *See, e.g., United States v. James Bulger*, Crim. No. 99-10371-DJC (where a
narcotics distribution conspiracy, a money laundering conspiracy, two extortion conspiracies and
several murder conspiracies were charged as predicate acts).

Department.  These individuals were subsequently hired without any vetting process and without any interview.

27.    The defendant **O'BRIEN** engaged in the conduct described above in paragraphs 25 and 26 in order to influence and attempt to influence members of the legislature to act favorably on legislation and budget requests regarding the Probation Department as well as to assist the Chairman in an upcoming contest for the post of Speaker of the House of Representatives.

### C. The Court's *Petroziello* Determinations Were Consistent With The Evidence

As discussed above, the evidence of the defendants' involvement in a RICO conspiracy was overwhelming.  The defendants enlisted numerous members of the management structure to participate in the rigged hiring scheme.  While most participants had specific and limited roles, they nonetheless became parties to the illegal agreement.  As the Supreme Court stated in *Salinas v. United States*, 522 U.S. 52 (1997),

> A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.  He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion.  One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense.  It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.

*Id.* at 63-65.

Despite the protestations of some of the witnesses at trial regarding their intent to engage in racketeering, the jury was the ultimate determiner of credibility and could have rejected this testimony as incredible.[5]  It is obvious that many of the currently employed Probation

---

[5]    This line of questioning was championed by the defense, but ultimately called for a legal conclusion by witnesses who were not lawyers.  While the government's examination focused on the conduct of the witnesses, the defense routinely employed meaningless rhetorical flourishes such as, "Are you a racketeer?"

Department managers were loath to admit their own personal wrongdoing and were engaged in saving their reputations, if not their positions, during their testimony at trial.  As noted by the Eleventh Circuit in *Starrett,*

> The government can prove an agreement on an overall objective "by circumstantial evidence showing that each [conspirator] must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity."

*United States v. Starrett*, 55 F.3d at 1543-44 (citation omitted).

The defendants complain that statements by Janet Mucci and Leonard Mirasolo were wrongly admitted as coconspirator statements.  *See* O'Brien Brief at 16.  They are wrong on both points.  Janet Mucci was the Director of Personnel for the Probation Department and testified that she knew that the defendant O'Brien was making appointment decisions based upon political considerations rather than merit.  She testified that she sat with him while he reviewed sponsor lists and gave her names to pass on to members of interview panels.  In fact, the recorded voicemails themselves demonstrated that Mucci had a complete understanding of the goals of the conspiracy and that she was participating by passing the names of sponsored candidates to Regional Administrator Edward Dalton.  Furthermore, Mucci testified that she and her staff prepared the certifications for O'Brien to send to the CJAM and changed the language from "most qualified" to "best candidate" knowing that O'Brien's appointments were not "the most qualified" candidates.  Also, in addition to Dalton, Deputy Commissioner Paul Lucci testified that he received the names of sponsored candidates from Mucci.

The defendants also claim that the Mucci voicemails predated O'Brien's authority to appoint probation officers.  This is a distinction without a difference.  The Mucci voicemails demonstrate, consistent with the allegations in the Indictment, that the conspiracy was ongoing at

13

the time O'Brien received appointment authority.  Therefore, Mucci was a coconspirator at the time she left the voicemails for Dalton and the voicemails were appropriately admitted pursuant to F.R.E. 801(d)(2)(E).

Likewise, the statements of Leonard Mirasolo were properly admitted as coconspirator statements.  ELMO Regional Program Manager Edward Ryan testified that O'Brien told Ryan that all legislative requests from the House of Representatives for ELMO jobs were to be referred to then Chairman of House Ways and Means Committee Robert DeLeo.  O'Brien was interested in helping DeLeo garner support to become the next Speaker of the House.  Mirasolo and Ryan discussed giving ELMO jobs to certain members of the House from whom DeLeo was seeking support.  Ryan's testimony clearly established a conspiracy between O'Brien, DeLeo and Mirasolo to give things of value to elected officials in an attempt to garner support for DeLeo for the Speakership.

Although the testimony of Ryan was a sufficient basis to admit the statements of Mirasolo, there was significant corroborative evidence of the conspiratorial agreement.  First and foremost, numerous members of the House testified that they were contacted by DeLeo and Mirasolo and offered the opportunity to place an individual in an ELMO position.  Second, there was significant evidence of the close relationship between DeLeo, Mirasolo and O'Brien.  In fact, Mirasolo's son and DeLeo's godson, Brian Mirasolo, was a probation officer, and Brian Mirasolo's appointment was the subject of a proven racketeering act.   Third, there was evidence that O'Brien sought significant legislative favors from DeLeo during the time period of the ELMO appointments.  Finally, almost every state representative to whom DeLeo gave an ELMO position voted for DeLeo and became a member of DeLeo's leadership team.  For these reasons, the Court's *Petroziello* determinations were consistent with the evidence and the defendants'

motions should be denied on this ground.

### D.  The Court's *Pinkerton* Instruction Was Appropriate And Not Error

The defendants Tavares and Burke complain that the Court should not have instructed the jury on co-conspirator liability pursuant to *United States v. Pinkerton*, 328 U.S. 640 (1946). Particularly, they complain that: (1) the *Pinkerton* rule should not be applied in a marginal case and that the case at bar was a marginal case; and (2) *Pinkerton* does not apply in RICO cases. Tavares Brief at 18-24; Burke Brief at 7-8.

As discussed above, there was substantial evidence of both Tavares' and Burke's participation in the charged conspiracy.  Unlike many RICO cases where many different types of criminal acts are committed by various participants, the Indictment in the case at bar charges multiple criminal acts committed pursuant to a single scheme to defraud.  Thus, the substantive offenses and predicate acts charged in the Indictment were clearly reasonably foreseeable to any member of the conspiracy.[6]  This was not a marginal case where the evidence of a conspiracy was weak and there was a danger that the jury would infer from the commission of the substantive offenses that a conspiracy existed.  *See United States v. Sanchez*, 917 F.2d 607, 612 n.4 (1st Cir. 1990) (upholding a *Pinkerton* charge).  To the contrary, there was significant direct evidence from several witnesses that established the existence of the conspiracy.  Due to the extensive nature of the conspiracy and the large number of individuals delegated with responsibilities by the defendants, a *Pinkerton* charge was especially appropriate where the defendants could not have possibly participated in all the acts necessary to accomplish the goals of the conspiracy.

---

[6]    The defendant Burke was not convicted of any substantive offenses based upon co-conspirator liability and was not charged in the substantive RICO count.

Finally, despite the defendants' contentions to the contrary, the Supreme Court has endorsed the use of *Pinkerton* in RICO cases.  *See Salinas*, 522 U.S. at 63-64.  In *Salinas*, the defendant was convicted of RICO conspiracy.  The defendant appealed and contended that the conviction should be reversed because he had neither committed nor had he agreed to commit two predicate acts.  The Supreme Court rejected this argument and explained,

> A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. (citation omitted)  The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other.  ***See Pinkerton v. United States*, 328 U.S. 640, 646, 66 S.Ct. 1180, 1183-1184, 90 L.Ed. 1489 (1946).**  ("And so long as the partnership in crime continues, the partners act for each other in carrying it forward.")  If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as a guilty as the perpetrators.  As Justice Holmes observed: "[P]lainly a person may conspire for the commission of a crime by a third person."

*Id.* at 63-64 (citation omitted) (emphasis added).  On these grounds, the defendants' *Pinkerton* claims must be denied.

## II.    The Evidence At Trial Was Sufficient To Support The Convictions Of The Defendants O'Brien And Tavares For Mail Fraud

Defendants O'Brien and Tavares next contend that the government presented insufficient evidence to convict them on any of the mail fraud charges.[7]  The defendants' claims, however, amount to little more than a recitation of the legal arguments in their unsuccessful motions to

---

[7]    The jury convicted defendants O'Brien and Tavares of mail fraud as charged in Counts 3-6 of the Indictment (related to the hires of Patrick Lawton, Kelly Manchester, Melissa Melia and Patricia Mosca).  In addition, the jury convicted O'Brien and Tavares of racketeering (Count 2 of the Indictment), based, in part, on mail fraud relating to the hires of Lawton, Manchester, Melia, Mosca, John Chisholm, Brian Mirasolo, Douglas Maclean, Frank Glenowicz, Joseph Dooley and Bernard Dow.

dismiss the Indictment.[8]  Applying facts to a set of faulty legal theories does not create grounds

for a judgment of acquittal.  To the extent the defendants advance new claims, they also must

fail, as they ignore or misstate the evidence presented at trial.

### A.  The Government Presented Sufficient Evidence Of Mailings "In Furtherance Of" The Scheme To Defraud

First, the defendants contend that the government failed to present sufficient evidence of

mailings "in furtherance of" the fraudulent hiring scheme.  That claim – based on an erroneous

interpretation of the law and ignorance of the facts – must be denied.  At trial, the government

presented evidence of three types of mailings "in furtherance" of the scheme to defraud: (1)

rejection letters mailed to unsuccessful candidates (in regard to the hires of Patrick Lawton,

Kelly Manchester, Melissa Melia, Patricia Mosca, Joseph Dooley, John Chisholm and Bernard

Dow); (2) an appointment letter, mailed to Chief Probation Officer James Casey, in regard to the

hire of Douglas Maclean; and (3) an application for employment related to the hire of Frank

Glenowicz.  Each of those mailings was "in furtherance" of the scheme to defraud.  As discussed

in the parties' motions to dismiss the Indictment, the government must prove two things to

satisfy the mailing element of the mail fraud statute: (1) that the defendants caused the use of the

mails (or that the use of the mails was reasonably foreseeable to them); and (2) that the

defendants did so for the purpose, or in furtherance of, executing the scheme to defraud.  *United

States v. Hebshie*, 549 F.3d 30, 36 (1st Cir. 2006).

The defendants first contend that the mailed rejection letters were not "in furtherance" of

---

[8]        The defendants' motions to dismiss were denied twice by this Court; once, in a
36-page Order, by Judge Saylor (Docket No. 229), and again, after careful consideration, by this
Court. *See* Docket No. 354.  Accordingly, the government will not re-hash the arguments from
these motions, but incorporates, by reference, the government's omnibus response thereto. *See*
Docket No. 195, Government's Response to Defendants' Motion to Dismiss the Indictment.

the charged scheme.  This argument, taken verbatim from their motions to dismiss, is based upon the faulty factual and legal theory that the rejection letters could not be "in furtherance" of the fraudulent hiring scheme because the letters constitute administrative or ministerial communications mailed after the scheme reached fruition.  *See, e.g.*, Docket No. 171, Defendants' Memorandum of Law in Support of Motion to Dismiss ("Defendants' Motion to Dismiss") at 25-28.  In denying the Defendants' Motion to Dismiss on that ground, Judge Saylor explained that (1) the Indictment alleged an ongoing scheme that occurred over a period of at least ten years (during which the rejection letters were mailed); and (2) rejection letters sent to unsuccessful applicants as a part of a fraudulent hiring scheme are "in furtherance of those schemes" because they lend a false air of propriety and legitimacy to the hiring process.  *See* Docket No. 229, Memorandum and Order on Motion to Dismiss the Indictment ("Order on Motion to Dismiss") at 16.

