## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **NO. 12-CR-40026-WGY** |
| | ) | |
| **JOHN J. O'BRIEN, ET AL.** | ) | |

## DEFENDANT TAVARES'
## MEMORANDUM IN AID OF SENTENCING

Defendant Elizabeth V. Tavares ("Ms. Tavares"), by and through undersigned counsel, respectfully submits this memorandum in aid of her sentencing scheduled for November 12, 2014.  Ms. Tavares requests this Honorable Court consider sentencing her to three (3) years of probation with conditions including community confinement, home confinement or a combination of both.  Ms. Tavares contends that such a sentence is "sufficient but not greater than necessary" in light of her minor role in the offense, and all the relevant 18 U.S.C. § 3553(a) factors.  The recommended sentence also reflects undersigned counsel's position that the instant prosecution, including a RICO conspiracy charge which dramatically increased Ms. Tavares' base offense level, demonstrates that Ms Tavares is far outside the heartland of RICO defendants and, as argued in other motions, may well not have been sufficiently proven as to Ms. Tavares, at least as to the RICO charge.[1]

---

[1] At the outset, undersigned counsel urges this Honorable Court to consider the difficult position they find themselves in by suggesting *any* sentence is appropriate under the circumstances, given that Tavares is in the process of appealing her convictions.  While undersigned counsel respects the jury process and this particular jury's ultimate decision, they nonetheless believe the jury's determination regarding Ms. Tavares, with all due respect to it and the function it performed over such an extended period of time, was contrary to the weight of the evidence presented at trial.

## I.  GUIDELINES CALCULATION

Ms. Tavares was convicted of violating 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1962(c) (RICO substantive), and 18 U.S.C. § 1962(d) (RICO conspiracy).  The offense level for the mail fraud counts was calculated by probation as follows: USSG § 2B1.1 "instructs that the base offense level is 7 if the offense of conviction has a statutory maximum term of imprisonment of 20 years or more," and since a violation of 18 U.S.C. § 1341 carries such a maximum penalty, the base offense level ("BOL") is 7.  PSR at ¶ 79.  USSG § 2B1.1(b)(10)(C) "directs that if the offense involved sophisticated means, add two levels and if the resulting offense level is less than 12, increase to 12.  *Id.* at ¶ 80.  Accordingly, the offense level was increased 5-levels, from 7 to 12.  *Id.*  The PSR further finds an enhancement under USSG § 3B1.3, which allows for a 2-level enhancement "if the defendant abused a position of public or private trust... in a manner that significantly facilitated the commission or concealment of the offense."[2]  *Id.* at 82.  Adding this enhancement to the offense level of 12, results in an Adjusted Offense Level ("AOL") of 14.[3]  *Id.* at 84.  As for the RICO counts, Probation determined that

As a result of her position, Ms. Tavares, who is extremely remorseful for the time, expense, and attention spent on her prosecution and trial, cannot admit to crimes she and her undersigned counsel believe she did not commit; knowing full well she will not receive any credit for accepting responsibility as a result.  Undersigned counsel respectfully requests this Honorable Court not hold against Ms. Tavares her right to appeal her convictions and maintain her innocence.

[2] Ms. Tavares has objected to this enhancement and will explain her grounds for the objection below; the government has agreed with its application, *see* Dkt. # 661 at 5.

[3] In its objection to the PSR, the government faulted Probation for failing to include loss in its calculation, despite the fact that the government, itself, failed to indicate what kind of adjustment should apply.  *See* Dkt. # 661 at 2.  This enhancement need not be fully analyzed below because, with all due respect, its application in this case seems so far-fetched as to suggest vindictiveness. The Official Commentary to USSG § 2B1.1 states that "loss is the greater of actual loss or intended loss."  The Official Commentary further defines "intended loss" as "the pecuniary harm

because the offense level for the underlying racketeering activity is less than 19 (the BOL for racketeering general), the BOL is 19.  *Id.* at ¶ 72.  Just as it did with the mail fraud counts, Probation added a 2-level enhancement for abuse of public trust, for an AOL of 21.  *Id.* at ¶ 75-77.  Although mail fraud and the RICO charges result in separate guidelines calculations, USSG § 3D1.3 "directs that the applicable offense level is the highest offense level of the Counts."  *Id.* at ¶ 85.  Accordingly, the total offense level ("TOL") Probation calculated for Ms. Tavares is 21, resulting in an advisory guidelines sentence of 37-46 months.[4]  The defendant contends below that her offense conduct is so far outside the heartland of a RICO charge and conviction that the mail fraud guidelines represent a more appropriate defendant-specific guideline for sentencing, *see* USSG § 5K2.0, discussed *infra*.

