# ATTACHMENT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2013 NOV 27 P 2: 35

UNITED STATES OF AMERICA     )
                             )
v.                           )     Criminal No. 12-40026-FDS
                             )
JOHN J. O'BRIEN,             )
ELIZABETH V. TAVARES, and    )
WILLIAM H. BURKE, III,       )
                             )
        Defendants.          )

## GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS FOR SEVERANCE

Defendants John J. O'Brien ("O'Brien"), Elizabeth V. Tavares ("Tavares") and William H. Burke, III ("Burke") are charged by indictment with (1) conspiracy to commit racketeering, in violation of 18 U.S.C. §1962(d), (2) racketeering (O'Brien and Tavares only), in violation of 18 U.S.C. §1962(c), (3) mail fraud, in violation of 18 U.S.C. §1341, (4) conspiracy to commit bribery concerning programs receiving federal funds, in violation of 18 U.S.C. §371, and (5) bribery concerning programs receiving federal funds, in violation of 18 U.S.C. §666(a)(2). Trial for all defendants is scheduled for February 24, 2014. However, on or about October 29, 2013, each defendant filed a motion for severance under Federal Rule of Criminal Procedure 14 claiming that a joint trial would violate his or her rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.[1] In particular, the defendants argue that, at trial, the government will seek to introduce statements provided by Tavares and Burke in connection with the Supreme Judicial Court's administrative inquiry into alleged improprieties with respect to hiring within the

---

[1] While each defendant filed a separate motion, the motions are nearly identical in substance and thus, for purposes of this Response, will be discussed together.

Massachusetts Department of Probation.   While conceding that these statements would be
admissible at separate trials against Tavares and Burke, respectively, the defendants - citing
Bruton v. United States, 391 U.S. 123 (1968), Crawford v. Washington, 541 U.S. 36 (2004), and
their progeny - argue that admission of such statements at a joint trial will "seriously prejudice"
their Sixth Amendment right to confront and cross examine their accusers (assuming, of course,
that Tavares and Burke do not testify at such a trial).   See, e.g., O'Brien Motion at 4-5; Tavares
Motion at 4-5; Burke Motion at 5.[2]

Each of the defendant's motions should be denied because neither Tavares' nor Burkes'
statements constitute a "powerfully incriminating" confession that inculpates their co-defendants.
See, e.g., Richardson v. Marsh, 481 U.S. 200, 207-208 (1987); Bruton, 391 U.S. at 135-136.
Bruton, therefore, does not apply and so long as this Court gives an appropriate limiting
instruction, admission of those statements at a joint trial will not create a serious risk that the
defendants' rights under the Confrontation Clause will be compromised; nor will it prevent the
jury from making a reliable judgment about guilt or innocence.   See Zafiro v. United States, 506
U.S. 534, 539 (1993).   On that ground, defendants' motions for severance should be denied.[3]

---

[2] Specifically, O'Brien argues that admission of Tavares' and Burkes' statements will seriously
prejudice his right to confrontation under the Sixth Amendment; Tavares argues that admission of
Burkes' statements will seriously prejudice her right to confrontation under the Sixth Amendment;
and Burke argues that admission of Tavares' statements will seriously prejudice his right to
confrontation under the Sixth Amendment.

[3] The defendants' motions assume that the government will seek to admit the statements of
Tavares and Burke at the trial beginning on February 24, 2014.   While the government has not
stated its intent in that regard, for the purposes of this Response, the government agrees that it will
seek their admission.

## I.     Relevant Factual Background

### A. Tavares' and Burkes' Statements to Independent Counsel

On or about May 23, 2010, the Supreme Judicial Court (hereinafter, "SJC") issued an order

appointing Paul F. Ware, Jr., of Goodwin Procter LLP, as an Independent Counsel and directed

him to conduct an administrative inquiry into the hiring improprieties alleged in a recent Boston

Globe Spotlight Team article.    As part of its order, the SJC granted Ware the power to subpoena

witnesses and administer oaths.

During his investigation, Ware and his team subpoenaed and deposed many witnesses

including Tavares and Burke.    Prior to each deposition, Ware or a member of his team advised

each witness of his or her rights during the deposition including, but not limited to, the right to

remain silent and exercise the witness's Fifth Amendment privilege against self-incrimination.