At trial, the government presented evidence that the alleged hiring scheme began in at least 2000, before O'Brien had appointment authority.  In particular, Edward Dalton testified that he received and passed on names of preferred candidates as early as 2000.  The jury also listened to recorded phone messages from Janet Mucci to Dalton, from October 2000, during which Mucci passed names of preferred candidates to Dalton and explained the goals of the scheme (to obtain favorable legislative treatment).  The government also presented evidence that the hiring scheme continued until at least 2010, when O'Brien resigned as Commissioner of Probation.  Each of the rejection letters admitted into evidence was mailed during that time frame (2000 to 2010).  In addition, contrary to the defendants' claim that there was no evidence that the rejection letters were "important in any way," Mucci testified that the only way rejected candidates were

notified that they did not get a job was through a rejection letter in the mail.[9]   In sum, the evidence at trial established that the rejection letters were mailed during the time period of the fraudulent hiring scheme and they were the only means of notifying a candidate that he or she did not get a job.  The letters, therefore, "lent a false air of propriety and regularity" to the hiring process.  *See United States v. Sorich*, 523 F.3d 702, 714 (7th Cir. 2008).

In addition, the defendants vaguely allege deficiencies in the mailings related to the Glenowicz and Maclean hires.  *See* O'Brien Brief at 25.  While the nature of the defendants' complaint is not clear, the government presented sufficient evidence of a mailing "in furtherance of" the scheme in each instance.  With respect to the Maclean hire, the government introduced Maclean's appointment letter, signed by the CJAM, which was mailed to Maclean's Chief Probation Officer, James Casey.  Contrary to the defendants' assertion, Casey testified that he received the letter via the mail.  That mailing, which confirmed Maclean's fraudulent hire, constitutes a mailing in furtherance of the hiring fraud because it too lent an air of legitimacy and propriety to the hiring process – making it appear that he was hired in accordance with the policies of the Manual.  Likewise, with respect to the Glenowicz hire, the government introduced the application of Sheila Dintamin, one of two top candidates for the job.  Dintamin testified that she mailed her application to the Probation Department.  The fact that the Probation Department solicited applicants (and applications) by mail made the hiring process appear legitimate and

---

[9]      In an effort to point out the mundane character of the rejections letters, the defendants point out that the Manual required such letters to be sent once the CJAM approved the appointment of the successful candidate.  *See* O'Brien Brief at 24 (citing §4.301(E) of the Manual).  The fact that these letters were required by the Manual does not mean they were not mailed "in furtherance of" the fraudulent hiring scheme.  It does demonstrate, however, that these mailings were reasonably foreseeable to each of the defendants in this case.

merit-based[10]; the mailing, therefore, was "in furtherance of" the fraudulent hiring scheme. For each of these reasons, the defendants' claims regarding the mailings should be denied.

### B.  The Government Presented Sufficient Evidence Of The Defendants' Specific Intent To Defraud

The defendants' next claim that the government failed to present sufficient evidence that they had a specific intent to defraud. That claim ignores the testimony of dozens of witnesses at trial. Consider, for instance, the following summary of evidence presented at trial with respect to O'Brien:

- Edward Ryan: Ryan testified that he met with O'Brien to cross-reference the applicant spreadsheets with the sponsor lists so that O'Brien could select who he wanted to get the jobs – based solely on sponsorship. Ryan testified that the State House controlled hiring at the Probation Department.

- Francis Wall: Wall testified that, prior to the final round interview, O'Brien routinely provided him with the names and ranking of the candidates who he wanted to get the jobs. Wall also testified that he informed O'Brien that he and Patricia Walsh were uncomfortable lying under oath at arbitration proceedings when asked how candidates were selected for hire. In substance, O'Brien told Wall to do what he needed to do to protect the process.

- Janet Mucci: Mucci testified that, in earlier years, O'Brien personally signed the certifications – certifying to the CJAM that each hire was based solely on merit. Thereafter, his staff used a stamp with his name on it – with his permission.

- Chief Probation Officer James Casey: Casey testified that when he asked O'Brien why O'Brien hired drug addict Doug Maclean, O'Brien responded, in substance: "tremendous pressure from the legislature."

- Judge Kevin Cunningham: Cunningham testified that O'Brien called him, prior to the posting of the position, to tell him that Joseph Dooley would be the new Chief Probation Officer in Taunton District Court. When Cunningham pushed back, citing Dooley's inadequacies, O'Brien explained that he (O'Brien) was getting tremendous pressure from "Pacheco." According to the sponsor lists introduced at trial, Dooley was sponsored for multiple positions by Senator Marc Pacheco.

---

[10]      Mucci testified that she received the majority of applications via the mail.

- Regional Administrator Ellen Slaney: Slaney testified that O'Brien dressed her down for her failure to advance Doug Maclean to the final round of interviews in 2000. According to Slaney, she informed O'Brien that she had not advanced Maclean because he admitted to her, in the interview, that he had a drug problem which was not adequately resolved. O'Brien's response was, in substance, "Come on Ellen, everyone has a sponsor." Slaney was later removed from hiring and assigned to audits because she failed to move on yet another of O'Brien's preferred candidates.

These are just some examples of evidence presented at trial illustrating that O'Brien had a specific intent to defraud, *i.e.*, that he knowingly and intentionally instituted a sham hiring process to make it appear that hiring was based on merit, when, in fact, hiring was based solely on political sponsorship. Then, to protect that sham process, he lied, repeatedly, to the CJAM, certifying that each hire complied with the Manual and was based on merit. The defendants' suggestion that O'Brien had no specific intent to defraud because patronage had always existed in the trial court misconstrues – yet again – the charges in this case. As the government has repeatedly explained, O'Brien is charged with fraud, not patronage.[11]

The same is true for defendant Tavares. Like O'Brien, Tavares contends that the

---

[11] Taking another page verbatim from their unsuccessful motion to dismiss the Indictment, O'Brien also contends that the jury verdict should be set aside based on "the vagueness doctrine and the rule of lenity" because O'Brien "could not have known that [he] was required to conduct hiring in any particular way, and certainly could not have anticipated that [he] could be subject to federal criminal prosecution for [his] failure to do so." *See* O'Brien Brief at 26. The evidence at trial, some of which is summarized above, established, beyond a reasonable doubt, that O'Brien understood he was required to hire based on merit, but, instead, hired solely based on political sponsorship. Indeed, the government admitted tens of letters written between O'Brien and the CJAM where the CJAM made plain his understanding that hiring was to be based solely on merit.

As if that were not enough, O'Brien went to great lengths to cover up the true nature of his hiring process by: (1) establishing a sham third round interview designed to make it appear that the top ranked candidates were the most qualified, when they were not; (2) directing his employees to lie under oath at arbitration proceedings in order to protect the process; and (3) certifying, sometimes in his own writing, that he had complied with the policies and procedures manual and hired employees solely based on merit. Based on that evidence, the notion that O'Brien did not (and could not) understand that he was doing anything wrong is absurd. For these reasons, O'Brien's arguments based on the rule of lenity and vagueness doctrines must fail.

government failed to present evidence of her specific intent to defraud.  In particular, Tavares

argues that the evidence showed that she acted in good faith when she mindlessly passed names

from O'Brien on to the interview panels.  The evidence at trial presents a different picture of

Tavares' intent.[12]  Consider the following:

- Ellen Slaney:  Slaney testified that, after questioning Tavares about a non-merit-based hire, Tavares said, in effect, "sometimes you have to do the political thing." When Slaney confronted Tavares about hiring drug addict and ex-con, Doug Maclean, Tavares said, in effect, "not our finest hour."

- Edward Dalton:  Dalton testified that Tavares gave him approximately six names of individuals who were to advance to the final round interview for the Barnstable District Court Assistant Chief position.  She also blacklisted two candidates – telling Dalton they were not to make the final list.  When Dalton pushed back, aggressively, Tavares did not back down.

- Regional Administrator Richard O'Neil: O'Neil testified that, to the extent he got names prior to an interview, they were always from Tavares.

- Janet Mucci:  Mucci testified that Tavares or a member of her staff signed many of the rejection letters that were introduced into evidence.

- Francis Wall:  Wall testified that he and Patricia Walsh informed O'Brien that they were uncomfortable lying under oath at arbitration proceedings (regarding the hiring practices).  O'Brien told Wall and Walsh to do what they had to do to protect the process.  Tavares, an attorney and former member of the legal department, was present for that conversation.  Despite her presence, neither Wall nor Walsh was advised that they should not lie under oath.

- Edward McDermott:  McDermott testified that he and Patricia Walsh interviewed Kelly Manchester for the final round interview.  Walsh told McDermott that she complained to Tavares about the hire of Kelly Manchester, because Manchester was so woefully underqualified.

Finally, the government presented evidence at trial that Tavares was a lawyer who had

---

[12]     Like O'Brien, Tavares also claims that the government presented no evidence tending to suggest that O'Brien understood that he had to hire based solely on merit.  *See* Tavares Brief at 14.  As described in footnote 11, *infra*, such a notion is absurd; if O'Brien did not know he had to hire based on merit, than there was no reason for him to create a sham system of hiring or direct his employees to lie under oath at arbitration proceedings – both of which, the evidence showed, he did.

once worked in Probation's legal department. All of that evidence, which is only a subset of that

introduced at trial, illustrates Tavares' understanding that hiring at the Probation Department was

based on political sponsorship, not merit. More significantly, it demonstrates her specific intent

to engage in fraud by helping to cover it up.

In sum, the evidence at trial sufficiently established that both O'Brien and Tavares acted

with a specific intent to defraud. They did not act in good faith. On that ground, therefore, the

defendants' motions should be denied.

### C.  The Government Presented Sufficient Evidence That The Certifications Constituted A *Material* Misrepresentation Relied Upon By The CJAM

Again reciting, nearly verbatim, from their unsuccessful motion to dismiss the

Indictment, the defendants contend that the certifications could not constitute a material

misrepresentation because "the CJAM did not have a role in the Probation hiring process, [and

thus] statements to the CJAM regarding that process were not 'capable of influencing' the

CJAM." O'Brien Brief at 29. However, even if the certifications were false, the defendants

contend, the government failed to present sufficient evidence that CJAM Mulligan relied on

them, as required to prove mail fraud. O'Brien Brief at 33; Tavares Brief at 17. These frivolous

arguments can be disposed of simply.

At trial, CJAM Mulligan testified that his role with respect to hiring at the Probation

Department was to approve O'Brien's appointments. Such approval was based upon whether the

hires complied with the Manual – including whether the hires were merit-based. CJAM

Mulligan also testified that he relied upon (and thus was influenced by) O'Brien's certifications

in order to ensure that each hire was based on merit. As if that were not enough, the government

introduced O'Brien's own statements to the media shortly after his resignation. In those

statements, *O'Brien himself* stated that all of his appointments had to be approved by the CJAM

– thus, the CJAM played a role in the Probation Department hiring process.  The defendants'

own words are sufficient to prove that the certifications were *material* misrepresentations.