## II. ARGUMENT

### A.   An Advisory Guidelines Sentence Should Not Be Applied

---

that was intended to result from the offense."  "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."  The First Circuit has "recently clarified that 'intended loss'… is a term of art meaning the loss the defendant reasonably expected to occur at the time he perpetrated the fraud."  *United States v. Innarelli,* 524 F.3d 286, 290 (1st Cir. 2008).  The First Circuit, however, has also made clear that "[i]f a reliable intended loss formula cannot be devised, total actual loss *must* be used."  *United States v. Appolon,* 695 F.3d 44, 69 (1st Cir. 2012) (emphasis added).  "If neither actual loss nor intended loss can be gauged, a district court may use, *as a last resort*, 'the gain that resulted from the offense as an alternative measure of loss.'"  *Id.* at 67 (citing U.S.S.G. § 2B1.1 cmt. n.3(B)) (emphasis added).  Here, the government also made no attempt at devising a "reliable" method by which *either* "intended loss" *or* "actual loss" could be calculated.  Therefore, according to *Appolon*, the only other option for this Court would be to use "gain."  The government has failed to prove (or even suggest) what, if any, "gain" resulted from the offense conduct; indeed Ms. Tavares did not derive a penny from the offense conduct at issue here.  A loss adjustment is simply inapplicable to the facts of this case.

[4] As further evidence of what undersigned counsel perceives to be a pattern of vindictiveness, the government is seeking an additional 4-level enhancement for her role in the offense (before including loss adjustments)  which would bring her guidelines exposure to a draconian 57-71 months.  A defendant should, when appropriate, not receive an acceptance of responsibility benefit, but should not be penalized for exercising her Sixth Amendment right to trial.

With regard to the United States Sentencing Guidelines, the district court, while not bound by them, still must consult and consider them when imposing sentence. *United States v. Booker*, 543 U.S. 220, 264 (2005). Courts of Appeals cannot disturb a district court's sentence unless the appellate court finds that sentence unreasonable. *See id.* The United States Supreme Court clarified post-*Booker* sentencing procedure in *Gall v. United States*, 552 U.S. 38 (2007). The *Gall Court* indicated that when sentencing a defendant,

> [A] District court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

552 U.S. at 49-50 (internal citations and quotation admitted). The Supreme Court re-emphasized the point stating. "[T]he sentencing court does not enjoy the legal presumption that the Guidelines sentence should apply." *Nelson v. United States*, 555 U.S. 350, 351 (2009) (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)). In fact, the First Circuit has summarized the central principles of the post-*Booker* and *Gall* sentencing procedure described above, as follows:

> In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent of that they are sound, case-specific reasons for deviating from them.  Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale.  Rather, the court "should consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."

*United States v. Martin*, 520 F. 3d 87, 91 (1st Cir. 2008).

While the First Circuit has noted that sentencing courts must employ "an increased degree of justification commensurate with an increased degree of variance" from the advisory sentencing guideline range, it has also held that under a post-*Gall* rubric, "there is no stringent mathematical formula that cabins the exercise of the sentencing court's discretion.  Indeed, after *Gall*, the sentencing inquiry—once the court has duly calculated the guidelines sentencing range—ideally is broad, open-ended, and significantly discretionary.  At that point, sentencing becomes a judgment call, and a variant sentence may be constructed based on a complex of factors whose interplay and precise weight cannot even be precisely described." *Martin*, 520 F.3d at 91-92 (internal citations and quotations omitted) (affirming a 91-month downward departure from the advisory sentencing guideline range).

Against this backdrop, Ms. Tavares respectfully requests this Honorable Court, after considering the advisory range, not impose a guidelines sentence in this case.  Instead, she submits that a sentence of 3-years of probation, with conditions to include a combination of community confinement, home confinement, or both, is "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).  In the alternative, she asks this Court (as discussed *infra*) to impose a below the guidelines sentence in light of her minor role in the offense, her personal characteristics, her unique family circumstances, and the

nature of the crime itself.   Undersigned counsel also urges this Court to consider, when determining the appropriate sentence for Ms. Tavares, whether the instant prosecution might represent an overreach by the federal government into wholly intrastate activity by Massachusetts state public officials to such a degree as to push application of the federal criminal statutes at issue here beyond their intended bounds.   In other words, she asks this Court to consider her sentence, as if this case were mail fraud only, without RICO, as undersigned counsel suggests should have been the case, *see United States v. Patriarca*, 807 F.Supp. 165, 187 n. 1 (D.Mass. 1992) (Wolf, J.).   In that context, her TOL without enhancements but with a downward adjustment for either her minor role in the offense or unique family circumstances, would be 10, a Zone "B" offense level.   A within-guidelines sentence would allow the requested sentence, namely a period of probation, with conditions to include a combination of community confinement, home confinement, but no period of imprisonment.   *See* USSG § 5C1.1(c)(3) ("If the applicable guideline range is in Zone B of the Sentencing Table, the minimum term may be satisfied by... a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment...").