Each witness, including Tavares and Burke, signed this advice of rights prior to their deposition.

See SJC/Probation Investigation Warnings of Tavares and Burke, attached hereto as Exhibits A

and B.      No witness, therefore, was "compelled" to make a statement.[4]   On November 9, 2010,

at the culmination of his investigation, Ware issued a Report of Independent Counsel (hereinafter,

"Ware Report") which made wide-ranging allegations regarding the impropriety of hiring

practices within the Department of Probation.

### 1. Tavares' Deposition

Tavares, the Former First Deputy Commissioner of the Department of Probation, was

---

[4] The government has no information suggesting that any probation employee was informed that his or her failure to cooperate with Independent Counsel's investigation – by, for instance, asserting his or her Fifth Amendment privilege – would impact the witness's employment with the Probation Department.   To the contrary, the government understands that witnesses were advised that there would be no retaliation if the witness refused to provide statements to Independent Counsel.

deposed by Independent Counsel on July 13, 2010. She appeared for the deposition with counsel and was advised, as part of the standard advice of rights, that she could leave the deposition and consult with her attorney as necessary. Tavares was also advised that she had the right to remain silent. Tavares, an attorney herself, signed the advice of rights form and stated that she had no questions concerning its content. See Tavares Transcript (hereinafter "Tavares Tr.") at 5;[5] see also Exhibit A. Tavares then chose to answer questions.

Suffice it to say, Tavares did not use the deposition as an opportunity to "confess" her involvement in the alleged crimes. Nor did she use it as an opportunity to incriminate her co-defendants, O'Brien and Burke. To the contrary, most of Tavares' statements appear designed to protect herself and O'Brien and cover up the nature and extent of their involvement in the alleged hiring scheme. For instance, while Tavares stated that O'Brien provided her with names of recommended candidates to pass on to the interview panels,[6] she denied knowing whether O'Brien "expected" the interviewers to move these candidates to the next round of interviews. See Tavares Tr. at 64.[7] Moreover, Tavares denied any understanding that recommended

---

[5] Tavares' deposition transcript is attached to O'Brien's motion as Exhibit A.

[6] By way of background, there were three rounds of interviews for probation officers, the screening round (interviews conducted by two probation employees), the "local" or second round (interviews conducted by two probation employees and a Judge from the relevant court), and the final round (interviews conducted by two Deputy Commissioners). After the final round interview, the Commissioner made his final selection. A recommended or "preferred" candidate is a candidate who was sponsored by, typically, a state legislator.

[7] At one point in the deposition, after being asked whether O'Brien intended interviewers to rank recommended candidates "at the top of the list," Tavares responded "I think so." See id. at 73-74. However, toward the end of the interview, Tavares stated: "Q. But it was your understanding that Commissioner O'Brien expected the Regional Supervisors to get the recommended candidates into that final round as long as they were somehow responsive to the questions? A. Expected? I mean, I don't know if I'd use that word, but wanted to see people in the final round, yeah, I suppose. . . . Q. [I]t's your understanding that . . . [O'Brien] was checking up to make sure that the

4

candidates, in essence, got a free pass through the interview process. See id. at 63-64 ("He received these recommendations. I assumed that they were based on a personal knowledge of the person, whoever gave them those recommendations, and they were passed along, and they would have been required to be responsive to the questions. And if they made it, they made it; if they didn't, they didn't."); see also id. at 66 ("Q. So was it your expectation that if you passed along a name from the Commissioner that the Regional Supervisor would try to make sure that that person was in the top eight? A. I suppose if the person was responsive to the questions and the entire committee agreed, then, yes."); see also 101-102. Tavares also denied the extent of the alleged hiring fraud. See id. at 75 ("Q. For the most part, were people who were getting hired people whose names you were given by the Commissioner? A. I don't know. I mean, I'd have to go back and do an analysis, and I don't know. Q. Was it your understanding over the last eight or nine years . . . that for people that got hired, for the most part, they had to be people that the Commissioner received a recommendation for? A. I think a lot of them received recommendations, but I don't know if it would be the majority. Like I said, we have many positions, and some people that were recommended were hired and some were not.").