Mulligan's testimony established his reliance on them.  The defendants' motions, therefore,

should be denied on that ground.[13]

### D.  The Government Presented Sufficient Evidence That The Certifications Were False

Next, the defendants contend that the certifications from O'Brien to CJAM Mulligan

were "true and accurate" and thus cannot be considered the material misrepresentation

underlying the mail fraud charges.[14]  O'Brien Brief at 29.  In particular, the defendants contend,

O'Brien's decision to "factor recommendations into the "merit" hiring calculus" does not violate

the personnel standards of the Trial Court Manual; thus, the certifications are literally true.  *See*

*id.* at 30.  That argument wholly misrepresents the testimony and evidence presented at trial

which established that O'Brien hired employees *solely* on the basis of political sponsorship – not

merit.  Such hiring practices are in direct contravention of the language of the Manual which

states, in no uncertain terms, that the policy of the trial court was to hire employees solely based

on merit.  Consider, for instance, the following evidence presented at trial:

---

[13]     Although the government sufficiently proved that CJAM Mulligan relied on O'Brien's false certifications, as the government has argued throughout this case, reliance is not a required element of mail fraud.  *See* Docket No. 261, Memorandum and Order on Defendant's Motion for Recusal (Saylor, J.) (explaining that whether or not CJAM Mulligan was deceived by O'Brien's certifications is irrelevant because detrimental reliance is not an element of mail fraud, citing *United States v. Camuti*, 78 F.3d 738, 742 (1st Cir. 1996); *United States v. Allard*, 926 F.2d 1237, 1242 (1st Cir. 1991); *System Management, Inc. v. Loiselle*, 112 F. Supp. 2d 112, 114-15 (D. Mass. 2000); *Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70, 82 (D. Mass. 1998); *United States v. Brien*, 617 F.2d 299, 311 (1st Cir. 1980).

[14]     Yet again, the defendants' argument is cribbed nearly verbatim from their unsuccessful motion to dismiss the Indictment.

- Section 4.0 of the Manual (submitted to the jury for review):  Section 4.304 states that is it the policy of the Trial Court "that all appointments be made solely on the basis of merit."

- Certification documentation for each hire (submitted to the jury for review):  Each certification stated: "I certify that I have complied with the Trial Court's personnel standards and that sufficient funding exists in the current fiscal year budget to support this position."

- CJAM Mulligan:  Mulligan testified that he understood the certification to include compliance with the requirement that each hire be based solely on merit.[15]

- Ed Ryan: Ryan testified that O'Brien decided who to hire based solely on a review of the sponsor lists and applicant spreadsheets.  The state house, he said, controlled hiring at the Probation Department.

- James Casey: Casey testified that, in July 2004, O'Brien told Doug Maclean, in Casey's presence, that Maclean would never be a probation officer.  Three months later, O'Brien appointed Doug Maclean as a temporary probation officer in Casey's office.  When Casey asked O'Brien why O'Brien hired drug addict Doug Maclean, O'Brien responded, in substance: "tremendous pressure from the legislature."

- Judge Kevin Cunningham: Cunningham testified that O'Brien called him, prior to the posting of the position, to tell him that Joseph Dooley would be the new Chief Probation Officer in Taunton District Court.  When Cunningham pushed back, O'Brien explained that he was getting tremendous pressure from "Pacheco."  According to the sponsor lists introduced at trial, Dooley was sponsored for multiple positions by Senator Marc Pacheco.

- Francis Wall:  Wall testified that the final round interview process was a complete sham.  Before every final round interview, O'Brien gave Wall the names and rank of each candidate who the Commissioner wanted to get the job.  Wall, in turn, embellished answers and scores to ensure that the Commissioner's candidates appeared to be the most qualified.  In addition, said Wall, O'Brien

---

[15]     O'Brien regurgitates, word-for-word, his argument from the motion to dismiss that the phrase "personnel standards" does not include the standard that hiring be based solely on merit.  Judge Saylor denied the defendants' motion to dismiss on that ground, finding that "a certification that the appointment was made in compliance with the personnel standards of this section is a certification that the appointment was made solely on the basis of merit."  *See* Order on Motion to Dismiss at 19 (internal quotations omitted).  In any event, CJAM Mulligan's credible testimony sufficiently establishes otherwise.

sanctioned Wall's perjury at arbitration hearings so that they could protect the sham hiring process.

Moreover, nearly every Judge and Regional Administrator who sat on second round interview panels testified that the charged hires were not the most qualified individuals for their respective jobs.  In short, the government presented sufficient evidence at trial to establish that O'Brien's certifications were false.[16]  The defendants' motions should be denied on this ground.

### E.  The Government Presented Sufficient Evidence Of A Deprivation Of Property

Again arguing, almost word-for-word, from their unsuccessful motion to dismiss the Indictment, the defendants claim that the government failed to present sufficient evidence of a deprivation of tangible property because: (1) there was no evidence at trial that the Probation Department fraudulently "obtained" jobs and salaries; and (2) there was no evidence at trial that anyone was deprived of tangible property.  O'Brien Brief at 33-39;Tavares Brief at 8-10.  The defendants, once again, are wrong.  Their first argument – that there was no evidence at trial that the Probation Department fraudulently "obtained" jobs and salaries – is irrelevant.  "It is well-settled that a scheme to obtain jobs or promotions . . . [for] persons who are not qualified, or the most qualified, can constitute a scheme to obtain money or property under the mail fraud statute."  Order on Motion to Dismiss at 20 (citing *United States v. Doherty*, 867 F.2d 47, 55-56 (1st Cir. 1989, *Sorich*, 523 F.3d at 712-13, *United States v. Leahy,* 464 F.3d 773, 786-89 (7th Cir. 2006), and *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990)).  The evidence at trial sufficiently established that the defendants engaged in a scheme to obtain jobs and promotions for individuals who were not the most qualified candidates, but rather, the most

---

16    The defendants also contend that the government failed to present sufficient evidence of mail fraud, as a whole, with respect to four particular charged hires: Patrick Lawton, Joseph Dooley, Brian Mirasolo and Bernard Dow.  Each of those allegations is addressed, *infra*, at Section G (1) through (4).

politically connected ones.  As that constitutes a fraudulent scheme to obtain money or property, the defendants' first argument must fail.

The defendants' second claim – that there was no evidence that anyone was deprived of tangible property – fares no better.[17]  It is premised upon the faulty notion that the Commissioner of Probation had absolute hiring authority and that neither the Manual, nor M.G.L. Ch. 211B apply to the Probation Department since the Probation Department does not fall under the auspices of the Trial Court.  Thus, the defendants argue, the Commonwealth had no right to the most qualified probation officers (and, therefore, could not be deprived of such a right).  *See* O'Brien Brief at 34-39; Tavares Brief at 9.  As a threshold matter, the defendants' argument fails as a matter of law.  See Order on Motion to Dismiss at 20-21.  The mail fraud statute requires only that the government allege and prove a scheme or artifice to defraud, or to obtain money or property by means of false and fraudulent pretenses.  *See* 18 U.S.C. §1341; Judge D. Brock Hornsby's 2008 Pattern Criminal Jury Instructions for the District Courts of the First Circuit, §4.18.1341.  Indeed, while some mail fraud cases include a discussion of the "deprivation" of property, it is well-established that the government does not have to prove contemplated harm to the victim or any loss in order to establish a charge of mail fraud; rather, the government must allege and prove that the object of the fraud was to obtain money or property.  *See, e.g., Leahy*, 464 F.3d at 786-89.  Here, the government presented sufficient evidence at trial that the object of the fraud was to obtain jobs and promotions for individuals who were not the most qualified

---

[17]     As a threshold matter, the defendants' argument assumes that the mail fraud statute requires a deprivation of *tangible* property.  It does not.  *See* Order on Motion to Dismiss at 20-21 ("While the mail fraud statute requires proof of a scheme to obtain money or property, the term "property" can include either tangible or intangible property."  *See, e.g., Carpenter v. United States*, 484 U.S. 19, 25 (1987).)

candidates.  It is well-established that such evidence constitutes "money or property" within the meaning of the mail fraud statute.  *See* Order on Motion to Dismiss at 21 (citing cases).

Furthermore, the defendants' claim is premised upon a faulty set of facts, *i.e.*, that the Probation Department was not part of the Trial Court and thus not subject to the supervision of the Trial Court, or the policies of the Manual.  The evidence at trial overwhelming demonstrated that to be false.  Multiple witnesses (including high-ranking Probation employees such as Regional Administrators and the CJAM) testified that the Probation Department was part of the Trial Court, subject to the supervision and authority of the CJAM, and bound by the merit-based hiring policies of the Manual.  Indeed, there was no evidence to the contrary.

Accordingly, for all of these reasons, the government presented sufficient evidence at trial of a scheme or artifice to defraud, or to obtain money or property by means of false and fraudulent pretenses.  The defendants' Motion should, therefore, be denied on that ground.

### F.  The Government Presented Sufficient Evidence That Tavares Aided And Abetted O'Brien's Fraud

Defendant Tavares contends that the government failed to present sufficient evidence that she aided and abetted O'Brien's fraudulent hiring scheme.  Her argument is two-fold: (1) Tavares' conduct, namely signing rejection letters and passing names, was not "in furtherance" of the fraud; and (2) Tavares had no specific intent to defraud.  *See* Tavares Brief at 3-6.  Both arguments fail in the face of the evidence presented at trial.

In order to prove the crime of aiding and abetting mail fraud, the government must establish that Tavares (1) took an affirmative act in furtherance of the fraud; (2) with the intent of facilitating the fraud.  *See Rosemond v. United States*, --- U.S. ---, 134 S.Ct. 1240, 1245 (March

5, 2014).[18]  As described in part, *supra*, the government presented significant evidence of both

elements at trial.  Tavares organized and managed the sham hiring process, making it appear

legitimate when she knew that it was not.  In particular, the evidence established that Tavares

organized the interview panels, sent candidate application packages to the members of the

interview panels, passed the names of O'Brien's preferred candidates to the Regional

Administrators on the interview panels, handled complaints from members of the interview

panels when, for instance, a preferred candidate was not advanced, and signed rejection letters

which were mailed to candidates who did not get jobs.  Each of these activities constitutes an

affirmative act in furtherance of the fraudulent hiring scheme.  Tavares' argument that she would

have engaged in these activities anyway, even absent the fraud, is irrelevant.  Many of these

activities – setting up interview panels, sending out candidate application packages (as if each

candidate would actually be considered on his/her merits) and signing rejection letters – lent a

false air of propriety and legitimacy to the hiring process.  *See, e.g., Sorich*, 523 F.3d at 714.

Moreover, Tavares' act of passing the names of preferred candidates to members of the interview

panels was integral to the fraudulent hiring scheme.  Indeed, without such conduct, there would

have been nothing to cover up.

Finally, Tavares conveniently omits any reference to the evidence at trial that she

participated in a meeting with O'Brien, Francis Wall, John Cremens, and Patricia Walsh to

discuss Wall and Walsh's testimony at arbitration proceedings.  According to Wall's testimony,

during that meeting, he and Walsh raised concerns that they would have to lie under oath during

---

[18]     Notably, the Court's "Chart of Elements of Offenses and Racketeering Acts
Charged" ("Cheat Sheet") was consistent with these two elements, stating that the elements of
aiding and abetting are: "Sharing the same criminal intent to commit mail fraud as the principal
actor" and "doing something to help make the mail fraud occur."

the arbitration when asked questions regarding the nature of the hiring process.  *See* Wall Tr. 6/12/14 at 44.  Wall testified that he and Walsh were told "it was more important that the process remain in effect to have a good relationship with the legislature."  *See id.* at 44-45.  In other words, Wall and Walsh were instructed to lie.  Tavares, an attorney, was present for that discussion.  Whether or not she verbally gave Wall and Walsh this advice, she participated in that meeting, the purpose of which was to cover up the true nature of hiring at the Probation Department.  That too, constitutes an affirmative act in furtherance of the fraudulent hiring scheme.

The government also presented sufficient evidence that Tavares was not willfully blind – as she suggests – but that she shared O'Brien's specific intent to engage in the hiring scheme. As described in more detail at Section II(B) of this Response, the government presented evidence that (1) Tavares understood that hiring at the Probation Department was based on political connections and not merit, and (2) Tavares acted with the intent of furthering O'Brien's scheme to defraud by covering up the true nature of the hiring process.  For all of these reasons, Tavares' claim must fail.