> **B.     When Considering Whether or Not the Requested Sentence is Appropriate For Ms. Tavares, Undersigned Counsel Submits The Following Sentencing Enhancements Should Not Apply.**
>
> 1.     Abuse of Trust Enhancement

Probation argues that USSG § 3B1.3, which allows for a 2-level enhancement "if the defendant abused a position of public... trust... in a manner that significantly facilitated the commission or concealment of the offense," is applicable because Ms. Tavares "was the First Deputy Commissioner of the Massachusetts Department of Probation from 2008 to 2010."

PSR at ¶ 75.   The government gave a similarly conclusory explanation for why the enhancement should apply: "The evidence demonstrated that the defendants abused their positions of public trust in a manner that facilitated both the commission and concealment of the fraudulent hiring scheme. In fact, the defendants would not have been able to formulate, successfully advance, or achieve the goals of this conspiracy if they were not leaders of the organization and did not hold positions of trust."   *See* Dkt. # 661 at 5.   This enhancement, however, is inappropriate as applied to Ms. Tavares, given the circumstances.

The First Circuit has instructed that a two-step process is to be employed to determine whether the 2-level enhancement under USSG § 3B1.3 should b applied:  "First they must see if the defendant held a position of trust. And, if the answer is yes, then (and only then) they must see if the defendant used that position in some significant way to facilitate or conceal the offense." *United States v. Zehrung*, 714 F.3d 628, 630 (1st Cir. 2013).  For the first step, court must determine if the position was "ones of 'professional or managerial discretion,' a phrase that means 'substantial discretionary judgment that is ordinarily given considerable deference.'" *Id.* (citing USSG § 3B1.3 cmt. n. 1).  Put another way, is the position more akin to "attorneys serving as guardians who fleece their clients, bank executives who perpetrate fraudulent-loan schemes, and doctors who sexually abuse patients during exams," or more like "bank tellers who embezzle." *Id.*  Probation and the government appear to suggest merely because Ms. Tavares was a "leader" of the Massachusetts Probation Department, her position automatically qualifies as one of "public trust" without actually analyzing her duties.  During trial, the government presented scant evidence regarding what duties her position actually entailed, aside from her signature appearing on interview scheduling letters, passing names of candidates preferred by the Commissioner, fielding occasional complaints about the hiring process, with her signature also

appearing on rejection letters; and little to no evidence regarding to what extent she reported to, or was overseen by other individuals.  Ms. Tavares respectfully submits her position as Second Deputy (for eight years) and First Deputy (for two years) in the Massachusetts Probation Department, while high ranking, was more akin to a bank teller; the evidence suggests she merely acted as messenger, passing along names of individuals the Commissioner had an interest in.[5]  There is no evidence she had unsupervised discretion or the ability to make unilateral decisions, and there is nothing in the record to the contrary.  Simply put, to suggest that merely because Ms. Tavares ultimately became First Deputy the first step is automatically satisfied, essentially raises form well above substance.

Moreover, neither Probation nor the government suggests what Ms. Tavares did that was an abuse of her *position* that significantly concealed or facilitated the crime.  Almost all the acts that the government alleges constituted her involvement in, and assistance to, the fraudulent hiring scheme were almost entirely non-discretionary: she passed names along *at the direction of* Mr. O'Brien; her name was *stamped* on forms generated by other Probation Department employees; she helped to devise standardized questions for the final round *at the direction of* Mr. O'Brien.  The government has never alleged Ms. Tavares chose any of the candidates that were to be moved along in the hiring process; any acts she performed were at the direction of another. *Cf. Zehrung*, 714 F.3d at 631 ("The [co-conspirator's] testimony about picking codes for [the defendant] to enter into the computer seemingly suggests that her position was more like a

---

[5] While comparing her position as Second or First Deputy to a bank teller does not seem appropriate, neither is it appropriate to compare her to "attorneys serving as guardians who fleece their clients, bank executives who perpetrate fraudulent-loan schemes, and doctors who sexually abuse patients during exams." *Zehrung*, 714 F.3d at 630.  'First Deputy' is arguably nearer to 'bank teller' along the continuum of jobs with discretionary functions for purposes of § 3B1.3, if only because her discretion (at least with respect to the alleged offense conduct) was almost entirely cabined by the Commissioner.

typical bank teller, who has access needed to commit the crime charged but has little (if any) professional or managerial discretion in performing her tasks").   Indeed, the entirety of the criminal liability Ms. Tavares allegedly incurred was by way of substantive criminal acts committed by Mr. O'Brien.   Although Ms. Tavares may have had some discretion how she performed certain tasks, Ms. Tavares had little to no discretion over the conduct that allegedly aided and abetted the alleged fraud by Mr. O'Brien.[6]   In other words, the very nature of the government's election to advance her liability to the jury as an aider and abetter, rather than a principal, on the facts as proven,  suggests a subsidiary relationship that is counter-intuitive to the application of this particular enhancement.