Tavares also covered up the alleged hiring fraud when discussing her role (and O'Brien's role) in the final round interviews for Chief Probation Officers ("CPOs").[8] For instance, Tavares stated that, when she participated in final round interviews for CPOs, O'Brien always hired the candidate with the highest ranking. See id. at 48. Tavares' statements in that regard are

names he gave you to pass through in fact did make it to the next round of interviews? A. I think he wanted to see who would be coming up for the final round." Id. at 104. Tavares' wishy-washy responses to this line of questioning are one example of her repeated attempts to protect O'Brien.

[8] According to Tavares, she, O'Brien, and then First Deputy John Cremins participated in final round interviews for Chief Probation Officers. See id. at 18.

misleading. Indeed, later in the deposition, Tavares said that, before many CPO interviews, O'Brien told her which candidate or candidates for the position were recommended. See id. at 113-114. Tavares stated that she understood she was to give these candidates a "good look." Id. at 114. Thus, while O'Brien may always have chosen the "highest ranked" candidate, since he and his top deputies were the only ones participating in the final ranking, and he identified the recommended candidates in advance, he could ensure that the highest ranked candidate was also his preferred candidate. As the Second Deputy Commissioner (at the time), and someone who admittedly passed names of recommended candidates to the lower round interview panels for a majority of the hires, Tavares must have understood this. Yet, she failed to explain it, making it appear, instead, as if the hiring process for CPOs was based largely on merit. The government expects that all evidence at trial will be to the contrary.

In addition, Tavares denied any understanding of a *quid pro quo*; i.e., that O'Brien hired candidates sponsored by legislators in order to gain favorable treatment on the budget and other legislative issues. See id. at 62-63; see also id. at 69 ("Q. So all you and the Regional Supervisor know are that these are names the Commissioner has received recommendations for but not anything else about why that recommendation should be given any weight in the interview process? A. That's true."); 70-71 (When asked whether she had an understanding of why the Commissioner wanted to take a closer look at some candidates, Tavares responded that, generally, she had no idea.). Again, the government expects to introduce evidence at trial to the contrary; i.e., that it was common knowledge, to those farther down the command chain than Tavares, that O'Brien catered to the legislators in order to ensure that he got the funding he requested.

Tavares also denied that O'Brien ever gave her the name of a candidate whom the Commissioner did not want to move on to the next round of interviews. See id. at 81 ("Q. Do

6

you recall ever being given names by the Commissioner of people who should not make it to the next round of individuals, people the Commissioner did not want to see come before Pat [stet] Walsh? A. You mean black-listing people? Q. Yes. A. No."); see also id. at 87-88. At trial, however, the government expects to introduce evidence that Tavares specifically told Regional Supervisor Edward Dalton - before the interviews - that two candidates for a Barnstable Assistant Chief position (the position ultimately awarded to Elzy Tubbs) should not be moved on to the final round of interviews.

Finally, when confronted directly with two instances when O'Brien removed Regional Supervisors from interview panels because they refused to advance a preferred candidate, Tavares either denied specific knowledge of the incident, "remembered" it differently, or mischaracterized what happened in an attempt to protect herself and O'Brien. For instance, when questioned about why former Regional Supervisor (and, ultimately, Commissioner of Probation) Ellen Slaney, was taken off of the interviewing panels, Tavares said that she believed Slaney used the "wrong form" during an interview; as a result, Slaney had some communication with O'Brien and didn't participate in interviews after that time. While Slaney was assigned to perform audits after this incident, Tavares denied knowing that it was because Slaney didn't "cooperate" with O'Brien's expectations for interviews, stating that audits were a normal function of a Regional Supervisor. See id. at 24-28, 43 and 88-90.

In addition, Independent Counsel asked Tavares about her knowledge of former Regional Supervisor Edward Dalton's removal from interview panels. In particular, Independent Counsel asked Tavares about Dalton's role in an interview for an Assistant Chief Probation Officer position in Barnstable. Tavares stated that an individual named Elzy Tubbs was a preferred candidate for the position. However, Tubbs did not show up for his second round interview on time and, as a