### G.  The Government Presented Sufficient Evidence Of Certain Individually Charged Mail Fraud Hires

The defendants further contend that the government failed to present sufficient evidence of mail fraud with respect to four specific hires: Patrick Lawton, Joseph Dooley, Brian Mirasolo and Bernard Dow.  *See* O'Brien Brief at 18-20.  For the reasons described herein, those claims also must fail.

### (1)  The Government Presented Sufficient Evidence That Patrick Lawton's Hire Constituted Mail Fraud

The defendants contend that the government failed to present sufficient evidence that

Patrick Lawton's hire constituted mail fraud because (1) there was insufficient evidence that the Lawton certification was false (or, put another way, there was insufficient evidence to establish that Lawton was not the most qualified candidate), and (2) there was insufficient evidence that CJAM Mulligan relied on the certification in approving the Lawton appointment.  Both arguments ignore much of the following evidence presented at trial.

- Judge Catherine Sabaitis:  Judge Sabaitis participated in the second round of interviews for Lawton's hire.  She testified that Lawton was not the most qualified candidate and, indeed, was not in the top eight.

- Chief Probation Officer Michael LaFrance:  Lafrance participated in the second round of interviews for Lawton's hire.  He testified that Lawton was not the most qualified candidate and did not rank him in the top eight.  When Lawton didn't make the final list of eight, Lafrance testified that Regional Administrator Frank Campbell made a call to Francis Wall.  After that call, Lafrance spoke with Wall who told him that there was more than one position available, so the panel could send more than eight names to the final round of interviews.  Lawton's name was added as the ninth name on the list and he was advanced to the final round.

- Francis Wall:  Wall testified that he spoke with Frank Campbell and Michael Lafrance after the second round interview and informed them that they could send up more than eight names to the final round because there was more than one position available.  Wall further testified that O'Brien gave him Lawton's name prior to the final round of interviews and told him that Lawton was the number one candidate.  Wall made a notation on his scoring sheet that Lawton was to be number one.  Wall testified that, as a result, he "made sure that his scores rated him as the Number 1 candidate."  Wall Tr. 6/11/14 at 93, lines 19-20.  Regardless of whether Wall testified, on cross examination, that, because he was a lawyer and articulated well, Lawton's answers didn't need the "embellishing that other clients would need," Wall did not testify nor suggest that Lawton was the most qualified candidate for the job.  Rather, Wall testified that "as instructed" he ranked Lawton number one.  Wall Tr. 6/12/14 at 99, lines 21-22.

- CJAM Mulligan:  Mulligan testified that, despite Judge Sabaitis' concerns, he approved Lawton's appointment because he relied on the certification and knew that Lawton was an attorney.

- Patrick Lawton:  Lawton testified that he is a recovering drug addict who resigned from his former job at the District Attorney's Office after committing an ethical violation.  Lawton also testified that he contacted the Senate President's

Office and Senator Jack Hart to assist him in getting a job with the Probation
Department.

- Judge Mark Lawton: Judge Mark Lawton testified that he contacted the Senate
  President's Office and Senator Jack Hart in order to assist his son in getting a job
  at the Probation Department.

- Francine Gannon:  Gannon, the director of constituent services for Senate
  President Therese Murray, testified that she spoke with both Patrick and Mark
  Lawton (and both communicated with her in writing) about Patrick's candidacy
  for a job at the Probation Department (and other state agencies).  Gannon
  contacted Ed Ryan at the Probation Department to assist Patrick in obtaining
  employment.  Gannon, reading from her notes, testified that Ryan told her that
  although Lawton had some trouble getting through the second round interview
  with the Judge, since it was in the hands of the Probation Department after that,
  he should be ok.

That evidence, just a sample of what was presented at trial, sufficiently established that

Patrick Lawton was not the most qualified candidate for the job.  Rather, he was hired because

he was sponsored by Senate President Therese Murray and Senator Jack Hart.  The certification,

therefore, was false, and the CJAM relied upon it in approving Lawton's appointment.  For these

reasons, the defendants' motions with respect to the Patrick Lawton hire must fail.

### (2)  The Government Presented Sufficient Evidence that Joseph Dooley's Hire Constituted Mail Fraud

The defendants next contend that the government failed to present sufficient evidence

that Joseph Dooley's promotion to First Assistant Chief Probation Officer ("FACPO")

constituted mail fraud (racketeering act "m").  In particular, the defendants claim that there was

no evidence that Dooley's name was passed down to the second round panel in advance of the

interview or that the second round scores were anything other than legitimate.  *See* O'Brien Brief

at 19-20.  Again, the defendants' claim ignores the following evidence presented at trial.

- Ellen Slaney:  Slaney sat on the second round interview panel for the FACPO
  position.  She testified that Elizabeth Tavares told her that Dooley was the
  preferred candidate for the FACPO position – prior to the interview.  Slaney
  discussed this information with the Chief Probation Officer on the second round

interview panel, Eugene Montiero.  Slaney testified that, in her view, Joseph
Dooley, whom she supervised at the time, was not the most qualified candidate;
rather, Mary Viera was.

- Scoring Sheets:  Mary Viera was listed as the top ranked candidate after the
  second round interview.

- Sponsor Lists:  Joseph Dooley is listed multiple times as the sponsored
  candidate of Senator Marc Pacheco.

- Francis Wall:  Wall testified that O'Brien instructed him to rank Dooley number
  one in the final round of interviews.  O'Brien told Wall that Dooley was good
  friends with Mr. Pacheco, who was a supporter of the Probation Department.
  The evidence at trial established that "Mr. Pacheco" is Senator Marc Pacheco.

- Judge Kevan Cunningham:  Cunningham testified that, in or about January
  2006, O'Brien called him to tell him that Dooley would become acting and then
  permanent CPO in Taunton District Court (at the time, Dooley was FACPO in
  Bristol Superior).  The CPO position had not even been posted at the time
  O'Brien called.  When Judge Cunningham pushed back, citing Dooley's work
  ethic and close relationships with courthouse personnel, O'Brien acknowledged
  this, but told Judge Cunningham that he (O'Brien) was getting tremendous
  pressure from Pacheco.  Judge Cunningham admitted that, although he ranked
  Dooley number one after the second round interview for the CPO spot, he did it
  only to keep the peace; it was not an accurate ranking.

That evidence sufficiently demonstrates that Dooley was promoted to FACPO not on his

own merit, but because of his connection to Senator Pacheco.  O'Brien's certification, therefore,

was false and fraudulent, and the defendants' motions should be denied on this ground.

### (3) The Government Presented Sufficient Evidence That Brian Mirasolo's Hire Constituted Mail Fraud

The defendants next contend that the government failed to present sufficient evidence

that Brian Mirasolo's hire constituted mail fraud.  In particular, the defendants claim that there

was no evidence that Mirasolo advanced to the final round interview based on anything other

than merit.  *See* O'Brien Brief at 20.  The defendants' view of the evidence is short-sighted.  In

fact, Francis Wall testified that he had a conversation with O'Brien before Mirasolo's final round

interview.  During that conversation, O'Brien told Wall that it was very important that Mirasolo

33

– the son of Leonard Mirasolo – be ranked number one because of Leonard Mirasolo's

relationship with Robert DeLeo, who was a supporter of the Probation Department's budget.  *See*

Wall Tr. 6/11/14 at 115-16.[19]  Wall testified that he ranked Brian Mirasolo number one and gave

him a perfect score of 40 out of 40, stating that, he ensured, through "inflated scoring,

embellishing his answers, and adding to it, that he received the highest score."  *Id.* at 116, lines

20-22.  According to the interview score sheets introduced at trial, Brian Mirasolo was ranked

ninth by the Judge on the second round interview panel.  In addition, Brian Mirasolo's sponsor,

according to the sponsor lists introduced at trial, was Robert DeLeo.[20]  In sum, the government

presented sufficient evidence at trial to establish that Brian Mirasolo's hire was fraudulent.  The

defendants' motions, therefore, should be denied on that ground.

### (4) The Government Presented Sufficient Evidence That Bernard Dow's Hire Constituted Mail Fraud

Finally, the defendants contend that the government failed to present sufficient evidence

that Bernard Dow's promotion constituted mail fraud.  Astoundingly, the defendants rely upon

the perjured testimony of Chief Probation Officer William Mattei who claimed, under oath in

federal court, for the first time, that Dow was the most qualified candidate, even though Mattei

didn't score him as such.[21]  The credible evidence presented at trial, however, established that

---

[19]    At trial, the government also presented evidence of a close relationship between Leonard Mirasolo and his boss, DeLeo.  Moreover, there was testimony that Brian Mirasolo was DeLeo's godson.

[20]    Furthermore, there was sufficient evidence presented at trial that O'Brien engaged in a conspiracy with Leonard Mirasolo to provide ELMO jobs to Robert DeLeo in order to assist him in the upcoming Speaker's Race.  The jury could properly have considered this evidence – and, in particular, the relationships between O'Brien, Leonard Mirasolo and DeLeo in finding that Brian Mirasolo was not hired solely based on merit.

[21]    In particular, Mattei's lies were exposed when he was asked whether he recognized a scoring sheet with his name on it.  He claimed, again for the first time, that he

Dow was promoted because he was sponsored for the job by then-Speaker of the House

Salvatore DiMasi, not based on merit.  By way of example, consider the following evidence:

- Daniel Toscano:  Toscano was Speaker DiMasi's Legal Counsel at the time Dow was hired.  Toscano testified that Dow contacted the Speaker's office for a recommendation for two promotions – one for ACPO and one for FACPO. Toscano contacted O'Brien who told him that Dow would get the ACPO position, but not the FACPO job.  Toscano communicated this information to Dow.

- Judge Paul LoConto:  LoConto served on the second round interview panel for Dow.  When shown a copy of a scoring sheet with his name on it, LoConto was unable to identify it as his own.  Nor could he explain some of the rankings on the scoring sheet.  For instance, he was unable to explain whether (or why) he would have ranked a candidate who was not present for the interview higher than several other candidates who were present for the interview.  A reasonable conclusion from LoConto's testimony regarding his scoring sheet is that he was not the author; rather, someone else on the panel filled in the rankings for him.  In addition, LoConto's notes of each interview – which were admitted into evidence – indicated that Dow was not the most qualified candidate in the group.

- William Mattei's Score Sheet and Notes:  Mattei's score sheet – which was introduced into evidence – looked very much like Judge LoConto's score sheet. While Mattei claimed it was in his handwriting, he was unable to explain why he ranked many individuals the way that he did, including the candidate who was sick and did not appear for the interview.  A reasonable conclusion, based on his testimony and the score sheet itself, is that someone other than Mattei filled it out (the same individual who filled out Judge LoConto's score sheet).  The only other person on the panel, other than Judge LoConto, was William Burke.  The jury, therefore, reasonably could have concluded that Burke forged LoConto and Mattei's score sheets.  In addition, like LoConto, Mattei's notes of the interviews indicate that Dow was not the most qualified candidate for the job.

- Composite Second Round Scoring Sheet:  Even the composite second round scoring sheet, purportedly an average of the panelists' individual rankings, indicated that Dow was ranked number two.