### 2.   Role in the Offense Aggravating Adjustment

Probation has determined that, aside from the upward adjustment for an abuse of public trust, no other upward adjustment should be applied against Ms. Tavares for her role in the offense.  *See* PSR at ¶¶ 75, 82.  The government takes a contrary position and requests a "four-level aggravating role adjustment," claiming Ms. Tavares was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," pursuant to USSG § 3B1.1(a).   Contrary to Probation's and the government's position, Ms. Tavares respectfully submits she is actually entitled to a 2-level mitigating adjustment, pursuant to USSG § 3B1.2(b), since she was a "minor participant" in the alleged criminal activity.

According to the government, Ms. Tavares' conduct satisfies all of the Application Note

---

[6] By arguing this way, Ms. Tavares is not hereby adopting a so-called "Nuremberg Defense."  To say she lacked discretion when performing these tasks (which the jury has apparently determined were affirmative acts in furtherance of the crime charged) is not intended to absolve her of liability.  Instead, whether she lacked discretion with respect to these *particular* acts ought to inform this Court's decision to impose a 2-level enhancement which is premised upon the abuse of a position with highly discretionary functions.

4 factors of § 3B1.1(a), except for the fourth factor.  The Application Note 4 factors include: (1) "the exercise of decision making authority"; (2) "the nature of participation in the commission of the offense"; (3) "the recruitment of accomplices"; (4) "the claimed right to a larger share of the fruits of the crime"; (5) "the degree of participation in planning or organizing the offense"; (6) "the nature and scope of the illegal activity"; and (7) "the degree of control and authority exercised over others."  It is respectfully submitted that this Court must consider her "role," not within the Massachusetts Probation Department generally, but within the alleged offense conduct itself.  As explained above, and reincorporated here, Ms. Tavares submits she had little to no "decision making authority" when it came to her actions in relation to the alleged criminal activity.  Ms. Tavares neither selected any of the "preferred candidates," nor did she add to the so-called sponsor lists, nor did she decide that a third interview round should be added, nor did she decide which Probation Officers would sit the various hiring panels, nor did she negotiate with, let alone speak to, anyone in the legislature relative to the hiring process.  The evidence suggests that Ms. Tavares was, at most, a mere messenger, passing along names of individuals the Commissioner had an interest in.  A mere messenger cannot be an "organizer" or "leader."

Factors (2) and (7) not only weigh heavily in favor of Ms. Tavares (and the government has conceded that Factor (4) is inapplicable, *see* Dkt. # 661 at 4), but they establish that a mitigating adjustment is, instead, the more appropriate way to characterize her involvement.  The conduct that the government has alleged satisfies the crimes charged range from passing names along to having her name stamped on rejection letters.  Ms. Tavares was involved with neither the legislature, nor the certification process, which this Court has determined is at the heart of the alleged fraud.  She had no authority to make final hiring decision.  She had no involvement with the creation of the "sponsor lists."  She did not falsify any scores (nor even instruct anyone to

falsify scores).  Indeed, she did not even sit on any of the panels.  She was merely a messenger.

Given that any role adjustment is to a RICO not mail fraud base offense level, it is important that

she had no involvement at all in communicating with legislators, in participating in any "corrupt

exchanges" or in any gifts, gratuities, promises, or bribes as charged as the centerpiece of the

RICO allegations.  To suggest that her simple phone call to a panel member letting them know

that the Commissioner had an interest in a particular candidate means that she is an "organizer"

of the alleged scheme strains credulity

> **C.  When Considering Whether or Not the Requested Sentence is Appropriate For Ms. Tavares, Undersigned Counsel Submits The Following Sentencing Mitigating Adjustments Should Apply.**
>
> 1.  Ms. Tavares is Entitled to a Role in the Offense Mitigating Adjustment

Based on the foregoing analysis of the factors set forth in USSG § 3B1.1(a), *see supra*

Part II/B, it is clear that a 2-level mitigating adjustment for her minor role in the offense should

be applied pursuant to USSG § 3B1.2(b).  As explained above, the evidence at trial established

Ms. Tavares merely passed along names of candidates Mr. O'Brien selected; her name was

stamped by *other* office personnel, not at her direction, on rejection and interview scheduling

letters; and she occasionally fielded complaints for panel members.  There was no evidence Ms.

Tavares had any involvement with the legislature, took part in planning the alleged scheme,

and/or was necessary to its execution (Mr. O'Brien, himself, could have contacted the panel

members).  In fact, there was no evidence that she knew what the goals of the scheme were or

what, if any, "fruits of the crime" could result from its execution.  Simply put, to the extent Ms.