7

result, the Judge and the Regional Supervisor on the interview panel, Edward Dalton, refused to interview him when he arrived. Tavares said that she spoke with the Judge who "cited to me some obscure city ordinance" as the reason he could not interview Tubbs. Dalton, she said, sided with the Judge and, as a result, O'Brien subsequently removed Dalton from the hiring panels. See Tavares Tr. at 20-23 and 28-31. Tavares' statements make the incident appear innocuous – Tubbs was late for an interview; Dalton and the Judge erroneously refused to interview him; O'Brien removed Dalton from the interview panels. Tavares also went out of her way to praise Tubbs' credentials, further justifying O'Brien's decision to remove Dalton from hiring panels. See id. at 76 ("But Elzy was also on our training team, our Probation training team, and was a Probation Officer in charge. I mean, he had great credential[s]."). Finally, Tavares told Independent Counsel that she did not recall a time when Dalton or Slaney complained to her about the rigged interview process.

At trial, the government expects to introduce evidence that is wholly inconsistent with Tavares' statements regarding Slaney and Dalton – further demonstrating that her statements to Independent Counsel were not part of a "powerfully incriminating" confession, but a cover-up designed to protect herself and O'Brien. As for her other co-defendant, Burke, Tavares did not mention his name nor reference his position (Deputy Commissioner in Western Massachusetts) during her three hour deposition.[9]

Tavares re-appeared before Independent Counsel on October 22, 2010. Again, she brought counsel. This time, she asserted her Fifth Amendment privilege and chose not to answer

---

[9] It is also worth noting that, when asked whether she had spoken with O'Brien after the Globe articles were published, Tavares stated that "the allegations in the newspaper . . . [were] disturbing to him because he knew them to be untrue." Id. at 124.

questions.

### 2. Burke's Deposition

Burke, a retired, former Deputy Commissioner of the Department of Probation, was deposed by Independent Counsel on July 22, 2010.[10]  While Burke chose not to appear with counsel, he read and signed the standard advice of rights form and, after stating that he understood its contents, chose to answer questions.  See Exhibit B.  Like Tavares, Burke also did not take this opportunity to "confess" his crimes.  Nor did he take the opportunity to inculpate his co-conspirators, O'Brien or Tavares.  To the contrary, Burke told Mr. Ware that he thought the investigation was a "witch hunt" which unfairly targeted O'Brien, whom he described as "probably the greatest Commissioner the state has ever had."  Burke Transcript (hereinafter, "Burke Tr.") at 73.[11]

Consistent with Tavares, Burke stated that sometimes he received names of recommended candidates during the interview process.  See id. at 22-23.  Burke stated that he received these names from Tavares, Fran Wall and Ed Ryan.  See id. at 26.[12]  Burke, however, went out of his way to protect O'Brien, stating: "Jack O'Brien, the Commissioner of Probation, never once himself asked me to put anybody on a list."  Id. at 25.  When asked whether he understood that the names provided by Tavares, Wall and Ryan were approved by the Commissioner, Burke replied "That's hearsay.  I don't know."  Id. at 26; see also 27-28.

Apart from protecting his personal friend and boss, Burke also used the deposition to cover

---

[10]  Burke was retired at the time of the deposition.

[11]  Burke's deposition transcript is attached to O'Brien's motion as Exhibit B.

[12]  That is the only substantive information Burke provided about Tavares.  Indeed, Burke did not appear to be particularly familiar with Tavares; he first referred to her as "Liz Travaglini."  See id. at 9.

9

up his role in the alleged conspiracies. For instance, when asked why he, as a Deputy Commissioner, sat on second round interview panels (instead of the Regional Supervisor who generally participated), Burke explained that it was because the Regional Supervisors sometimes had conflicts and could not participate. See id. at 49-50. He flatly denied the suggestion that it was because the Commissioner knew that Burke would make sure to pass on O'Brien's preferred candidates. See id. at 49 ("Q. Were there particular circumstances in which the Commissioner's office had preferred candidates and they wanted that to happen so they sent you to participate? A. No. No. Q. That never occurred? A. No. . . ."). At trial the government expects to introduce evidence that Burke was put on second round interview panels precisely for that reason.

In addition, when asked, Burke failed to explain the true circumstances surrounding the hires of at least two Acting CPOs, Christopher Hoffman and Frank Glenowitz. See id. at 59-60 (when questioned about how individuals were promoted to Acting CPOs, Burke explained that Hoffman and Glenowitz were promoted because they were Assistant Chiefs). At trial, the government expects to introduce evidence showing that Hoffman and Glenowitz, both part-time bartenders at Burke's favorite haunt, obtained their jobs and promotions within the Probation Department because of their relationship with Burke.