- Francis Wall:  Wall testified that O'Brien told him, prior to the final round interview, that Dow should be ranked number one for the ACPO position.  Wall

recognized the scoring sheet as his own handwriting.  When questioned about his rankings, however, his lies became apparent.  One candidate, for instance, did not appear for the interview because he was sick.  Nonetheless, Mattei ranked him approximately 9 out of 16 candidates. When asked how he could possibly rank a candidate who was absent ahead of 7 others who participated in the interview, Mattei had no meaningful response.

testified that he inflated Dow's scores and increased Dow's information to ensure Dow was the top ranked candidate. *See* Wall Tr. 6/11/14 at 114, lines 8-10. Wall, who was familiar with the Worcester courts, testified that, in his view, Geoffrey Shooshan was the most qualified candidate for the ACPO job. *Id.* at 115. Shooshan was the highest ranked candidate after the second round interview.

This evidence sufficiently proves that the defendants engaged in fraud in the promotion of Bernard Dow from probation officer to ACPO. The defendants' motions, therefore, should be denied on that ground.[22]

### III. The Evidence At Trial Was Sufficient To Support The Convictions Of The Defendant O'Brien Giving Illegal Gratuities In Violation Of Massachusetts Law

The defendants, once again, restate their claim that the government has presented no evidence of a link between the illegal gratuities offered by the defendants and an official act the defendants intended to influence. As the government has stated on numerous occasions, the defendants' arguments are meritless because, unlike the *Sun-Diamond* case, the government in the present case submitted evidence that proved the defendants intended to influence particular and specific official acts. From the evidence elicited at trial, a rational jury could find that the purpose of the defendants providing items of value, in the form of well-paying law enforcement jobs for friends and constituents, to members of the legislature was to help secure the

---

[22]     For each challenged hire, the defendants repeat the argument that, according to the testimony of CJAM Mulligan, "as appointing authority, O'Brien had the authority to select anyone who was passed on by the second panel." O'Brien Brief at 18-20. The defendants have taken that statement out of context. As the evidence established, O'Brien was required to hire the most qualified candidate based solely on merit. In other words, if he chose to forego his sham third round interview process and select the number eight candidate from the second interview round, O'Brien would have to explain – in a grievance proceeding, for instance – how the number eight candidate was more meritorious than the seven others ranked above him. That is not what happened in this case. According to the evidence presented at trial, O'Brien paid no attention to who was the most meritorious candidate. The system was rigged from day one, even before the second round interview, to favor the most politically connected candidates. The defendants' argument, therefore, has no force.

speakership for Representative Robert DeLeo.  Therefore, the facts of the present case are easily distinguishable from the facts and circumstances in *Sun-Diamond*.

By way of background, in 2006, the legislature enacted legislation which required certain sex offender probationers and parolees to be subject to electronic monitoring by Probation.  By the spring of 2007, Probation had begun the process of implementing this legislative directive.  However, the hiring process did not follow the typical Probation/Trial Court hiring protocol.  For example, Probation did not "post" the positions on the state government job website to solicit applications from the general public.  In fact, it was not a matter of public knowledge that these ELMO positions were available.  The ostensible reason for this deviation from standard practice was that these $40,000 a year positions were deemed "temporary," not permanent.  Pursuant to the Manual, temporary positions do not have to be posted, nor do temporary employees have to go through the formal interview process applicable to permanent positions.  Essentially, temporary employees were hired at the will of defendant O'Brien.  Approximately ten of these ELMO jobs were offered to the then-Chair of Ways and Means Robert DeLeo.  DeLeo and/or Leonard Mirasolo offered most of these positions to other members of the House as a reward for the members' support of DeLeo in his candidacy for Speaker.

Generally, the process worked as follows: defendant O'Brien (or Ed Ryan) offered the ELMO jobs to DeLeo and/or Mirasolo and then DeLeo or Mirasolo placed a call to or spoke with the House member, indicated that there were ELMO positions available in Clinton, and asked whether the member knew of anyone who wanted one of the jobs.  The members, all of whom had friends or campaign supporters in mind for the jobs, put their candidates in contact with Mirasolo or Probation directly.  In all instances, the candidates were instructed to fill out an application and return it to Probation, most often directly to the Clinton ELMO facility.  The

candidates were not interviewed; in fact, many were hired, sight unseen, on the same day that they completed and signed their applications.  The government demonstrated at trial, and the jury found, that these jobs were provided by the defendants to the legislators as gratuities for the legislators' support of DeLeo's candidacy for Speaker.

The centerpiece of the Massachusetts gratuity statute is the giving of an item of "substantial value" to an official, "for or because of any official act performed" by the official. M.G.L. Ch. 268A, §3(a).  The government must "prove a link between a thing of value conferred upon a public official and a specific 'official act' [or act within the official responsibility of the defendant] for or because of which it was given."  *Scaccia v. State Ethics Commn.*, 431 Mass. 351 (2000), quoting *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 414 (1999).  However, a Massachusetts gratuity offense does not require a finding of corrupt intent, such as the improper intent to influence official decision making.  *See Commonwealth v. Dutney*, 4 Mass. App. Ct. 363 (1976) (finding gratuity offense to be a lesser included offense of Massachusetts bribery statute).  Rather, only some lesser intent need be shown.  *United States v. Sawyer*, 85 F.3d 713, 730 (1996).

The Massachusetts gratuity statute was enacted into law before the Federal gratuity statute, but "it is very similar to the Federal statute."  *Scaccia*, 431 Mass. at 354; *see also Sawyer*, 85 F.3d at 736; *Packaging Indust. Group, Inc. v. Cheney*, 380 Mass. 609, 611 (1980) (when Massachusetts statute adopts the language of Federal statute, it is ordinarily given same construction as cognate Federal statute).  In fact, the Massachusetts Supreme Judicial Court ("SJC") stated, "In light of the similarity between the Massachusetts and Federal statutes, as well as the legislative history of the Massachusetts statute, we look to Federal law for guidance in construing §3 (a) and (b)."  *Scaccia*, 431 Mass. at 355.  The SJC also found that the bribery

statute typically involves a *quid pro quo*, in which the giver corruptly[23] intends to influence an

official act through a "gift," and that "gift" motivates an official to perform an official act.  In

effect, what is contemplated is an exchange, involving a two-way nexus.  A gratuity in violation

of the statute, in contrast, can either be provided to an official as a reward for past action, to

influence an official regarding a present action, or to induce an official to undertake a future

action.  Only a one-way nexus need be established for a gratuity violation.  *Id.* at 356; *see also*

*United States v. Schaffer*, 183 F.3d 833, 841 (D.C. Cir. 1999).  In *Scaccia*, the Court stated,

> Certainly, a lobbyist's cultivation of friendship with legislators is
> legitimate and lawful. But when that cultivation involves
> hospitality or other gift giving above the permissible amount, it
> becomes suspect.[24] Coupled with an intent that the gift influence a
> specific act, or, in the case of the recipient, when those gifts have
> an influence on an official act or constitute a reward for official
> acts already undertaken, such gifts constitute a violation of the
> gratuity statute.

*Scaccia*, 431 Mass. at 356; *see also Sawyer*, 85 F.3d at 741.

The gratuity violations alleged in the Indictment, and proven at trial, easily satisfy the

one-way nexus test as established in *Sun-Diamond*, 526 U.S. at 405**.**  In *Sun-Diamond*, which

involved gifts[25] from lobbyists to a public official, the Court drew careful lines between bribes,

gratuities, and lawful gifts under 18 U.S.C. §201.  The Court held that "for bribery there must be

a *quid pro quo*—a specific intent to give or receive something of value in exchange for an

---

[23]     As stated previously, under M.G.L. Ch. 268A, §§2 (a) and (b), bribery requires
proof of "corrupt intent," an element missing from the gratuity statute.

[24]     Of course, it is also questionable and suspect to subvert the formal probation
officer interview process on behalf of politicians in contravention of the Manual.

[25]     The gifts included tickets to the 1993 U.S. Open Tennis Tournament in the
amount of $2295, luggage worth $2427, meals totaling $665, and a framed print and crystal bowl
purchased for $524.

official act," while a gratuity "may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Id.* at 404-405.  The Court determined that for either bribery of gratuity there must exist a connection or nexus between the defendant's intent and an official act.  *Id.*  Therefore, the Court in *Sun-Diamond* rejected the government's argument that a gratuity offense could be established by a showing that the defendant gave a government official (the then-Secretary of Agriculture Michael Espy) a gratuity "because of his official position—perhaps, for example, to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." *Id.*  In fact, the *Sun-Diamond* indictment only "alluded to two matters in which [Sun-Diamond] had an interest in favorable treatment from the Secretary at the time it bestowed the gratuities." *Id.* at 401.  Furthermore, although the government in *Sun-Diamond* described the "two matters before the Secretary in which [Sun-Diamond] had an interest, the indictment did not allege a specific connection between either of them-or between any other action of the Secretary- and the gratuities conferred." *Id.* at 402.

Unlike the government's trial presentation in *Sun-Diamond*, the prosecution in the case at hand presented testimony and other evidence from individual co-conspirators that proved the defendants provided jobs and promotions to legislators' constituents to assist Representative DeLeo in his campaign to become Speaker of the Massachusetts House of Representatives.[26] The evidence submitted to the jury demonstrated that the defendants specifically intended the jobs and promotions provided to legislators to influence particular official acts and were not limited to building a reservoir of goodwill as in *Sun-Diamond*.  In the present case, the

---

[26]     The government also established that the defendants provided probation jobs to legislators with the specifically identified intent and purpose of affecting legislation and for increasing Probation's annual budget.

government satisfied, through the allegations in the Indictment and the evidence offered at trial, Justice Scalia's admonition that "[t]he insistence upon an "official act," carefully defined, seems pregnant with the requirement that some particular official act be identified and proved." *Id.* at 406.

The defendants also allege that there was insufficient evidence to support the Kathleen Petrolati hire as a gratuity. This suggestion ignores the overwhelming weight of the evidence the government submitted to the Court and jury to support this count. The jury heard that in 2001 Representative Thomas Petrolati, the husband of Kathleen Petrolati, proposed legislation that established and funded the ELMO program and various jobs within that program. They also heard that the ELMO program was, in fact, funded and established in 2001. The government also presented evidence that Kathleen Petrolati possessed no college degree, had no prior experience in the field of criminal justice, and provided the Department of Probation no references on her application for employment. Moreover, Paul Lucci testified that prior to interviewing Kathleen Petrolati for the critical job of implementing and managing the ELMO program, Lucci was informed that Petrolati was the commissioner's choice for the position. Lucci, therefore, agreed to consider her even though she was woefully unqualified. Kathleen Petrolati was then hired to fill one of the two management positions that were mentioned specifically in the legislation proposed by her husband only months before. This evidence established a direct connection between the job provided to Kathleen Petrolati by O'Brien and the legislation and funding proposed by the lead sponsor of the bill, Kathleen Petrolati's husband, Thomas Petrolati. Thus, there was more than sufficient evidence to support the jury's verdict regarding this particular predicate act.

Finally, the defendants claim that the government failed to prove that the hiring of John

Langone was an illegal gratuity.  The defendants acknowledge in their brief that "Ed Ryan

mentioned his name as someone who had been hired in the ELMO program."  O'Brien Brief at

15.  Of course, Ryan testified to much more that the simple fact that Langone was hired as an

ELMO program employee.  Ryan testified that Langone was one of the ELMO employees hired

during the 2007 batch of hires utilized to influence the Speaker's race on behalf of

Representative DeLeo.  Specifically, Ryan recalled that Langone was included on a list of

individuals that were to be offered jobs at ELMO; this particular list was created by Leonard

Mirasolo.  Likewise, the exhibits submitted to the jury relative to the Langone hire indicate that

Langone signed his application for employment on May 22, 2008, and defendant O'Brien

appointed Langone as an employee of the ELMO program on the very same day.  This pattern of

an ELMO candidate submitting an application and being hired on the same day is consistent with

the other ELMO hires that the jury determined were proven as gratuity predicate acts.  This

testimony elicited from Ed Ryan, and the documentary evidence submitted to the jury as

exhibits, formed a sufficient basis for the jury to find that the hiring of Mr. Langone was a

gratuity.