Tavares had any involvement with the alleged criminal activity, it was only as Mr. O'Brien's

intermediary.  Therefore, if any adjustment is to be applied for Ms. Tavares' role in the offense, a

2-level mitigating adjustment is far more appropriate given the facts of this case.

2.    Ms. Tavares is Also Entitled to a Departure For Her Unique Family Circumstances

Ms. Tavares respectfully requests this Honorable Court apply a 2-level downward departure for her unique family circumstances, pursuant to USSG § 5K2.0(a)(2)(B).  Ms. Tavares has substantial concerns over what might happen to her parents if she is incarcerated. Her parents, who have been married for approximately 66-67 years, are becoming increasingly fragile given their age (her father is 90; her mother is 88).  This fragility in their age requires substantial care by Ms. Tavares.  In particular, she (1) administers and supervises her Father's and Mother's intake of their prescribed medication; (2) she is their sole mode of transportation for frequent doctor's visits for ailments that range from high blood pressure, Parkinson's Disease, bladder and uterine cancer, diabetes, and dementia, *see* PSR at ¶ 94; and (3) she ensures their general living needs and requirements, such as food and hygiene, are being met. Moreover, English is Ms. Tavares' parents' second language which, of itself, creates challenges that require her assistance on an almost daily basis, especially as it relates to their ongoing healthcare needs.  Given that the instant charges will likely result in a suspension of her pension, a loss of income from her part-time work as a real-estate agent, coupled with substantial attorney's fees for a situation that has gone on over 4 years to this point, Ms. Tavares will almost certainly be unable to pay for the care they require in her absence.  But most important, her physical absence leaves them without the critical guardian necessary for the continuation of their life in a private residence.  Ms Tavares is irreplaceable to her parents. She is also pivotally important to her child who is at a crucial developmental stage.  *See* Letter of Support by Deirdre Antonelli, attached hereto (Ms. Tavares' parents "are 89 and 91 years old and... depend[] upon Liz's care and comfort.  Their daily care rests on Liz."); Letter of

Support by Joan Bastian, attached hereto (Ms. Tavares "also is the primary caretaker of her elderly parents whom reside on the first floor of their 2 family home in Newton.  I know they would be lost without her."); Letter of Support by Sandra Leitao (Ms. Tavares and her spouse, Ms. Antonelli, "relocated Liz's parents to their two family house in Newton.  This was a priority of hers given her parents failing health and their inability to live indepedendently... Liz's only sister lives in Singapore, with no immediate family close by.  Their complete care is under Liz's supervision.").   In light of her parents' healthcare issues and needs, a 2-level departure pursuant to USSG § 5K2.0(a)(2)(B) is appropriate.

### D.      The Requested Sentence is Appropriate For Ms. Tavares in Light of the Various Factors Set Forth in 18 U.S.C. § 3553(a).

After determining the guideline range, this Court must consider whether the statutory factors warrant an ultimate sentence above or below the guideline range.  *United States v. Jiménez-Beltre*, 440 F.3d 514, 518-19 (1st. Cir. 2006).  The Supreme Court has emphasized that section 3553(a) is "more than a laundry list of discrete sentencing factors; rather, it is a tapestry of factors, through which runs the thread of an overarching principle."  *United States v. Rodríguez*, 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough v. United States*, 552 U.S. 85 (2007)).  That tenet -- the "parsimony principle" -- instructs "district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing."  *Id*. (quoting 18 U.S.C. § 3553(a)).  Accordingly, Ms. Tavares requests that this Court fashion a non-guidelines sentence based on her personal history and characteristics, family circumstances, nature of the crime (and prosecution) and the purposes enumerated in the Sentencing Reform Act.

Ms. Tavares respectfully avers that an appropriate application of 18 U.S.C. § 3553(a) factors to the circumstances herein, coupled with an acknowledgement that the use of the federal laws by the Government in this prosecution as applied to her suggests, at best, prosecutorial overreach, and should, as such, result in a sentence of probation with conditions of release including community confinement, home confinement or both. The §3553(a) factors generally include (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide the defendant with needed educational or vocational training or medical care, (3) the kinds of sentences available, (4) the kinds of sentence and the sentencing range established by the United States Sentencing Guidelines, (5) any pertinent policy statement, (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (7) the need to provide restitution to any victim of the offense 18 U.S.C. §3553(a).