Burke also failed to answer honestly with respect to questions about the employment of his daughter, Mindy Burke. When asked how she was hired, Burke responded: "She's the best qualified candidate." See id. at 102. Burke also stated that, when it came to his daughter, he "absolutely" did not attempt to influence the hiring process. See id. at 104. At trial, the government expects to introduce evidence that Mindy Burke was considered a "must hire" because her father was the Deputy Commissioner in Western Massachusetts.

While Burke made some arguably inculpatory statements involving himself and O'Brien,

10

when pressed, he retreated. For instance, when asked whether some less qualified candidates got jobs because O'Brien wanted them to get jobs, Burke agreed. However, upon further questioning, Burke said that candidates only got jobs if they "met the requirements and . . . answered the questions" and if "they did good on an interview." See id. at 75-76. He expressly refused to agree that the hiring process was "rigged." See id. at 116.

Likewise, while Burke said that he had a general understanding of a *quid pro quo*, i.e., that the legislature generously funded the Probation Department and the Probation Department gave jobs to candidates recommended by the legislature, see id. at 82-83, he qualified his statement, noting "[b]ut most of those people [preferred candidates] were probably the most qualified people, too." See id. at 83; 114-116.

Perhaps the most telling portion of Burke's deposition was toward the end, when Independent Counsel asked whether Burke had conferred with anyone before being deposed. Burke responded: "Didn't do anything wrong so I didn't have to [sic] talk to counsel." See id. at 92.

## B. Second Superseding Indictment[13]

Following the issuance of the Report of Independent Counsel in November 2010, the federal government began an investigation into the allegations contained within that report. That investigation led to a Second Superseding Indictment against O'Brien, Tavares, and Burke. Distilled to its essence, the Second Superseding Indictment alleges that, from approximately 2000 to approximately April 2010, the defendants engaged in a fraudulent hiring scheme. Instead of hiring the most qualified probation officers (and Assistant Chief and CPOs) as required by the

---

[13] Unless otherwise indicated, the allegations described in this subsection are derived from the Second Superseding Indictment.

11

Trial Court Policies and Procedures Manual, the defendants hired candidates on the basis of their political sponsorship by members of the Massachusetts legislature. In order to conceal this practice and create an aura of legitimacy with respect to hiring, the defendants instituted a sham hiring system involving job postings, three levels of interviews, judicial participation on the interview panels, scoring sheets, and a process for notifying successful and unsuccessful candidates. For each individual hired or promoted, O'Brien certified to the Chief Justice of Administration and Management, Robert Mulligan, that he had complied with the personnel standards of the Trial Court, including the requirement that he hire or promote the most qualified candidate. In fact, the defendants did not hire the most meritorious candidate; they hired the most politically connected one. The defendants and their co-conspirators achieved this by, among other things, passing names of "preferred" candidates to participants on each of the three interview panels and falsifying the interview scoring sheets to make it appear as if the "preferred candidate" was also the best.

The defendants engaged in this conduct in order to curry favor with members of the legislature, particularly high-ranking members, in order to obtain favorable treatment with respect to their budget and other legislative interests. To this end, the defendants are also charged with federal program bribery for giving jobs and salaries to politically sponsored candidates in order to influence members of the legislature who had the ability to influence Probation's budget and other legislative interests of the Department of Probation.

## II.   Law of Severance

It is well-established that, as a rule, "persons who are indicted together should be tried together." United States v. O'Bryant, 998 F.2d 21, 25 (1st Cir. 1993). Indeed, "there is a preference in the federal system for joint trials of defendants who are indicted together" because

12

joint trials promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." Zafiro, 506 U.S. at 537 (internal quotations and citations omitted). However, the Federal Rules of Criminal Procedure recognize that, in some instances, a joint trial may prejudice one of the parties. Thus, Federal Rule of Criminal Procedure 14 (hereinafter, "Rule 14") provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.[14]

Despite this potential remedy, a party seeking severance must clear a high hurdle. See O'Bryant, 998 F.2d at 25. The Supreme Court has instructed that, when defendants properly have been joined . . . a district court should grant a severance under Rule 14 *only* if there is *a serious risk* that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539 (emphasis added). Echoing this sentiment, the First Circuit has stated that a defendant seeking a separate trial can succeed only by "making a strong showing of evident prejudice." O'Bryant, 998 F.2d at 25 (citing cases). As if the bar were not high enough, severance is especially disfavored when defendants are charged with conspiracy, as in this case. See, e.g., United States v. Celestin, 612 F.3d 14, 19 (1st Cir. 2010); United States v. Pena-Lora, 225 F.3d 17, 33 (1st Cir. 2000).