For each of these reasons, the defendants' claims of error regarding the gratuity charges

must fail.

### IV.    The Court Did Not Commit Error During Its Charge To The Jury

The defendants next contend that they are entitled to a new trial because this Court's jury

instructions were fraught with error.  First, the defendants contend that the Court improperly

"marshalled and applied" the government's evidence during its jury charge.  Second, the

defendants claim that the Court omitted key jury instructions.  Finally, the defendants contend

that the Court erroneously instructed the jury on contested issues of fact.  Each of these claims

must fail.

### A.  The Court Did Not Improperly Marshal And Apply The Government's Evidence

The defendants' principal argument is that the Court improperly infused evidence

presented at trial with the jury instructions.  *See* O'Brien Brief at 2.  The defendants are wrong as

a matter of fact and law.

The United States Supreme Court has explained:

> In a trial by jury in a federal court, the judge is not a mere
> moderator, but is the governor of the trial for the purpose of
> assuring its proper conduct and of determining questions of law.
> In charging the jury, the trial judge is not limited to instructions of
> an abstract sort.  It is within his province, whenever he thinks it
> necessary, to assist the jury in arriving at a just conclusion by
> explaining and commenting upon the evidence, by drawing their
> attention to the parts of it which he thinks important, and he may
> express his opinion upon the facts, provided he makes it clear to
> the jury that all matters of fact are submitted to their determination.

*Quercia v. United States*, 289 U.S. 466, 469 (1933) (internal citations omitted).  This

Circuit has adopted those principles.  "It is unquestioned that, when instructing a jury, a

judge may explain, comment upon and incorporate the evidence into the instructions in

order to assist the jury to understand it in light of the applicable legal principles."  *United

States v. Hernandez*, 490 F.3d 81, 84 (1st Cir. 2007) (no error where trial judge

"explained to the jury how . . . a meeting [which was a hotly contested piece of

evidence], if the jury believed beyond a reasonable doubt that it had occurred, would

relate to the conspiracy charge"); *United States v. Maguire*, 918 F.2d 254, 268 (1st Cir.

1990) (same, citing *Quercia*).

In this case, the Court did not even reach – let alone cross – the boundaries of propriety in its instructions to the jury.  Indeed, at the very outset, the Court explained to the jury that they were the sole judges of the evidence in this case.  The Court said:

> You are the sole judges of evidence in this case.  This is your constitutional responsibility and authority.  It is not mine.  I cannot exercise it.  In the course of my charge I'm going to have to talk about this case and I may have to talk about the evidence and I may say things like, "Well, if you think this, then this follows," that's so you will understand, but I have nothing to say about the evidence, I am not constitutionally permitted to say anything about the evidence, and my descriptions or my references to the evidence are simply in an effort to teach you the legal implications of findings, if you were to make certain findings, then certain things happen and the like.  The determination about evidence rests entirely with you.

7/15/14 Excerpt Transcript of Jury Charge at 8, lines 8-22.  In fact, in its nearly two-hour charge, this Court reminded the jury at least 9 times that, despite the Court's discussion of the evidence, they (the jury) were the sole deciders of the evidence in this case.  *See, e.g.*, 7/15/14 Excerpt Transcript of Jury Charge at 5 (lines 8-10); 8 (lines 8-22); 10-11 (line 21, page 10 to line 7, page 11); 23 (lines 3-7); 26 (lines 18-19); 30 (lines 13-15); 35 (lines 21-23); 47 (lines 20-21); and 63-64 (line 17, page 63 to line 3, page 64).  Finally, at the end of the Court's charge, in response to an objection by the defendants, the Court re-iterated this principle to the jury, explaining, yet again:

> Now, the parties properly say to me, "Well, Judge, you really talked about the evidence here," and I did because I believe it's so important to understand the line, and they properly bring to my attention that when you say, "Well, you could find this or you could find that," don't for a moment think that I'm suggesting that you should find that or you will find that.  As I've said, but I need to emphasize it, because I have tried to explain things as best I know how, I have nothing to say about the evidence.  Nothing.  No clue comes from me, I don't have anything to say about it.  So if that isn't a way that your own independent, completely free from me, reasoning goes so be it.  I have nothing to say about it beyond

that the burden's on the government, they've got to prove it
beyond a reasonable doubt, and I've accurately stated the elements
of each of the claims.

7/15/14 Excerpt Transcript of Jury Charge at 63, line 13 to 64, line 3.  The Court's use of

the evidence, to assist the jury, therefore, was not in error and the defendants' principle

claim must fail.[27]

### B.   The Court Did Not Omit Key Jury Instructions

#### (1)   The Court Did Not Improperly Fail To Give Instructions On Agency "Custom And Practice" And The Rule Of Lenity

The defendants contend that the Court erred by failing to instruct the jury on "agency

custom and practice" and the rule of lenity.  That error, defendants claim, prevented the jury

from making a fair determination of what the Manual required and what the defendants

reasonably believed about those requirements.  *See* O'Brien Brief at 2.  This argument is

confusing at best.

As a threshold matter, there is nothing ambiguous about the Manual's requirement that

hiring be based solely on merit.  Indeed, in plain English, the Manual states: "It is the policy of

---

[27]      The defendants also make a wholly unsupported claim that the Court's
instructions were in error because they presented the jury with a "logical progression" which is
forbidden in this Circuit.  *See, e.g., Maguire*, 918 F.2d at 269 (instructions which present the jury
with a taut, logical progression, interweaving the evidence and the counts in the indictment so as
to lead the jury directly to a guilty verdict are forbidden).  Nothing in this Court's jury charge
mandated a "logical progression" leading the jury directly to a guilty verdict.  To the contrary,
this Court, using the verdict slip as a guide, charged the jury on each element of each offense.
Where a decision on one charge impacted a decision on another charge (*e.g.*, a finding with
respect to a substantive mail fraud count as to O'Brien may impact a finding on one of the
racketeering predicate acts as to O'Brien and/or Tavares and Burke), the Court was careful to
instruct the jury as to the impact of a not guilty finding and a guilty finding.  *See, e.g.*, Excerpt
Transcript of Jury Charge at 44, line 9, to 45, line 5; *see also Maguire*, 918 F.2d at 269 (court's
instructions *did not* mandate a "logical progression" where the court's charge depended upon the
jury's assessment of the evidence and the judge re-emphasized that the jury was not bound by his
opinions).

the Trial Court that all appointments be made solely on the basis of merit." Manual at §4.304.

Thus, there would have been no reason for this Court to instruct the jury on the rule of lenity as

to whether or not the Manual contemplates merit-based hiring. *See also* Order on Motion to

Dismiss at 19 (interpreting the Manual as a matter of law and recognizing that it contemplates

merit-based hiring).

Moreover, to the extent the defendants' complaint is that the Court failed to instruct the

jury that they could consider evidence that the Manual was not followed by other members of the

Trial Court, they are mistaken. This Court did precisely that. *See* 7/15/14 Excerpt Transcript of

Jury Charge at 27, lines 17-23 (reminding the jury that they had heard evidence from which they

could infer that the Manual was not always followed). In addition, the Court expressly instructed

the jury as to the intent necessary for the defendants to be convicted of any crime charged. *See,*

*e.g.*, 7/15/14 Excerpt Transcript of Jury Charge at 35-40 (explaining specific intent required for

mail fraud). Thus, there can be no claim that the jury was unable to make a fair determination of

what the defendants "reasonably believed" about the requirements of the Manual. Indeed, given

the Court's instructions, the jury *could* have concluded that O'Brien had no specific intent to

defraud because he did not understand that hiring was to be based solely on merit (or because he

believed that the practice in the Trial Court was to hire based on political connections so didn't

think he was doing anything wrong). Of course, the jury did not so find because the

overwhelming evidence at trial proved that O'Brien did, in fact, know that he was committing

fraud. For each of these reasons, this claim of error must fail.[28]

---

[28]     To the extent the defendants' complaint is that the Court failed to instruct the jury
about the propriety of making and accepting job recommendations, they are, again, mistaken.
This Court expressly instructed the jury that making job recommendations, accepting and
tracking job recommendations, and even passing names of recommended candidates to
interviewers are not criminal acts. *See* 7/15/14 Excerpt Transcript of Jury Charge at 28-30.

### (2) The Court Did Not Fail To Instruct That The Mailings Must Be "In Furtherance Of" The Charged Fraud Scheme

The defendants next contend that this Court failed to instruct the jury that, in order to convict on the charge of mail fraud, the alleged mailings must have been "in furtherance of" the fraudulent hiring scheme.  *See* O'Brien Brief at 3; Tavares Brief at 11-13.  Citing *Hebshie*, the defendants contend that this Court's instructions conflated the causation requirement of the mailing element with the "in furtherance of" requirement.[29]  This Court's instruction, the defendants argue, allowed the jury to find the mailing element satisfied if the use of the mails were reasonably foreseeable to the defendants (regardless of whether the mails were used "in furtherance of" the alleged fraud).  Tavares Brief at 12.  By way of example, the defendants contend that a jury hearing this Court's instructions "could only assume that, as long as they found that O'Brien knew about the rejection letters, that they were sufficient 'to carry out this scheme' . . . ."  Tavares Brief at 12.  This argument – based on a narrow reading of the Court's instruction – must fail.

Taken as a whole, the Court's instruction on the mailing element plainly explains both the causation and the "in furtherance of" requirements.  In particular, the Court explained:

- "Now, the first eight questions deal with the crime of mail fraud, that the government does allege, and for that the government has to prove these following things . . . a reasonable understanding that *in the execution of the scheme*, somebody was going to use the United States mails."  7/15/14 Excerpt Transcript of Jury Charge at 32, lines 4-16 (emphasis added).

- "As part of the scheme and artifice to defraud, it has to be reasonably understood by each of the people you are considering . . . that the mails of the United States

---

[29]     In order to establish the mailing element of mail fraud, the government must prove two things: (1) that the defendant caused the use of the mails (causation requirement); and (2) that the mail was used in furtherance of, or for the purpose of, the scheme to defraud ("in furtherance of" requirement).  *Hebshie*, 549 F.3d at 42.

are going to be used by someone to *carry out the scheme.*"  7/15/14 Excerpt Transcript of Jury Charge at 42, line 21 to 43, line 1 (emphasis added).

- "And *the government's got to be specific about this and so here they have been specific and they claim that their specific proof of the use of the mails is the rejection letters* . . . And they say, *"Well, that's part of the scheme and that was done by the U.S. Mails."* . . . the government's got to prove beyond a reasonable doubt that [O'Brien] . . . does understand that the mails are going to be used." 7/15/14 Excerpt Transcript of Jury Charge at 43, lines 11-21 (emphasis added).

- "but all that's required on this element is that Mr. O'Brien reasonably understood that *to carry out this scheme to defraud*, where he makes a fraudulent certification, that the mails of the United States would be used."  7/15/14 Excerpt Transcript of Jury Charge at 44, lines 3-8 (emphasis added).