### 1.    Nature and Circumstances of the Offense

The Guidelines, Chapter 1 Pt. A(4) explains that, "[t]he Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted."  Undersigned counsel once urges this Honorable Court to view this case, when fashioning an appropriate sentence for Ms. Tavares, as falling outside the "heartland" of a typical RICO case.  The purpose of the RICO statute when enacted was to provide tools for federal prosecutor to combat "organized crime, particularly La Costa Nostra" because it "derives a major portion of

its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs..." *Criminal Rico: 18 U.S.C. §§ 1961-1968, A Manual for Federal Prosecutors* at 4 (quoting Organized Criminal Control Act of 1970, Congressional Statement of Findings and Purposes, Section 904(a) of Pub. L. No. 91-452, 84 Stat. 922, 922-23 (1970). Ms. Tavares is not a violent thug, a soldier, intimidator, or organized criminal; she should not be sentenced like one.  But even as transformed into a statute applicable to a wider range of activities, Ms Tavares' proven conduct – for which she acquired no profits, had no decision-making authority, acted more as an aider and abettor than principal – is outside the RICO heartland.

This request is especially appropriate with respect to her proven involvement because no evidence was adduced establishing her own involvement with the legislature, or the overarching goals of the RICO enterprise.  This Court, itself, had noted on various occasions that it perceived this case as more appropriately a mail fraud case, not a RICO case. Undersigned counsel respectfully asks this Court to treat it as such, when considering the appropriate sentence for Ms. Tavares.  Notably, if this case were treated as a mail fraud only case, as it likely should have been, *see United States v. Patriarca*, 807 F.Supp. 165, 187 n. 1 (D.Mass. 1992) (Wolf, J.), her BOL would be 7.  If the 5-level increase due to use of a sophisticated means, *see* USSG § 2B1.1(b)(10)(C), were applied along with the above-requested 2-level departure for a minor role in the offense, her TOL would be 10, within "Zone B" on the USSC Sentencing Table.  A combination of community confinement, home confinement, and no period of imprisonment would be a within-guidelines sentence.  *See* USSG § 5B1.1(a)(2) ("[A] sentence of probation is authorized if... the applicable guideline range is in Zone B of the

Sentencing Table and the court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention as provided in subsection (c)(3) of §5C1.1.").

Undersigned counsel also urges this Court to also closely examine the actual conduct that the government alleges constituted crime(s) she was convicted of.  The government suggests that she should receive a 4-level upward adjustment for her role in the offense as an organizer, a 2-level upward adjustment for her abuse of a position of public trust, and an indeterminate-level upward adjustment for the "loss" that resulted to the "victim."  Without the latter adjustment for loss, and if calculated by the BOL for RICO, her TOL becomes 25.   In other words, at a minimum, the government is asking this Court to sentence Ms. Tavares to somewhere in between 57 and 71 months (4.75 years and 5.9 years) in prison.  When considered in light of Ms. Tavares *actions* that they allege constitute a crime, this recommendation is not only extreme, but vindictive, or at a minimum has the appearance of penalizing Ms Tavares for exercising her right to trial wherein she challenged the sufficiency of proof against her but neither testified nor presented an affirmative defense inconsistent with the position that the charges that were alleged could not be fairly proved.

The government contends Ms. Tavares should be severely punished although Probation could not identify any victims to the offense, *see* PSR at ¶ 129; although Ms. Tavares never profited financially from the alleged conduct; although there was no evidence that Ms. Tavares was involved in the alleged offense's planning; although there was no evidence that Ms. Tavares ever spoke to a member of the legislature in relation to the alleged scheme, and although there is no evidence that Ms. Tavares' own interests were enhanced or promoted through the alleged fraud.  Instead, the government apparently justifies such severe punishment because Ms. Tavares

16

was instructed to pick up the phone and pass along names of preferred candidates to panel members; because her name was stamped on rejection and panel member letters; and because she was instructed to create standardize questions for the final interview panel.  The consequences of any prison sentence to a 57 year old mother of a teenage daughter who has never before run afoul of the law or been on the wrong side of the courtroom are profound (on top of her loss of her license to practice law, her retirement, and her reputation), but a sentence approaching what the Government may seek is far beyond the statutory imperative of 18 USC 3553(a).  Simply put, a sentence of a combination of community and home confinement is considerably more appropriate in light of the actual offense *conduct* at issue.

## 2.        History and Characteristics of the Defendant

Ms. Tavares is a loving spouse, nurturing parent, caring daughter, and was a hard working civil servant for the Commonwealth of Massachusetts.  She has a Criminal History Category of I, no prior record, and has never been arrested.  Ms. Tavares did not even have any workplace complaints or discipline prior to 2010 when the facts of the instant case first began to surface.

Born in Dorchester, Massachusetts, Ms. Tavares was raised, alongside her sister, by her parents who immigrated to this country from Cape Verde in the late 1940's.  She was born into a tight-knit family and grew up with her cousins and sister.  Her parents worked hard to provide for the family; her father was a chef on a tanker, her mother worked as a seamstress from the home.