Here, the defendants argue that severance is required under Rule 14 because, if the government seeks to admit the "powerfully incriminating" prior statements of Tavares and Burke

---

[14] Notably, Rule 14 does not *require* severance where there is prejudice to a party; rather, the Rule "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." Zafiro, 506 U.S. 538-39.

at a joint trial (at which neither Tavares nor Burke will testify), there is a serious risk that the

defendants' Sixth Amendment right to confront their accusers will be violated and that a jury will

be unable to make a reliable judgment as to guilt or innocence.   In essence, the defendants make a

Bruton claim.   For each of the reasons described below, that claim must fail and, "having failed to

make a strong showing of evident prejudice," defendants' motions for severance should be

denied.[15]

### III.   Argument

#### A. Bruton does not Require Severance Under Rule 14 Because Tavares' and Burkes' Statements do not Constitute Powerfully Incriminating Confessions that Inculpate their Co-Defendants

Admission of Tavares' and Burkes' statements at a joint trial will not create a serious risk

that the defendants' Sixth Amendment right to confront their accusers will be violated, or that a

jury will be unable to make a reliable judgment as to guilt or innocence, because the statements are

not "powerfully incriminating" confessions under Bruton.   A review of the basic facts of Bruton

is instructive.   In that case, two defendants, Evans and Bruton, were convicted after a joint trial of

armed postal robbery.   See Bruton, 391 U.S. at 124.   Prior to trial, defendant Evans confessed his

involvement in the robbery and, in the course of that confession, inculpated his co-defendant,

Bruton.   See id.   At trial, the district court permitted a federal agent to testify to Evans'

out-of-court confession.   See id.   Evans did not testify at trial and, thus, was not subject to cross

examination as to his prior confession.   See id. at 128.   At the close of the government's case, the

district court instructed the jury that, while Evans' confession was competent evidence against

---

[15] Notably, the defendants' motions present no Crawford issue.   Assuming *arguendo* that Burkes' and Tavares' statements are testimonial, the government will seek their admission only against Burke and Tavares, respectively, as admissions of a party under Federal Rule of Evidence 801(d)(2)(A).   Because such statements do not constitute hearsay, Crawford is inapposite.

Evans, it was inadmissible hearsay against Bruton and, therefore, had to be disregarded in determining Bruton's guilt or innocence. See id. at 125. Both Evans and Bruton were convicted. See id. at 124. Bruton appealed his conviction on the ground that Evans' confession should not have been admitted at the joint trial. See id. The Eight Circuit affirmed Bruton's conviction based on the district court's limiting instruction. See id. The Supreme Court, however, reversed, overruling prior precedent, and held that "admission of Evans' confession in . . . [a] joint trial violated . . . [Bruton's] right of cross examination secured by the Confrontation Clause of the Sixth Amendment." See id. at 126. In so doing, the Court relied, significantly, on the nature of Evans' out-of-court statement, i.e., a "powerfully incriminating" confession that inculpated his co-defendant. See generally id. at 130-36. In those circumstances, the Court held, "we cannot accept limiting instructions as an adequate substitute for . . . [Bruton's] constitutional right of cross-examination. The effect is the same as if there had been no instruction at all." Id. at 137.