As these excerpts illustrate, the Court plainly instructed the jury that the government must be specific as to the alleged mailings in this case.  The Court identified those mailings – the rejection letters and in one case, an application – for the jury, stating that the government alleged these mailings were "part of" the scheme.  The Court also explained that, in order to satisfy the mailing element, the jury must find that the defendants reasonably understood that the mails would be used to carry out the scheme to defraud (or, "in furtherance of it").[30]  Taken as a whole, those instructions encompass both the causation and the "in furtherance of" requirement, *i.e.*, the jury must find that the government's alleged mailings were part of the scheme and that O'Brien reasonably understood they would be mailed.  *See, e.g., United States v. Dockray*, 943 F.2d 152, 155 (1st Cir. 1991) ("Jury instructions are to be evaluated in the context of the charge as a whole, and a defendant has no absolute right to the use of particular language.").[31]

---

[30]    There is no material difference between the phrase "in furtherance of" and the phrases "to carry out" or "use in the execution of."  *See, e.g., United States v. Davis*, 717 F.3d 28, 34 (1st Cir. 2013) ("The trial court need not use the precise words proposed by either party in its instructions; it is sufficient if the principle of law is correctly stated.").

[31]    The defendants' reliance on the facts of *Hebshie* is misplaced.  There, the district court instructed the jury, erroneously, that they could find the mailing element satisfied if they

Accordingly, this Court properly instructed the jury that the alleged mailings had to be "in furtherance of" the alleged fraud.  The defendants' claim, therefore, must be denied.

(3) <strong>The Court Did Not Inappropriately Omit A Good Faith Instruction</strong>

The defendants contend that the Court improperly failed to instruct the jury on good faith. Tavares Brief at 14-16.  That argument is without merit.  Courts are not required to instruct specifically on "good faith" where there is a proper instruction on intent to defraud.  Indeed, the case law cited by the defendants says precisely that.  *See, e.g., Dockray*, 943 F.2d at 155 ("There is nothing so important about the words 'good faith' that their underlying meaning cannot otherwise be conveyed.  Thus, where the court properly instructs the jury on the element of intent to defraud – essentially the opposite of good faith – a separate instruction on good faith is not required." (internal citations and quotations omitted).

This Court appropriately instructed the jury on the element of "intent to defraud."  As a threshold matter, the "Cheat Sheet" states that the second element of mail fraud is "a knowing misrepresentation of material fact intended to deceive another."  The Court more fully explained this instruction as to O'Brien (in the context of mail fraud) and Tavares (in the context of aiding and abetting mail fraud) in its formal jury charge.  *See, e.g.*, 7/15/14 Excerpt Transcript of Jury Charge at 35-40 (O'Brien and mail fraud); 45 (Tavares and aiding and abetting mail fraud).  The defendants' contention that the Court failed to instruct the jury specifically as to intent is, therefore, wrong.

In addition, the defendants contend that the Court erred in failing to remind the jury of every theory of "good faith" presented at trial.  Once again, it is the defendants who are in error.

---

found *either* (1) the mails were used in furtherance of the scheme; *or* (2) the use of the mail was reasonably foreseeable to the defendant.  *See Hebshie*, 549 F.3d at 42.  The Court said nothing like that here.

The defendants claim that they presented evidence and argument regarding their belief that they could hire whomever they wanted, notwithstanding the provisions of the Manual.  Putting aside the absurdity of this argument, this Court's instruction on specific intent did not "effectively foreclose" the jury from considering it in determining whether the defendants had a specific intent to defraud.  Indeed, at the end of the intent instruction, this Court stated: "So to sum up, if . . . [O'Brien] knows the process is fraudulent that improper entries are being made or composites are being fudged, if the system is intrinsically fraudulent as to the specific person we're talking about – and he certifies the personnel standards were followed, then you may find that that is a fraudulent representation."  7/15/14 Excerpt Transcript of Jury Charge at 39, line 23 to 40, line 4.  Given that instruction, the jury could have found, as the defendants suggest, that there was no fraudulent misrepresentation because neither O'Brien nor Tavares had any knowledge that they were doing anything wrong (or, to put it another way, neither had any idea that the process they were engaging in was fraudulent).  The jury, of course, did not so find because the evidence at trial overwhelming demonstrated that each had a specific intent to engage in a fraudulent hiring scheme.  For each of these reasons, the defendants' claim of error should be denied.

### (4) The Court Did Not Fail To Instruct The Jury As To The Deprivation Of Money Or Property For The Mail Fraud Counts

The defendants next contend that the Court erred by failing to instruct the jury that, in order to establish mail fraud, the jury must find, "beyond a reasonable doubt, that there was a loss of property."  Tavares Brief at 32.  The defendants are wrong as a matter of law.  As explained in Section II(E) of this Response, it is well-established that the government does not have to prove loss in order to establish a charge of mail fraud; rather, the government must allege and prove that the object of the fraud was to obtain money or property, *see, e.g.*, 18 U.S.C. §1341; *Leahy*, 464 F.3d at 786-89; Judge D. Brock Hornsby's 2008 Pattern Criminal Jury

Instructions for the District Courts of the First Circuit, §4.18.1341.  Nonetheless, this Court went

further than required, instructing the jury, both in the "Cheat Sheet" and in its formal

instructions, that the third element of mail fraud was reliance "such that money or property goes

where it would not otherwise have gone."  *See* 7/15/14 Excerpt Transcript of Jury Charge at 32.

In addition, throughout its charge on mail fraud, the Court made clear that – according to the

government – *jobs* were going where they would not otherwise have gone (to non-merit-based

hires).  Thus, when taken as a whole, the Court properly instructed the jury that to prove mail

fraud, the government must show that the object of the fraud was to obtain money or property, in

this case jobs for politically sponsored candidates.  Thus, this claim of error too, must fail.

### C.  The Court Did Not Erroneously Instruct The Jury As To Any Matter

#### (1)  The Court Did Not Erroneously Instruct The Jury Regarding The "Passing" Of Names To Interview Panels

The defendants further contend that this Court erred in instructing the jury that certain

conduct, including the passing of names to interview panels, was "questionable."  Such

instructions, claim the defendants, improperly invaded the fact-finding province of the jury.  *See*

O'Brien Brief at 3; Tavares Brief at 28-29.  Not so.  First, the purpose of the Court's comments

regarding this particular practice (passing names of preferred candidates to interview panels) was

to ensure that the jury understood the criminal allegations in this case.  As the Court noted, there

was a significant amount of evidence presented about conduct that was not, standing alone,

criminal.  It was, however, relevant to the scheme to defraud and thus properly admitted.  In

order to ensure that the jury did not hold such conduct against the defendants (or convict them on

the basis of it), the Court appropriately distinguished between conduct that was criminal and

conduct that was not criminal.  The fact that the Court commented on the nature of this non-

criminal conduct, in order to distinguish it, is not error.  *See, e.g., Hernandez*, 490 F.3d at 84 ("It

is unquestioned that, when instructing a jury, a judge may explain, comment upon and

incorporate the evidence into the instructions in order to assist the jury to understand it in light of

the applicable legal principles."). Moreover, this Court expressly instructed the jury that it was

their job to determine if any such conduct actually occurred. *See* 7/15/14 Excerpt Transcript of

Jury Charge at 30 ("Now, if any of that happened – and I won't say it did or that it didn't, but

there's evidence and you decide what you make of it."). Accordingly, the defendants' claim for

relief on this ground should be denied.[32]

### (2) The Court Did Not Erroneously Instruct The Jury On "Merit Hiring"

In a twist on the foregoing argument, the defendants next contend that the Court's

instructions regarding "merit hiring" were erroneous because the Court's instruction usurped the

jury's role as fact finder. In particular, the defendants claim that this Court erred in telling the

jury that the Manual "expects, contemplates merit selection, that the best person, the most

qualified person will get the job," *see* 7/15/14 Excerpt Transcript of Jury Charge at 27, because

that is a fact to be found by the jury. *See* O'Brien Brief at 3; Tavares Brief at 30-31.

As a threshold matter, the defendants' suggestion that there was evidence that the Manual

did not require merit-based hiring is a fallacy. The defendants may have argued this point

through cross examination or in closing, but, as the Court instructed the jury on multiple

occasions, the lawyers' arguments are not evidence. There was simply no evidence presented at

trial that the Manual did not require merit-hiring. Regardless, the Court's instructions regarding

---

[32]     The defendants also claim that the Court's comment regarding this practice was
factually wrong, *i.e.*, it was appropriate for the Commissioner to provide input and instruction to
interview panel members. First, the evidence at trial established that O'Brien and his staff were
not providing *input and instruction* to the interview panels; they were telling them who to
advance so they could stack the deck with political candidates. Even if that were not the case,
the Court expressly instructed the jury that they were the finders of fact in this regard – not the
Court.

its view of the Manual were not in error.  The Court made clear – crystal clear – throughout its

instructions that "descriptions or [] references to the evidence are simply in an effort to teach you

the legal implications of findings . . . [t]he determination about evidence rests entirely with . . .

[the jury]."  7/15/14 Excerpt Transcript of Jury Charge at 8; *see, e.g., Quercia*, 289 U.S. at 469 (a

judge may express his opinion regarding the evidence so long as he makes it clear that the

determination of the evidence rests with the jury).  Accordingly, the defendants' claim of error

must fail.

### (3)  The Court Did Not Erroneously Instruct The Jury As To Aiding And Abetting

Tavares next contends that the Court's instructions on aiding and abetting were erroneous

because the instructions: (1) failed to explain that the required "act" must be in furtherance of the

alleged crime; (2) trivialized the "act" requirement; and (3) were too specific and thus invaded

the province of the jury.  *See* Tavares Brief at 6-8.  All three arguments are faulty.  First, the

Court properly instructed the jury regarding the "act" element of aiding and abetting.  As

described in Section II(F) of this Response, in order to prove the crime of aiding and abetting

mail fraud, the government must establish that Tavares (1) took an affirmative act in furtherance

of the fraud; (2) with the intent of facilitating the fraud.  *See Rosemond*, 134 S.Ct. at 1245.  Here,

the Court instructed the jury that (1) "Ms. Tavares has got to share the same criminal intent as

Mr. O'Brien . . . ."; and (2) "If she does, then she's got to do something *to make it come about*.

She's got to take some act herself *to help it out*."  7/15/14 Excerpt Transcript of Jury Charge at

45 (emphasis added).[33]  This portion of the Court's charge clearly lays out the two elements of aiding and abetting, including each aspect of the "act" requirement.[34]

Moreover, the Court's instructions did not trivialize or mischaracterize the "act" requirement.  As the Court explained, the government had to prove that Tavares took some act to "help" the scheme to defraud.  *See* 7/15/14 Excerpt Transcript of Jury Charge at 45.[35]  Tavares' argument that the act must be "substantial" is unsupported by any authority.  To the contrary, the common law of aiding and abetting, acknowledged and applied by the Supreme Court in *Rosemond*, included the principle that a person's involvement in the crime "could be not merely partial but minimal too;" the quantity of assistance was immaterial, "so long as the accomplice did something to aid the crime."  *Rosemond*, 134 S.Ct. 1246 (internal quotations, citations and emphasis omitted).  The examples provided by the Court in its jury charge (sending files for interviews, sending out letters, collating files) were not trivial; they are all acts which could satisfy the "act" requirement if they were done "in furtherance of" (or "to help") the scheme to defraud.

Finally, the Court's instruction did not invade the fact-finding province of the jury.  As described in Section IV(A) of this Response, a Court may properly "explain, comment upon and incorporate the evidence into the instructions in order to assist the jury to understand it in light of

---

[33]     In addition, as described in footnote 18 of this Response, the "Cheat Sheet" provided to the jury correctly laid out the two elements of aiding and abetting.