Her parents' instilled in her a strong work ethic which is exemplified by her educational and work history.  In 1979, Ms. Tavares graduated from Fitchburg State College with honors and a GPA of 3.4.  After earning her Bachelor of Science degree, Ms. Tavares immediately

began her long career as an employee for the Commonwealth of Massachusetts where, with hard work and determination, worked her way up within the Massachusetts Probation Department.  In 1980, she was hired as a line Probation Officer at the Taunton District Court. While working there, she also went to graduate school and eventually earned her Master's Degree in Social Education from Boston University in 1981.  Ms. Tavares ground away as a Probation Officer for over a decade, helping to monitor and rehabilitate probationers, and was promoted to an Assistant Chief Probation Officer ("ACPO") at Taunton District Court.  Ms. Tavares then quickly rose through the ranks: after a mere six months as an ACPO, she was promoted by then-Commissioner Don Cochran to a Chief Probation Officer ("CPO") position with regional responsibilities at the Office of the Commissioner of Probation ("OCP").  While an ACPO and CPO, she was also earning her law degree from Suffolk Law School at night. After she earned her degree, Ms. Tavares was promoted once again to Associate Legal Counsel for the Commissioner of Probation in roughly 1994 or 1995.  Three years later, when Mr. O'Brien was promoted to Commissioner of Probation, he promoted Ms. Tavares to Deputy Commissioner for the Programs division in roughly 1998 or 1999.  Two years after that, she was promoted *again* to Second Deputy Commissioner, when in 2008, she was promoted to First Deputy Commissioner.  Ms. Tavares was a hard-working woman in a male-dominated profession and quickly rose through the ranks.  Ms. Tavares clearly dedicated her life to social service, to the probationers and PO's she oversaw, and to the Commonwealth of Massachusetts.  Simply put, Ms. Tavares gave her life to the Massachusetts Probation Department.

This work ethic and determination has persisted even in the face of the instant charges. To support her family, Ms. Tavares obtained her real-estate brokerage license and works as an

agent for ReMax in Newton, Massachusetts.  PSR at ¶ 109.  In this new-found profession, Ms. Tavares has thrived and is a member of the Communications and Forms Committee for the Massachusetts Association of Realtors and the Grievance and Professional Standard Committee for the Greater Boston Association of Realtors.  In addition to working as a real-estate agent, Ms. Tavares volunteered at the Newton Community Service Center at its development office where "she was trained on how to communicate with children in school about sexual assault, bullying and stranger safety."  PSR at ¶ 112.  She also volunteered at the Newton Public Library in the English as a Second Language program.  *Id.*  Given the time constraints of the trial, Ms. Tavares ceased volunteering at these programs but intends to resume her involvement with them after the instant proceedings have commenced.

Despite the fact that Ms. Tavares gave substantial time to her profession and to the Commonwealth, she has also been a loving spouse and caring mother.  In the mid-1990's as Ms. Tavares was working her way up the Massachusetts Probation Department, she began dating Diedre Antonelli ("Ms. Antonelli").  Very soon after *Goodridge v. Department of Public Health* was decided by the Massachusetts Supreme Judicial Court, Ms. Tavares and Ms. Antonelli were married.[7]  Before Ms. Tavares was promoted to Second Deputy, Ms. Antonelli's and Ms. Tavares' daughter was born.  Their daughter is currently in 9th grade, and is an exceptional student and softball player.  Ms. Antonelli, Ms. Tavares and their daughter are highly concerned that a sentence of incarceration for Ms. Tavares will cause this family to substantially deteriorate as Ms. Tavares' daughter begins transitioning into a young-adult life in High School.

---

[7] Ms. Antonelli, who has been, and continues to be, supportive of Ms. Tavares, has stood by her spouse and was present for trial nearly every day.  Indeed, even after Ms. Tavares' conviction, Ms. Antonelli was quick to point out to Probation "that Ms. Tavares holds herself to a high ethical standard."  PSR at ¶ 93.

In addition to concerns over the potential effect on her immediate home if she is incarcerated, Ms. Tavares has substantial concerns over what might happen to her parents. As explained *supra* in Part III/B, her parents require substantial care by Ms. Tavares due to their advanced age and deleterious physical conditions. Ms. Tavares administers their medicine, helps them go to and from frequent doctor's visits for a host of ailments, *see supra*, and she even ensures they are fed, clothed, and are otherwise cared for. Many of the letters of support, attached hereto, references the care and support that her parents require and that Ms. Tavares provides. Given that the instant charges will likely result in a suspension of her pension, a loss of income from her part-time work as a real-estate agent, coupled with substantial attorney's fees for a situation that has gone on over 4 years to this point, Ms. Tavares will almost certainly be unable to pay for the care they require in her absence.

Ms. Tavares' continued and much-needed care for her parents (and child) should not be deferred for the three to four years suggested by the guidelines (or the five to six years suggested by the government). A significantly shorter sentence will serve the purposes of the guidelines and is more consonant with the interests of justice.