The Bruton Court's holding is exceptionally narrow, confined only to cases involving facially incriminating confessions of a co-defendant. See, e.g., Richardson v. Marsh, 481 U.S. 200-201 (1987) ("The Bruton Court recognized a very narrow exception to the almost invariable assumption of the law that jurors follow their instructions in the situation when the facially incriminating confession of a nontestifying codefendant is introduced at a joint trial and the jury is instructed to consider the confession only against the codefendant."); United States v. Vega-Molina, 407 F.3d 511, 520 (1st Cir. 2005) (Bruton proscribes the introduction of statements that are "powerfully incriminating," i.e., inculpatory on their face, vis-à-vis a jointly tried defendant); see also United States v. Lopez-Lopez, 282 F.3d 1, 112-13 (1st Cir. 2002) (Bruton does not apply when the statements at issue are not confessions, let alone powerfully incriminating ones); Brown v. Maloney, 267 F.3d 36, 40-43 (1st Cir. 2001). Indeed, Bruton does not apply to

15

confessions that are incriminating only when linked with other evidence introduced at trial. Richardson, 481 U.S. at 208. This is because, "[w]here the necessity of linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." Id. (declining to extend Bruton in a case where the defendant's out-of-court confession was redacted to exclude reference to his co-defendant and was thus incriminating (as to the co-defendant) only when linked to other evidence introduced at trial).

The Bruton "exception" does not apply here. First, Tavares' and Burkes' statements are not facially incriminating confessions, let alone "powerfully incriminating" ones. As described, in detail, in the facts section of this Response, neither Tavares nor Burke confessed to any crime. To the contrary, Tavares and Burke responded to question after question with false exculpatory statements in attempt to cover up their misconduct and conceal the level of their involvement in the hiring fraud. Tavares, in particular, refused to acknowledge the depth and breadth of the fraud, or the reason for it (the *quid pro quo*). Conveniently, she could not recall instances when she provided names of black listed candidates to the interview panels, or instances when Regional Supervisors were disciplined because they refused to participate in the scheme. While Burke, at least, acknowledged a general understanding of a *quid pro quo* between the Probation Department and the legislature, he also was defensive about his role in the scheme - denying that the interview process was rigged, refusing to admit that he got jobs for many candidates in Western Massachusetts (including his daughter), and misrepresenting the nature of his involvement on second round interview panels. Indeed, at one point during the deposition, Burke explained: "Didn't do anything wrong so I didn't have to [sic] talk to counsel." See Burke Tr. at 92.

Nor do Tavares' and Burkes' statements powerfully inculpate their co-defendants. To the contrary, during their depositions, both Tavares and Burke went out of their way to protect

O'Brien. Tavares, for instance, tiptoed cautiously around questions regarding O'Brien's involvement in the scheme, often claiming a lack of knowledge or a failure of memory. Burke took a more direct approach - accusing Mr. Ware of engaging in a "witch hunt" against his boss and personal friend. Likewise, neither Tavares nor Burke powerfully inculpated each other. Indeed, Tavares never even mentioned Burke's name. Burke did no more than state that Tavares gave him names of recommended candidates prior to interviews – a fact which, standing alone, is not incriminating.

To be sure, while Tavares' and Burkes' statements are not powerfully incriminating, some may be viewed as inculpatory when linked with other evidence the government expects to introduce at trial. Most significantly, Tavares said that she received the names of recommended candidates from O'Brien and passed them on to members of the interview panels. Burke, likewise, said that as a member of several interview panels, he received names of recommended candidates from Tavares (and others). Both Tavares and Burke stated, generally, that recommendations played a role in the hiring process. In addition, Burke admitted, generally, to his understanding of a *quid pro quo* between the Probation Department and the legislature. Standing alone, these statements are not incriminating. It is only when they are linked with other evidence that they become inculpatory. For instance, the government does not allege that it is a crime in and of itself to consider a recommendation made on behalf of a candidate. Yet, when testimony to that effect is coupled with evidence that the interview process was a sham, scores were fixed, candidates were hired solely on the basis of their political connections, and O'Brien falsely certified otherwise, it becomes incriminating. Bruton, however, does not apply to confessions that are incriminating only when linked with other evidence introduced at trial. Richardson, 481 U.S. at 208; see also Lopez-Lopez, 282 F.3d at 13 ("The argument that the

17

statement was of an 'incriminatory nature' is insufficient to clear the [Bruton] hurdle requiring a powerfully incriminating statement.").