[34]     The fact that the Court goes on to provide examples of possible "acts" which may satisfy the act requirement does not negate or confuse the Court's instructions regarding the "act" element.  *See* 7/15/14 Excerpt Transcript of Jury Charge at 46.

[35]     Tavares suggests that the act must be in furtherance of the material misrepresentation.  The crime charged, however, is a scheme to defraud by means of a material misrepresentation.  Thus, the "act" must be in furtherance of that scheme to defraud

the applicable legal principles," *Hernandez*, 490 F.3d at 84, "provided he makes clear to the jury

that all matters of fact are submitted to their determination."  *Quercia*, 289 U.S. at 469.  That is

precisely what the Court did here.  In order to assist the jury, the Court provided possible

examples of evidence that could satisfy the "act" element of aiding and abetting.  Indeed,

recognizing the boundaries of its authority, the Court expressly used the word "maybe" before

each of the descriptive "acts," *e.g.*, "maybe she send the files for the interviews to the people,

maybe she sends out letters, maybe she collates files . . . ."  7/15/14 Excerpt Transcript of Jury

Charge at 45-46.  Moreover, the Court explained that even if the jury found that such acts

occurred, the jury must also find that Tavares engaged in those acts in order to "help" the alleged

fraudulent hiring scheme and that she possessed the same criminal intent as O'Brien.  *See id.*

The Court's instructions, therefore, were appropriate and did not invade the fact-finding province

of the jury.

        For each of these reasons, Tavares' claim of error regarding the aiding and abetting

instruction must fail.

### (4)  The Court Did Not Erroneously Instruct The Jury As To What Constitutes A Pattern Of Racketeering Activity

        Finally, the defendants contend that the Court erroneously instructed the jury on the

RICO charge by failing to correctly explain what constitutes a "pattern of racketeering activity."

In particular, the defendants claim that the Court failed to instruct the jury that, in order to find

that the predicate acts constitute a "pattern," the jury must find that the acts are related (the

"relatedness" requirement) *and* that they amount to or pose a threat of continued criminal activity

(the so-called "continuity" requirement).  *See* Tavares Brief at 26-27.  Yet again, the defendants

are in error.

As a threshold matter, there is no question that the Court instructed the jury that the predicate acts must be "related" in order to constitute a "pattern of racketeering activity."  *See* 7/15/14 Excerpt Transcript of Jury Charge at 48, lines 21-25.  In addition, the Court sufficiently instructed the jury on the concept of "continuity," explaining that:

- "however many acts you find, they must constitute a pattern *to further the goals of the enterprise*;" and

- "Now you must ask an additional thing, does the particular predicate act form a pattern, that is, is it related to the other predicate acts *to achieve these legislative goals [referencing the goals of the enterprise, e.g., to obtain better budgets, transferability, etc.]* or is it perhaps we're just taking care of a probation officer's brother or something?  It's got to be part of the pattern.  It's an additional element.  *It's got to further the goals of the enterprise*."

7/15/14 Excerpt Transcript of Jury Charge at 48, lines 23-25 and 52, line 25 to 53, line 8 (emphasis added).  Those instructions encapsulate the idea that, in order to establish a pattern, the alleged predicate acts must be both related (to one another) and continuous, by furthering the goals of the enterprise.  Indeed, it is well-recognized that one way to establish continuity is by proving that the charged predicate acts constitute a regular way of conducting or participating in a defendant's ongoing and legitimate business (or of conducting or participating in an ongoing and legitimate RICO enterprise).  *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 243 (1989); *United States v. Boylan*, 898 F.2d 230, 250 (1st Cir. 1990) (relying on *H.J. Inc.* and finding no plain error where district court omitted explicit reference to "continuity" but "unarguably apprised the jury of the pattern requirement"); *see also Davis*, 717 F.3d at 34 ("The trial court need not use the precise words proposed by either party in its instructions; it is sufficient if the principle of law is correctly stated.").

Here, the Court sufficiently explained to the jury that the predicate acts must be related to one another *and* further the goals of the enterprise (the Probation Department), *i.e.*, obtaining

favorable treatment from the legislature.  The Court, therefore, "unarguably apprised the jury of the pattern requirement."  *See Boylan*, 898 F.2d at 250.

In any event, "continuity" was not an issue in this case, and, accordingly, the defendants never raised it.  The issue of "continuity" only arises in cases where the criminal activity occurred over a short period of time or the case was indicted before continuity could be established.  As the Supreme Court explained in *H.J. Inc.*,

> Congress was concerned in RICO with long term criminal conduct. Often a RICO action will be brought before continuity can be established in this way.  In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*Id.* at 242 (emphasis in original).  In this case, the overwhelming evidence at trial established that the defendants' criminal activity occurred over a period of ten years; thus continuity was not at issue.  *See United States v. Owens,* 167 F.3d 739, 754 (1st Cir. 1999) (no plain error when district court erroneously instructed the jury that they could find a "pattern" of racketeering activity if the defendants acts were related *or* posed a continuing threat of criminal activity because the evidence of continuity at trial was overwhelming).  For each of these reasons, the defendants' final claim of jury instruction error must fail.[36]

---

[36]      The defendants also contend that the Court was required to give the jury "more direction" regarding how to determine whether the predicate acts were related.  *See Tavares Brief* at 27.  This is not a "traditional" RICO case involving different types of predicate acts, *e.g.*, kidnapping, drug dealing, gambling, and attempted murder, where there is a legitimate question as to their relatedness.  The predicate acts in this case were of the same ilk – mail fraud and bribery aimed at more favorable legislative treatment – which the Court explained, at length, in its jury charge.  *See* 7/15/14 Excerpt Transcript of Jury Charge at 49-50.  Thus, the Court's instruction – explaining that the predicate acts must be related, not disparate acts, designed to further the goals of the enterprise – is sufficient when viewed as a whole.

**V.      The Court Did Not Commit Error By Allowing The Jury To Propose Questions For Witnesses During The Trial**

Finally, the defendants claim that the Court committed error when it permitted the jurors to ask questions of the witnesses because, they assert, this practice was highly prejudicial to the defendants.  The defendants cite no example of any particular question that caused the practice to become prejudicial or why the eleven judicial circuits, including the First Circuit, that permit questions from jurors are wrong.  The government notes that the defendants do not cite any statute, rule, or case that forbids the practice.  In fact, every Court of Appeals to address the issue of jurors submitting questions during trial has determined that it is a matter within the sound discretion of the trial court, and that juror questions are not per se prejudicial.

In *United States v. Rawlings*, 522 F.3d 403, 407 (D.C. Cir. 2008), the Court found that "at least ten circuits had considered the issue and concluded that juror questions are within the trial judge's discretion."  *Id.*, citing *United States v. Sutton*, 970 F.2d 1001, 1005 (1st Cir. 1992); *United States v. Bush*, 47 F.3d 511, 515 (2d Cir. 1995); *United States v. Hernandez*, 176 F. 3d 719, 723 (3d Cir. 1999); *DeBenedetto v. Goodyear Tire and Rubber Co.*, 754 F.2d 512, 516 (4th Cir. 1985); *United States v. Callahan*, 588 F.2d 1078,1086 (5th Cir. 1979); *United States v. Collins*, 226 F.3d 457, 461 (6th Cir. 2000); *United States v. Feinberg*, 89 F.3d 333, 337 (7th Cir. 1996); *United States v. Groene*, 998 F.2d 604, 606 (8th Cir. 1993); *United States v. Gonzalez*, 424 F.2d 1055, 1056 (9th Cir. 1970); *United States v. Richardson*, 233 F.3d 1285, 1288-89 (11th Cir. 2000).

Furthermore, the *Rawlings* Court found, as other courts have also observed, that "the practice offers substantial benefits.  For example, it can help focus the jurors, clear up confusion, alert counsel to evidentiary lacunae and generally ensure that the jurors have the information needed to reach a reasoned verdict."  *Rawlings*, 522 F.3d at 407-408, citing *Collins*, 226 F.3d at

58

426; *Bush*, 47 F.3d at 514, 516; *Sutton*, 970 F.2d at 1005 n. 3; *Callahan*, 588 F.2d at 1086.

Additionally, in a more recent case, also out of the Seventh Circuit, *United States v. Sykes*, 614 F.3d 303 (7th Cir. 2010), the Court reiterated the position it originally enunciated in *United States v. Feinberg*, 89 F.3d 333 (7th Cir. 1996) (and that it further explained in *SEC v. Koenig*, 557 F.3d 736 (7th Cir. 2009)).  In *Sykes*, the Court stated, "We held [in *Feinberg*, 89 F. 3d at 337] that the district court may, in its discretion, allow jurors to propose questions to be put to the witnesses."  *Sykes*, 614 F.3d at 312.  Furthermore, the *Sykes* Court highlighted their decision in *Koenig* when they stated, "We recently revisited the issue of juror questioning in *SEC v. Koenig*, and took a far more approving view of the practice, explaining that the American Bar Association recommended it and recent research on juror questioning had established its benefits.  In particular, we noted our own circuit's participation in the ABA's American Jury Project and observed that the 'judges, the lawyers for the winning side, and tellingly, the lawyers for the losing side, all concluded (by substantial margins) that when jurors were allowed to ask questions, their attention improved, with benefits for the overall quality of adjudication.'  Nevertheless, we noted the Jury Project's 'proviso that jurors should submit their questions to the judge, who will edit them and pose appropriate, non-argumentative queries.'"  *Sykes*, 614 F.3d at 313.  Importantly, the *Sykes* Court further held that "the practice could be beneficial in some contexts, 'such as conspiracy or antitrust cases, in which the facts are so complicated that jurors should be allowed to ask questions in order to perform their duties as fact-finders.'"  *Id.*, citing *Feinberg*, 89 F.3d at 337.  The facts, circumstances, and complexity of the case at hand make it a perfect paradigm for the practice of juror questions to witnesses.

Of course, it is critical to note that the eleven circuits that have analyzed the issue of jurors asking questions of witnesses during a trial recognize that there are potential risks with the

practice and that district judges who permit questioning should implement precautionary procedures.  For instance, the *Sykes* Court reiterated the instructions they proposed years earlier in *Feinberg* and instructed the district courts to "take prophylactic measures in an attempt to prevent the practice from harming either party.  For example, common sense dictates that the questions should be proffered in writing to the district court judge.  By reducing the questions to writing, a court eliminates the possibility that a witness will answer a question prematurely.  Written questions also guard against juror commentary that suggests or precipitates premature deliberations." *Id*. at 337 (internal citations omitted).  Of course, the Court in the case at hand scrupulously followed the prophylactic measures suggested by the eleven circuits that examined this issue and, therefore, the Court's discretion to employ juror questioning in the case at hand was not abused.  In fact, "to the contrary, the judge's decision, like his supervision of the questioning process, was well considered and sensible." *Koenig*, 557 F.3d at 742.

## CONCLUSION

For all of the reasons described herein, the defendants' motions for judgment of acquittal or, in the alternative, for a new trial should be denied.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:    /s/ Karin M. Bell
       /s/ Fred M. Wyshak, Jr.
       /s/ Robert A. Fisher
       Karin M. Bell
       Fred M. Wyshak, Jr.
       Robert A. Fisher
       Assistant U.S. Attorneys

Date:   September 26, 2014

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/ Karin M. Bell</u>
Karin M. Bell
Assistant United States Attorney

Date:   September 26, 2014