<u>3.</u>     <u>Letters of Support Filed on Ms. Tavares' Behalf Affirm the Appropriateness of the Requested Sentence</u>

There is no better testament to her strength of character, moral epicenter and social standing than the nearly 40 attached letters of support. These letters are from family members, her sibling, members of her community, judges, attorneys, law enforcement, even her dentist. Anyone who has known Ms. Tavares in any substantive way has been willing to write on her behalf. Almost letter written on her behalf highlights her integrity and character. For example, a friend, Claire Collins, wrote "She impressed upon me the importance of character and

integrity in everything you do personally and professionally... She is the anchor for their daughter and to her spouse.  If Liz were sentenced to prison, they would be lost and I believe damaged emotionally."  *See also*, Letter of Support by Robert Peabody, Esq. ("[H]aving participated as prosecutor and defense attorney in many, many federal sentencings for more than fifteen (15) years, I am sufficiently well versed in the process to recommend *probation* for Tavares based on what I know about her conduct as a Deputy Chief of the Probation Department and, more importantly, about her good character and accomplished past... Tavares was proud of the route she had taken from 'line' PO to senior staff of the Department; it was the right way, one based on hard work and committed public service.  Tavares' thirty years of exemplary public service, Your Honor, should trump her offense conduct in this case.") (emphasis in original).   Additionally, the irony that two witnesses who testified during the government's case-in-chief wrote heart-felt letters on her behalf cannot be lost on this Court. *See* Letters of Support by Janet Mucci & Maria Walsh.  That these witnesses were willing to come forward on her behalf not only speaks to the character traits described above, and emphasized in other letters of support, but also to the incongruity of the government's charges against her.

Finally, and perhaps most importantly, former Chief Justice of the Boston Municipal Court Charles Johnson wrote a letter on her behalf which speaks volumes.  For example, Judge Johnson, while recognizing that some punishment short of incarceration is appropriate in light of the crimes for which she is convicted, writes:

> I understand, as established by the jury's verdict, that Ms Tavares' participation in the probation department's hiring process was illegal, and cannot go unpunished.... [But i]n my opinion, Ms Tavares should not be punished as a false symbol of a tainted system, created by others more culpable than her; nor should she serve as a sacrificial scapegoat for a system with roots

> that long predated her employment, ran deep into the many cross currents always at play in Massachusetts politics, and often times support by a Judiciary, sometimes too willing to abnegate its constitutional responsibilities in exchange for false institutional securities.

This letter is not submitted to this Court lightly; Judge Johnson makes clear throughout the letter that Ms. Tavares "failed herself and the public." It is, however, too important an artifact to not be considered by this Court given Judge Johnson's considered recognition that larger systemic problems were at work within the Probation Department, the Trial Court, and Massachusetts politics as a whole contributing to the alleged offense at issue here: "Ms. Tavares' failure of character was also enabled by a Judiciary that long tolerated, at best, hiring practices in the probation department widely believed to be unfair. This singular fact alone would compel my request for leniency on Ms. Tavares behalf." Undersigned counsel urges this Court to consider not only Judge Johnson's words with the same care it has given to these proceedings as a whole but the entirety of Ms. Tavares professional and personal life in determining and fair and just and merciful sentence.

## III. CONCLUSION

Ms. Tavares respectfully requests this Honorable Court impose a non-guidelines sentence to three (3) years of probation with conditions including community confinement, home confinement or a combination of both. If this Court feels compelled to fashion a sentence requiring some imprisonment, Ms. Tavares respectfully requests this Honorable Court grant her requests for downward adjustments pursuant to USSG §§ 3B1.2(b) (minor role) and 5K2.0(a)(2)(B) (unique family circumstances), and to sentence her to a period of incarceration not to exceed 12 months and 1 day (366 days), on grounds that Ms. Tavares was minimally involved in the offense conduct and in light of her characteristics and family circumstances. Ms.

Tavares also requests, in the event incarceration is nonetheless imposed, that she be granted bail pending her appeal.

Dated: October 6, 2014                                   Respectfully submitted,

                                                        ELIZABETH TAVARES
                                                        By and through her attorneys,

                                                        */s/ R. Bradford Bailey*
                                                        R. Bradford Bailey, BBO#549749
                                                        Adamo L. Lanza, BBO#689190
                                                        Jeffrey A. Denner, BBO#120520
                                                        Four Longfellow Place, 35th Floor
                                                        Boston, Massachusetts 02114
                                                        Tel.    617.227.2800
                                                        Fax.    617.973.1562
                                                        bbailey@dennerlaw.com
                                                        alanza@dennerlaw.com
                                                        jdenner@dennerlaw.com

<u>CERTIFICATE OF SERVICE</u>

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing [NEF] and paper copies will be sent to those indicated as non-registered participants.

                                                        */s/ R. Bradford Bailey*