In sum, Tavares' and Burkes' statements to Independent Counsel are nothing like the "powerfully incriminating" confessions in Bruton or its progeny. See, e.g., Bruton, 391 U.S. at 124; see also Gray v. Maryland, 523 U.S. 185, 188 (1998) (confession to participation in a beating resulting in death); Richardson, 481 U.S. at 203-204 (confession to murder and robbery). Accordingly, there is no serious risk that the statements will compromise the defendants' rights under the Confrontation Clause of the Sixth Amendment if introduced at a joint trial. To the extent there remains any risk of prejudice at all, it can be cured by an appropriate limiting instruction. The Bruton "exception," therefore, does not require severance in this case.[16]

### B. Having Failed to Establish a Bruton Issue, Defendants' Have Not and Cannot Make a Strong Showing of Evident Prejudice Sufficient to Warrant Severance Under Rule 14

As there is no Bruton issue, defendants have failed to establish a strong showing of evident prejudice sufficient to warrant severance in this case. Indeed, the only other "arguments" the defendants appear to raise relate to (1) the *ex parte* nature of the SJC's administrative inquiry and, (2) the voluntariness of Tavares' and Burkes' statements. See generally O'Brien's Motion at 1-3,

---

[16] In addition, Bruton applies only when a co-defendant's statement is being offered to prove the truth of the matter asserted. See United States v. Cruz-Diaz, 550 F.3d 169, 178-79 (1st Cir. 2008), citing Tennessee v. Street, 471 U.S. 409, 413 (1985). "Where the codefendant's statement is *not* being offered to prove the truth of the matter asserted, a court may, in certain circumstances, admit the statement provided it gives a limiting instruction explaining the limited purpose the statement serves." Id. at 179 (emphasis in original). As described in the facts section of this Response, many of Tavares' and Burkes' statements are false; or, at least, contrary to the evidence the government expects to introduce at trial. The government, of course, will not seek to admit those statements in order to prove their truth, but to discredit Tavares and Burke and illustrate their consciousness of guilt. As such statements do not implicate the defendants' rights under the Confrontation Clause, see Cruz-Diaz, 550 F.3d at 178-79, the Bruton rule would not apply to bar their admission.

9-10; Tavares' Motion at 1-3, 8-9; Burke's Motion at 1-4.   Citing <u>Crawford</u>, the defendants allege

that the "prejudice that would flow from the introduction of these [compelled] statements at a joint

trial is compounded by the [*ex parte*] circumstances under which these statements were made."

<u>See, e.g.</u>, O'Brien's Motion at 9; Tavares' Motion at 8.   To the extent the defendants allege a

<u>Crawford</u> issue, it has no merit.   <u>See</u> Footnote 12, *infra*.   The government is not, at this stage,

seeking to admit Tavares' and Burkes' statements against anyone other than Tavares and Burke,

respectively.[17]   Because their statements are non-hearsay admissions of a party pursuant to

Federal Rule of Evidence 801(d)(2)(A), <u>Crawford</u> is inapposite.

## CONCLUSION

For the reasons described herein, the defendants have failed to show that admission of

Tavares' and Burkes' statements will create a serious risk that a joint trial would compromise a

specific trial right of one of the defendants, or prevent the jury from making a reliable judgment

about guilt or innocence.   <u>See</u> <u>Zafiro</u>, 506 U.S. at 539.   There are, therefore, no grounds for

severance under Rule 14 and the defendants' motions should be denied.

---

[17] In his motion for severance, Burke makes the perfunctory argument that Tavares' testimony
does not constitute a statement of a co-conspirator which would be admissible as non-testimonial,
non-hearsay under Federal Rule of Evidence 801(D)(2)(E).   <u>See</u> <u>Crawford</u>, 541 U.S. at 56
("statements in furtherance of a conspiracy" are not testimonial).   Should this Court rule against
the government with respect to the defendants' motions for severance, the government reserves the
right to file a brief and submit an offer of proof to determine whether Tavares' and Burkes'
statements do, in fact, constitute statements made "during and in furtherance of" the charged
conspiracies and would thus be admissible at a joint trial against all defendants.   <u>See</u> <u>id.</u>; Fed. Rule
Evid. 801(D)(2)(E) (2013).

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:    /s/ Karin M. Bell
       Karin M. Bell
       Fred M. Wyshak, Jr.
       Robert A. Fisher
       Assistant U.S. Attorneys

Date:  November 27, 2013

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Karin M. Bell
Karin M. Bell
Assistant United States Attorney

Date:  November 27, 2013