1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3                                No. 1:12-cr-40026-WGY

4

5    UNITED STATES OF AMERICA

6

7    vs.

8

9    JOHN J. O'BRIEN, et al

10

11                           * * * * * * * * *

12

13                      For Jury Trial Before:
                        Judge William G. Young

14

15                     ***EXCERPT TRANSCRIPT***:
                  Testimony of Judge Bertha Josephson

16

17                      United States District Court
                        District of Massachusetts (Boston)
18                      One Courthouse Way
                        Boston, Massachusetts 02210
19                      Friday, June 13, 2014

20                           * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
23               United States District Court
            One Courthouse Way, Room 5510, Boston, MA 02210
24                  bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3   FRED M. WYSHAK, JR., ESQ.
     KARIN M. BELL, ESQ.
 4   ROBERT A. FISHER, ESQ.
         United States Attorney's Office
 5       J. Joseph Moakley U.S. Courthouse
         1 Courthouse Way, Suite 9200
 6       Boston, Massachusetts 02210
         (617) 748-3954
 7       Email: Fred.wyshak@usdoj.gov
         For the United States
 8

 9   STYLIANUS SINNIS, ESQ.
     WILLIAM W. FICK, ESQ.
10   CHRISTINE DeMASO, ESQ.
         Federal Public Defender Office
11       District of Massachusetts
         51 Sleeper Street, 5th Floor
12       Boston, Massachusetts 02210
         Email: stellio_sinnis@fd.org
13       For John J. O'Brien

14
     JEFFREY A. DENNER, ESQ.
15   R. BRADFORD BAILEY, ESQ.
     ADAMO LANZA, ESQ.
16       Denner Pellegrino, LLP
         Four Longfellow Place, Suite 3501
17       Boston, Massachusetts 02114
         Email: Jdenner@dennerpellegrino.com
18       For Elizabeth V. Tavares

19
     JOHN A. AMABILE, ESQ.
20   JAMES C. BRADBURY, ESQ.
         Amabile & Burkly, P.C.
21       380 Pleasant Street
         Brockton, Massachusetts 02401
22       Email: John.amabile@amabileburkly.com
         For William H. Burke, III
23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (EXCERPT begins.)
 3              MR. FISHER:  Your Honor, the government calls
 4   Bertha Josephson.
 5              THE COURT:  She may be called.
 6              (JUDGE BERTHA JOSEPHSON, sworn.)
 7              THE CLERK:  Would you please state your name
 8   and spell your last name for the record.
 9              THE WITNESS:  My name is Bertha Josephson.  My
10   last name is spelled J-O-S-E-P-H-S-O-N.
11              MR. FISHER:  Your Honor, before I proceed, is
12   there any way we can get -- this screen isn't working
13   again.
14              THE COURT:  I understand that.  That's what I
15   said.  We've sent -- the problem is that's the screen
16   that you're forced to use and you can't tell whether
17   things are up here or not.
18        Now, we've sent to get people to repair that.
19              MR. FISHER:  That's all I'm trying to do.  The
20   only thing I want to do is clear the green arrows.  And
21   I know my screen isn't working.
22              THE COURT:  You may come up here and do it.
23              MR. FISHER:  Sure.  Is that clear?
24              (Clears arrows from witness's screen.)
25              MR. FISHER:  Thank you.  That's all I wanted
```

1    to do.

2              THE COURT:  That's all right.

3

4              * * * * * * * * * * * * * * * * * * * * *

5              JUDGE BERTHA JOSEPHSON

6              * * * * * * * * * * * * * * * * * * * * *

7

8    DIRECT EXAMINATION BY MR. FISHER:

9    Q.  Good morning, Judge Josephson.  Well, you've already

10   stated your name.

11        Can you tell the jurors a little bit about

12   yourself, what your educational background is?

13   A.  I graduated Skidmore College in 1975, Western New

14   England College, now "University," law school in 1978

15   with a JD.  I was admitted to the bar in Massachusetts

16   in 1978 and, um, practiced as an attorney in a private

17   firm in Springfield from 1978 until 19 -- I think '81,

18   and then joined the Smith school -- excuse me, the Smith

19   College School for Social Work on a National Institute

20   of Correction's funded project to investigate the legal

21   issues and resources of women inmates in the Northeast.

22   I finished that and then worked in private practice.

23   And then in, I believe, '83, I joined the Northwestern

24   District Attorney's Office as an Assistant District

25   Attorney.  In 1990, I became an Assistant U.S. Attorney

1    for the District of Massachusetts.  In 1992, I was

2    appointed by Governor Weld to the Chicopee District

3    Court as an Associate Justice.  And then in 1994, I was

4    appointed to the Superior Court as a Justice in

5    Massachusetts.

6    Q.  And you're still serving as a justice in that court

7    today?

8    A.  I am.

9           MR. FISHER:  May I have Exhibit 18.05.

10          (On screen.)

11   Q.  Judge Josephson, I'm putting up an exhibit, marked

12   already in evidence here, 18.05.  I'd like to draw your

13   attention to that panel you sat on.

14       Can you tell the jurors what panel that was you

15   sat on and what the purpose of you being there was for?

16   A.  That was a panel to interview for the, um, associate

17   chief, I think it was, probation officer for the

18   Franklin Superior Court.

19   Q.  And do you remember who you sat on that panel with?

20   A.  Yes.

21   Q.  And could you tell the jurors with who?

22   A.  With Bill Burke and Frank Siano.

23   Q.  And did you know Mr. Siano before that day?

24   A.  Yes.

25   Q.  And who was Mr. Siano?

1   A.   Mr. Siano was the Chief Probation Officer of

2   Franklin County Superior.

3   Q.   And how about Mr. Burke, did you know Mr. Burke

4   before that day?

5   A.   Yes, I did.

6   Q.   And who did you know Mr. Burke to be?

7   A.   He was, I think at that time the Western -- I might

8   not have the right title down, but he was in charge of

9   the Western, Massachusetts probation office.

10  Q.   And you knew these two gentlemen on a professional

11  basis, correct?

12  A.   I did.

13  Q.   And showing you -- if you take a look at Exhibit

14  18.05.

15  A.   (Looks.)

16  Q.   What do you recognize that exhibit to be?

17  A.   That was the final ranking of the candidates whom we

18  interviewed.

19  Q.   And is that your signature there?

20  A.   Yes.

21  Q.   The second signature?

22  A.   Right.

23  Q.   And is that -- you signed that January 12th of 2006,

24  is that fair to say?

25  A.   Right, I did.

1  Q.  Now, did you also, that day, fill out your own

2  grading sheet?

3  A.  Yes, I did.

4  Q.  And do you know if the other interviewers,

5  Mr. Siano, Mr. Burke, had their own ranking sheet for

6  the interview?

7  A.  I believe they did.

8  Q.  What did you do with your ranking sheet after the

9  interview?

10  A.  Well, I turned in notes that, um, that I had taken

11  and, um, that's what I'm referring to, I think, as a

12  ranking sheet.  I don't -- I think I had a separate

13  sheet, but I don't know what happened with that.  If it

14  was a separate sheet, um, where we actually put in

15  numbers for each candidate?  I can't recall.  But there

16  was, um, a sheet with remarks that was turned in.

17          THE COURT:  Just so I can follow.  The

18  position you're interviewing for, tell us again?

19          THE WITNESS:  Is the associate chief, I

20  believe, of a probation officer for Franklin County.

21          THE COURT:  In what court?

22          THE WITNESS:  Oh, in the Superior Court.  I'm

23  sorry.

24          THE COURT:  Thank you.

25  Q.  And in the sheet in front of you, that ranking

1    sheet, who compiled that, whose writing?  I know your

2    signature is on there, but do you remember who actually

3    compiled that list that's on the screen?

4    A.  Yes, Mr. Burke.

5    Q.  And how do you know that?

6    A.  He wrote it out and we signed it.

7    Q.  Now, could you tell the jury what this list is,

8    which comprises 18.05?

9    A.  It's the ranking of the final candidates or ranking

10   of the top 6 candidates who we interviewed.

11   Q.  Now, were there more than 6 candidates you

12   interviewed?

13   A.  Yes.

14   Q.  Do you remember how many extra candidates there

15   were?

16   A.  I'm not sure.  I think there may have been 9.

17   Q.  So some people did not get passed on to the final

18   round?

19   A.  That's right.

20   Q.  Now, in terms of this list, there's no numbers

21   written there, so could you tell the jurors who was

22   Number 1 and who was Number 6?

23   A.  They were ranked -- they were listed according to

24   how we ranked them, so, um, Mike Gralinsky and Sheila

25   Dintaman were tied for first, and then Bob Brown, Sheila

1    Moriarty, Frank Glenowicz, and Sean McDonald.

2    Q.   Do you -- after you -- well, when you signed this,

3    did you agree with the ranking of the candidates?

4    A.   Yes.

5    Q.   Is this in fact how you had the candidates ranked?

6    A.   No, this is how I think the candidates ended up

7    being ranked based on what each of the three of us had

8    determined.

9    Q.   In terms of how you had ranked the candidates who --

10        You interviewed these candidates, correct?

11   A.   Yes.

12   Q.   And you were able to look at their applications and

13   resumes?

14   A.   Right.

15   Q.   And did you know any of them before the interview,

16   had you worked with any of them?

17   A.   Yes, I had.

18   Q.   And so what did you base your ranking on?

19   A.   Well, the interview, the, um, documents that were

20   submitted in support of their application, um, along

21   with -- of course that was part of the application, um,

22   and, um, what I knew of them, my professional connection

23   with any of them.

24   Q.   You had worked with them professionally?

25   A.   Correct.

1   Q.   Now, the person getting that job would be working in

2   your court, correct?

3   A.   That's right.

4   Q.   So did you also consider the needs of the court?

5   A.   Oh, sure.

6   Q.   Would you tell the jurors who you felt were the most

7   qualified candidates for that position?

8   A.   Um, Sheila Dintaman, um, and Mike Gralinsky.

9   Q.   So therefore do you agree with -- do you agree with

10  them being tied for the Number 1 slot?

11  A.   Yeah, I think that's fair.

12  Q.   And why is it that you felt that they were the most

13  qualified for that position?

14  A.   Well, um, based on the applications that they had

15  submitted, based on their interviews, and based on what

16  I knew of what was needed in that court, I felt that

17  they were the top candidates.  I had worked with Sheila

18  Dintaman when I was an Assistant D.A.  She had been a

19  probation officer in the District Court.  I knew her

20  work.  I knew her work ethic.  And she was a very, very

21  good probation officer.  And her application, I thought,

22  proved that out, it was thorough and detailed.

23       Mike Gralinsky, if you want me to go on?

24  Q.   Sure, I was going to ask you about Mr. Gralinsky.

25  A.   Okay.  Mike Gralinsky had been in the Franklin

1   Superior Court probation office and I had worked with

2   him as a probation officer, as him being a probation

3   officer, and, um, he also was a good probation officer.

4   Both of them, because of being in Franklin County and

5   having been probation officers in Franklin County for so

6   long, really knew the community, knew the population

7   they were working with, knew the services that were

8   available to be able to provide to our probationers.  So

9   those were some considerations.

10  Q.  Now, at least according to the exhibit we have up

11  before you, 18.05, is it fair to say Mr. Glenowicz was

12  ranked Number 5 on that list?

13  A.  Yes.

14  Q.  Now, do you agree with that ranking of

15  Mr. Glenowicz?

16  A.  Yes.

17  Q.  And can you tell the jury why you agree with

18  Mr. Glenowicz being ranked Number 5 on that list?

19  A.  My memory of Mr. Glenowicz at that time was that he

20  was coming from the juvenile probation office in Hampden

21  County and I -- from the interview and from his

22  qualifications, did not feel he had a good grasp on what

23  the job in Franklin Superior would entail and the

24  resources and the community and the population that he

25  would be working with.  He had worked with juveniles and

1   we were dealing with the criminals who were -- for lack

2   of a better word, had "graduated" into Superior Court,

3   serious charges and crimes.

4   Q.  And just so the jury understands here, if they don't

5   already, but is Superior Court the highest you can go in

6   terms of a criminal court in Massachusetts?

7   A.  It's the -- yeah, it's the, um -- there are two

8   levels of trial court, um, criminal trial and civil

9   trial court in Massachusetts, District Court and then

10  the higher level is the Superior Court for major

11  felonies.

12  Q.  Now, subsequent to these interviews in this ranking

13  sheet, did you learn who received the assistant chief

14  probation officer job in your court?

15  A.  Yes.

16  Q.  And who did receive that position?

17  A.  Mr. Glenowicz.

18  Q.  And how did you learn that Mr. Glenowicz received

19  that promotion?

20  A.  I can't recall how I learned of it.

21  Q.  But fair to say you did learn of it?

22  A.  I did.

23  Q.  And when you learned that, what was your reaction to

24  that?

25  A.  I was upset.

1    Q.   Would you tell the jury why you were upset?

2              MR. AMABILE:  Objection.

3              THE COURT:  Yeah, she was upset.  Let's see

4    what she did, if anything.

5    Q.   What did you do in response to being upset and

6    learning that he got that promotion, if anything?

7    A.   I don't know if, um, Mr. Siano, if I called him or

8    he called me, but I spoke with Mr. Siano at some point

9    in this and said, "How" --

10             MR. AMABILE:  Objection.

11             THE COURT:  Wait a minute.

12             MR. AMABILE:  I object, your Honor.

13             THE COURT:  No, I understand.  Give me a

14    second here.

15             (Pause.)

16             THE COURT:  Come to the sidebar.

17

18             AT THE SIDEBAR

19             THE COURT:  Okay.  And what's the conversation

20    going to be?

21             MR. FISHER:  Mr. Siano is the chief probation

22    officer.  She called him, "I'm upset, how did that

23    happen?"  He tells her he learned of it too and he's

24    also upset.  And just for the Court's knowledge, he's

25    going to be my next witness.  And then I'm going to ask

1   her, "Well, what did you in response to that, the

2   conversation with Mr. Siano?"  And I believe her

3   testimony will be, "I called Mr. Burke to find out how

4   this happened and had a conversation with Mr. Burke

5   about how this happened."  That's my understanding.

6          THE COURT:  Well, you say Siano is a

7   conspirator.  Um, I am not in a position yet to make

8   that determination especially given the answer that he

9   gives her.  Of course she's the judge and he has to work

10  with her.

11      But how are you going to get it in against an

12  objection?

13          MR. FISHER:  Well, I think it informs -- it

14  informs the jury as to why she then takes an action.

15          THE COURT:  Well, of course the unusual way of

16  doing this is so we call up Siano, "Now, as a result of

17  that phone conversation, what did you do?"  "I called up

18  Burke."  Let's do it that way.

19          MR. FISHER:  Okay.

20

21          (In open court.)

22  Q.  So you -- who is Mr. Siano again?

23  A.  Mr. Siano was the chief probation officer for

24  Franklin County Superior.

25  Q.  And he worked in that court with you, correct?

1    A.  Yes, he did.

2    Q.  So the assistant chief position, that was going to

3    be working under him?

4    A.  Correct.

5    Q.  And you had a conversation with him after you

6    learned of the promotion, correct?

7    A.  I think I did.

8    Q.  After the conversation with Mr. Siano, what do you

9    do now?

10              MR. AMABILE:  Your Honor, I object, because

11   she's not saying she actually did anything.

12              THE COURT:  Overruled.  Well, she said -- it's

13   sufficient.  The question now, "After that conversation,

14   what did you do?"

15   A.  I called Mr. Burke.

16   Q.  And via the telephone?

17   A.  Yes.

18   Q.  And did you have a conversation with him?

19   A.  Yes.

20   Q.  And can you tell the jurors what you said and what

21   he said to you?

22   A.  I expressed my dismay that the -- that one of the

23   lowest-ranking candidates, Mr. Glenowicz, had been

24   selected and I questioned how that could have happened?

25   And, um, Mr. Burke said, um, something to the effect of,

1    "Well, that's somebody else's decision and that's just

2    the way it goes."  And so then I said, "Well, don't ever

3    ask me to be on another one of these panels."

4    Q.  Did you -- after you spoke to Mr. Burke, did you

5    speak to anyone else either at the Commissioner's

6    office, the Commissioner of Probation, or at AOTC,

7    regarding Mr. Glenowicz?

8    A.  I saw Nick DeAngelis who also was an administrator

9    in the probation office in Western, Massachusetts.  I

10   didn't seek him out, I happened to see him shortly after

11   that, and also I said I did not want to be on any of

12   these panels anymore because of this one.

13   Q.  And did -- well, what did Mr. DeAngelis say to you?

14              MR. AMABILE:  Objection.  He said he would --

15              THE COURT:  Wait.  Are you going to press that

16   or --

17              MR. FISHER:  I'll withdraw it, your Honor.

18              THE COURT:  You'll withdraw it.  All right.

19   Q.  After this, um, incident, did you sit on any more

20   interview panels for probation officers?

21   A.  I don't think I did until very recently.

22   Q.  And Mr. Glenowicz, he did become the assistant chief

23   in your court, correct?

24   A.  Yes, he did.

25   Q.  Was Mr. Glenowicz the most qualified candidate for

1  that position?

2          MR. AMABILE:  I object.  I object.

3          THE COURT:  Overruled.  She may give us her

4  view.

5  A.  Not in my opinion.

6  Q.  When you were sitting on this interview panel

7  interviewing Mr. Glenowicz and others with Mr. Burke,

8  did you know of any relationship between Mr. Burke and

9  Mr. Glenowicz?

10          MR. AMABILE:  Objection.

11          THE COURT:  Well, sustained on that

12  foundation.

13  Q.  How long had you known Mr. Burke?

14  A.  Oh, since I've been in the District Attorney's

15  Office in the '80s.

16  Q.  And did you have any conversation with him regarding

17  Mr. Glenowicz prior to the interview?

18          MR. AMABILE:  Objection.

19          THE COURT:  A conversation with -- no,

20  overruled.

21  A.  Prior to --

22          THE WITNESS:  I'm sorry.

23          THE COURT:  I assume you're asking about prior

24  to the interview, any conversations with Burke

25  concerning Glenowicz?

1          MR. FISHER:  Concerning any relationship with

2     Mr. Glenowicz, correct.

3          THE COURT:  All right.  That's the question

4     and you may answer it.

5          THE WITNESS:  Okay.  Thank you.

6     A.  Um, in the interview I think Mr. Burke said

7     something about knowing Mr. Glenowicz, but I don't have

8     a specific recollection of what that entailed.  And

9     because we all knew one another, it was a fairly

10    informal conversation going on in between candidates and

11    during the interview process.

12    Q.  So that that was the extent of your knowledge of the

13    relationship between Mr. Burke and Mr. Glenowicz, that

14    they knew each other?

15    A.  To my best memory at this moment, yes.

16          (Pause.)

17          MR. FISHER:  May I just have one moment, your

18    Honor, please?

19          THE COURT:  You may.

20          (Pause.)

21    Q.  Now, Judge Josephson, after this interview you said

22    you didn't sit on any more interview panels.

23          What was your response to the process of that

24    interview?

25          MR. AMABILE:  Objection.

```
1              THE COURT:  Sustained.
2   Q.  Well, can you tell the jury why you didn't sit on
3   any other interview panels?
4              MR. AMABILE:  Objection.
5              THE COURT:  Sustained.
6              (Pause.)
7              MR. FISHER:  No further questions, your Honor.
8              THE COURT:  Mr. Amabile, any questions?
9              MR. AMABILE:  Yes, your Honor.  Thank you,
10  your Honor.
11
12  CROSS-EXAMINATION BY MR. AMABILE:
13  Q.  Good morning, Judge Josephson, my name is John
14  Amabile and I represent Bill Burke.
15  A.  Good morning.
16  Q.  I think he -- you know him as "Billy Burke," is that
17  correct?
18  A.  That's right.
19  Q.  And you and I have never had the pleasure of meeting
20  before, is that correct, Judge Josephson?
21  A.  No, we have not had that pleasure.
22  Q.  Okay.  But you were kind enough, however, to speak
23  to me on the telephone about this particular case, is
24  that correct?
25  A.  I spoke to you on the telephone, yes.
```

1    Q.  Now, Judge Josephson, you've known Billy Burke for

2    your entire legal career, is that correct?

3    A.  Pretty much, yes.

4    Q.  In other words, he was a probation officer for many

5    years before you received an appointment as an Assistant

6    District Attorney, is that correct?

7    A.  Yes.

8    Q.  And you were appointed by Mike Ryan, is that

9    correct?

10   A.  I was.

11   Q.  And he was the District Attorney in Hampshire County

12   -- and was it Hampshire and Franklin County?

13   A.  Yes, it's actually called the Northwestern District

14   Attorney's Office.

15   Q.  Okay.

16   A.  Yes, it's both those towns.

17   Q.  And you worked in that office for a period of time,

18   is that correct?

19   A.  Yes.

20   Q.  And you're aware of the fact that Mike Ryan then

21   went on to become a Justice of the North Hampton

22   District Court, is that correct?

23   A.  Yes.

24   Q.  And he rose to the position of Chief Justice in that

25   court, is that correct?

1    A.   Um, he was a First Justice.  I don't mean to quivel,

2    but there's -- he was the First Justice for Hampshire.

3    Q.   Okay.  And I don't mean to quivel either but --

4    A.   North Hampton.  I'm sorry, Mr. Amabile.

5    Q.   Right.  And I don't mean to quivel either, but the

6    position that you interviewed for that you're talking

7    about here wasn't the associate probation officer, it

8    was the assistant probation officer, is that correct?

9    A.   Yes.  If I said otherwise, I -- I think it was the

10   assistant chief.

11   Q.   The assistant chief probation officer of the

12   Franklin County Superior Court, is that correct?

13   A.   I think that's right.

14   Q.   Okay.  Now, you knew two of the candidates before

15   the interviews were conducted, is that correct?

16   A.   I knew almost all of the candidates.

17   Q.   Well, you didn't know Frank Glenowicz though, did

18   you?

19   A.   No, I didn't.

20   Q.   You had no dealings with him whatsoever before the

21   interview, is that correct?

22   A.   Not that I know of.

23   Q.   All right.  Which other candidates did you know

24   other than Sheila Dintaman and Mr. Gralinsky?

25   A.   I knew, um, Bob Brown.  I think I had some dealings

1    with Sheila Moriarty, although I'm not positive, and

2    then some of the ones who didn't make it through, I

3    know.

4    Q.   Okay.  But you don't remember any of these names off

5    the top of your head?

6    A.   Yeah, I do.  One was Jason Harver.

7    Q.   Okay.

8    A.   And the other was Sean Hopkin or Houghton.

9    Q.   Okay.

10   A.   And the other was Loreen Masnick.

11   Q.   Masineck?  Was it Masnick or Masineck?

12   A.   It's Masineck.

13   Q.   All right.  Well, so was Mr. Glenowicz the only one

14   you didn't know?

15   A.   No, I didn't know -- you know, I don't think I knew

16   Sean McDonald, but I later learned that his father was

17   someone I knew.  But I don't think I knew that at the

18   time.

19   Q.   All right.  And, um, Sheila Dintaman you knew from

20   when you were an Assistant District Attorney, is that

21   correct?

22   A.   That's correct.

23   Q.   And she was a probation officer in the Greenfield

24   District Court?

25   A.   That's right.

1   Q.   And she had held that position for many years, is

2   that correct?

3   A.   That's correct.

4   Q.   And in that capacity you became familiar with her,

5   is that correct?

6   A.   That's right.

7   Q.   And you had a professional relationship with her, is

8   that correct?

9   A.   Yes.

10   Q.   And you had a very friendly relationship with her,

11   is that correct?

12   A.   Professionally, yes.

13   Q.   And the fact of the matter is that on her

14   application for this position --

15               MR. AMABILE:   The jurors are asking a

16   question.   So we'll pause for one moment.

17               THE COURT:   You go right ahead, Mr. Amabile.

18   Q.   On this particular application she asked you to, um,

19   act as one of her references on her application, is that

20   correct?

21   A.   She may have.   I don't have a specific memory of

22   that, but it's certainly -- it's certainly possible.

23   Q.   All right.   Well, you don't remember that she had --

24   well, you reviewed the applications at the time the

25   interviews were conducted, is that correct?

1    A.   Yes.

2    Q.   And you don't remember that you were listed as one

3    of her references on the actual application?

4    A.   I don't think I've seen the application in 14 years,

5    so I'm sorry.  Oh, not 14, how long has it been?

6    Q.   It was 2006, I think.

7    A.   Yes.

8    Q.   So that would be 8 years?

9    A.   All right.

10   Q.   Well, that's close enough.  It's a long time ago.

11   A.   That's what I'm talking about.

12   Q.   Okay.

13              MR. AMABILE:  May I approach the witness, your

14   Honor?

15              THE COURT:  You may.

16              MR. AMABILE:  I just want to redact something,

17   your Honor.

18              THE COURT:  You go right ahead.

19              (Pause.)

20              THE COURT:  And I don't know what he's doing,

21   but you've seen this before, no personal Social Security

22   numbers of financial information.  No one's hiding

23   anything that could possibly be germane from you.

24         And go ahead, Mr. Amabile.

25              MR. AMABILE:  And, your Honor, in fact I don't

1    want to be chastised by any of the jurors who are being

2    very attentive.

3                THE COURT:  They certainly are.

4    Q.  I'm going to show you a document and ask you if you

5    recognize it.  It's a multi page document.

6    A.  Uh-huh.

7    Q.  Do you recognize that?

8    A.  Sure.

9    Q.  Okay.  Would you tell the jury what that document

10   is?

11   A.  This appears to be -- and I think in fact it is,

12   Sheila Dintaman's application for employment.

13   Q.  For what?

14   A.  Franklin Superior Court assistant chief probation

15   officer.

16   Q.  And that would be the application for the position

17   which you sat on the panel for, is that correct?

18   A.  That's true.

19   Q.  And other than where I just crossed out the Social

20   Security number, is that a complete and accurate copy of

21   the application as far as you can recall?

22   A.  (Looks.)  I'm presuming it is.  I don't have a

23   specific recollection of the application, but it looks

24   to be it.

25                MR. AMABILE:  Can we have a stipulation or --

1          MR. FISHER:  I'm just not sure what version

2     you have.

3              (Hands to counsel.)

4          THE COURT:  While they're talking, when you

5     did these, how many people were interviewed for this

6     position?

7          THE WITNESS:  I think 9.

8          THE COURT:  9.  On your ranking, your personal

9     ranking, where did Mr. Glenowicz fit?

10         THE WITNESS:  I don't remember on my personal

11     ranking.  This is not dissimilar.  But he was down at

12     the bottom.  If he wasn't the last, he was then the

13     second to last.

14         THE COURT:  Was he in the top 6?

15         THE WITNESS:  Well, he was in the top -- you

16     know, I don't know.  I don't know that.

17         THE COURT:  Personally where you -- you don't

18     know whether, on your personal ranking, where he would

19     have been?

20         THE WITNESS:  I don't.

21         THE COURT:  You've got to move, one way or

22     another.

23         MR. AMABILE:  I'm sorry, your Honor.

24         THE COURT:  Okay.  And you don't.

25     Go ahead, Mr. Amabile.

1          MR. AMABILE:  Your Honor, I'd offer this?

2          THE COURT:  Any objection, Mr. Fisher?

3          MR. FISHER:  No objection, your Honor.

4          THE COURT:  It may be received Exhibit 158 in

5    evidence.

6          (Exhibit 158, marked.)

7    Q.  And having looked at that, if we go to the last

8    page, does that refresh your memory about whether or not

9    you were asked by Ms. Dintaman to act as a reference in

10   this particular job application?

11   A.  I see I am listed.

12   Q.  Okay.  And does that refresh your memory that before

13   the interview you had a conversation with her where she

14   obtained your permission to list you as a reference on

15   this job application?

16   A.  I don't know that it was before this interview or

17   before other interviews that she had asked, or at some

18   other point in the past, well before that, could she

19   list me as a reference, and I'm sure I said "Yes."

20   Q.  So in other words there's no question in your mind

21   that prior to this interview you had had a conversation

22   with her, is that correct, Judge Josephson?

23   A.  That's right.

24   Q.  And she had obtained your permission to use her as a

25   reference in job applications for positions within the

 1   trial court?

 2   A.   That's right.

 3   Q.   Okay.

 4           MR. AMABILE:  I'd ask to publish this to the

 5   jury, your Honor?

 6           THE COURT:  You want it passed?

 7           MR. AMABILE:  Yes, your Honor.

 8           THE COURT:  The Clerk may pass it.

 9           (Passes it to jury.)

10           THE COURT:  Proceed.

11   Q.   Judge Josephson, you said that familiarity with

12   Franklin County was one of the criteria you were looking

13   for in determining who was a suitable candidate, is that

14   correct?

15   A.   Yes.

16   Q.   Okay.  Now, are you aware of the fact that Frank

17   Glenowicz has lived his entire life in Franklin County?

18           MR. FISHER:  Objection.

19           THE COURT:  Yeah, sustained on that

20   foundation.

21   Q.   Well, did you review his application?

22   A.   Yes.

23   Q.   All right.  And do you know where --

24           (Pause.)

25           MR. AMABILE:  If I could have a moment, your

1    Honor?

2               THE COURT:  You may.

3               (Pause.)

4    Q.  And do you know where South Deerfield, Massachusetts

5    is?

6    A.  Yes.

7    Q.  And where is South Deerfield?

8    A.  It's in Franklin County.

9    Q.  And you're not aware of the fact that Frank

10   Glenowicz grew up in South Deerfield, Massachusetts?

11              MR. FISHER:  Objection.

12              THE COURT:  Well, um, we have the application.

13        You don't know Mr. Glenowicz at all?

14              THE WITNESS:  I know him now.

15              THE COURT:  But then, I'm sorry, and it was a

16   poor question.

17        So back then you didn't know where he was, where

18   he grew up, or what he had done beyond what you had on

19   the application?

20              THE WITNESS:  That's right.

21              THE COURT:  All right.

22   Q.  Do you know where Conway, Massachusetts is?

23   A.  Yes.

24   Q.  Where is that?

25   A.  Franklin County.

1    Q.   And did you know that Frank Glenowicz, at the time

2    of this interview, lived in Conway, Massachusetts?

3    A.   If it was on the application, I'm sure I must have

4    seen it.  But I don't remember that.

5    Q.   Okay.

6              MR. FISHER:  I'll stipulate, your Honor.

7              MR. AMABILE:  You'll stipulate, you said?

8              THE COURT:  That he --

9              MR. AMABILE:  That he lived in Conway at the

10   time that he --

11             THE COURT:  That's stipulated and I've

12   explained what stipulations are.  To save time they

13   agree to it.  No dispute about that.  You don't have to

14   take any time on it.  But so powerful is your role here

15   that -- just like the testimony of a witness, you can

16   believe it even though -- because they all agreed to it.

17   But you don't have to believe it.  You're the jury.

18        Go ahead.  Stipulate.

19             MR. AMABILE:  All right.  And just because of

20   that, your Honor, I would also like to approach the

21   witness because there's -- they can object to the

22   stipulation, so I'd like to approach and show the

23   application.

24             THE COURT:  Well, of course, you may.

25             MR. AMABILE:  Thank you, your Honor.

1                  (Shows to witness.)

2    Q.  And does that refresh your recollection about where,

3    um -- and this would particularly be on the first page,

4    but where Frank Glenowicz resided at the time that he

5    conducted this interview?

6    A.  That's what it says, it's Conway.

7    Q.  He lived in Conway at the time?

8    A.  That's what it says, yes.

9    Q.  Okay.

10        Now, are you aware of his background at all?  Did

11   you review the resume and the application?

12   A.  I'm sure I did.

13   Q.  Okay.  And, um, are you aware of the fact that he,

14   from 1994 to 1997 --

15            MR. FISHER:  Objection, your Honor, he's

16   reading from the document.

17            THE COURT:  Yeah, is it in evidence?

18            MR. AMABILE:  Well, I'd offer it in evidence,

19   your Honor.

20            THE COURT:  Yeah, any objection?

21            MR. SINNIS:  It's Exhibit 18, your Honor.

22            THE COURT:  It's in evidence.

23            MR. AMABILE:  It's already in evidence.  I'm

24   sorry.

25            THE COURT:  Right.  Then he may inquire from

1    it.

2              MR. AMABILE:  All right.

3    Q.  Are you aware of the fact that, from 1994 to 1997,

4    Frank Glenowicz worked at the Department of Social

5    Services at an address, 1 Arch Place, Springfield,

6    Massachusetts?

7    A.  I see that on the resume and I would have been aware

8    of it at the time.

9    Q.  And that is in Franklin County, is that correct?

10   A.  That is in Franklin County.

11   Q.  So he worked as a social worker in Franklin County

12   for a period of three years before he obtained his job

13   as a probation officer?  Is that fair?

14   A.  That's what it says.

15   Q.  All right.  Now, how long a drive is it from

16   Greenfield to Springfield?

17             MR. FISHER:  Objection, your Honor.

18             THE COURT:  It -- well, she may be asked that.

19        How long is it?

20             THE WITNESS:  It's about -- depends frankly

21   how fast you drive, but it's a straight shot down 91.

22   You can make it in 45 minutes or maybe 40 minutes.

23   Q.  But you've had occasion to make that drive in 40

24   minutes, is that correct?

25   A.  Um, yeah, I have.

1              (Laughter.)

2    Q.   And, um -- okay.  It's not that far away, in any

3    event, is that correct?

4    A.   No.

5    Q.   And Frank Glenowicz worked in Springfield as a

6    probation officer for nine years, is that correct?

7    A.   Yes.

8    Q.   Okay.  So he was a 40-minute drive from where he

9    lived in Conway.

10        Well, was Conway closer or further away?

11   A.   Further away.  I'm sorry, from where?

12   Q.   From Springfield.

13   A.   It was further away from Springfield.

14   Q.   All right.  So, in other words, assuming he commuted

15   by car, he drove right by Greenfield every day on his

16   way from Conway to Springfield, is that correct?

17   A.   Well, I'm sorry to say it isn't.  The geography is a

18   little different.

19   Q.   All right, why don't you explain.  I don't want to

20   put any words in your mouth, Judge Josephson, I want you

21   to give the testimony as accurately as you can.

22   A.   Well, Greenfield is directly north of Springfield,

23   Conway is over to the West of Greenfield and slightly

24   South of Greenfield, but it -- believe me, you have to

25   go on Route 112, you have to do a lot of things that

1    take a fair amount of time.  So it's really -- although

2    you go by Conway, it's a distance from the highway.

3    Q.   Okay.  Now, I think you also testified that the

4    Superior Court handles major felony cases, is that

5    correct?

6    A.   That's correct.

7               MR. AMABILE:  Your Honor, I'd ask to publish

8    the application, if I may?

9               THE COURT:  The Clerk may pass it.

10          I'm going to go a little longer, but we're only

11   going to take a 15-minute recess because we're going to

12   stop at quarter to 1:00 to accommodate a juror.  If that

13   makes anyone uncomfortable, just raise your hand, we can

14   take the recess at any time.

15          Go ahead, Mr. Amabile.

16   Q.   I think you testified that the Superior Court is

17   involved in the most serious types of cases, is that

18   correct?

19   A.   It is.

20   Q.   Um, major felonies in the criminal side, is that

21   correct?

22   A.   That's right.

23   Q.   And that's where, um -- those are the types of cases

24   that the probation officers are involved in in the

25   Superior Court, is that correct?

1    A.   That's correct.

2    Q.   Okay.   Now, Mr. Gralinsky had worked in the Superior

3    Court --

4    A.   Yes.

5    Q.   -- for about the same length of time that Glenowicz

6    had been in the juvenile court, is that correct?

7    A.   I don't know that.

8    Q.   You don't remember?

9    A.   No.

10   Q.   Gralinsky was not your Number 1 choice, is that

11   correct?

12   A.   I'm sorry?

13   Q.   Mr. Gralinsky was not your Number 1 choice, correct?

14   A.   I don't know.   I know that our final ranking, from

15   the three of us, ended up this way.   Whether

16   Mr. Gralinsky was ahead of Ms. Dintaman or not, I don't

17   know, but my top two certainly were Ms. Dintaman and

18   Mr. Gralinsky.

19             THE COURT:   Let me interject with a juror

20   question.

21        The composite rank -- you were shown that

22   handwritten sheet that had the six people, the top two

23   and the like, and you signed that?

24             THE WITNESS:   Yes.

25             THE COURT:   How did that piece of paper come

1   into being?

2              THE WITNESS:  My best memory of that is that

3   we did our individual rankings and then from that this

4   was generated as, um, where they fell based on prior

5   rankings, and I think, if in remember correctly, that is

6   why Mr. Gralinsky and Sheila Dintaman ended up in a tie

7   was that we had, um --

8   Q.  Well, you ranked them --

9              THE COURT:  Wait a minute.  Let me just finish

10  with the juror question.

11             MR. AMABILE:  I'm sorry.

12             THE COURT:  Who put them together?

13             THE WITNESS:  At the time?

14             THE COURT:  No, who created that piece of

15  paper, wrote the names on it and made the entries?

16             THE WITNESS:  I think Mr. Burke did.

17             THE COURT:  And where was he?  I mean how was

18  it done?

19             THE WITNESS:  Oh, okay.  We were all in a room

20  and my memory of it is that it was after we had done our

21  rankings, Mr. Burke put this together based on how we

22  had ranked the candidates and said, "This is how they

23  fall," and it appeared to be that was how they fell

24  based on our individual rankings and that was then how

25  the panel ranked them.  That's the best memory I have.

1          THE COURT:  Go ahead, Mr. Amabile.

2   Q.  And in your memory, that was all above board, is

3   that correct?

4   A.  It was done right in front of me, yes.

5   Q.  It was done right in front of you?

6   A.  Yes.

7   Q.  And it was done accurately, is that correct?

8   A.  Yes.

9   Q.  Okay.  Now, you don't remember that you had Dintaman

10  Number 1 and Siano had Gralinsky Number 1 and that's how

11  you ended up with a tie there?

12  A.  I think that's probably right.

13  Q.  Okay.  So you ranked Ms. Sheila Dintaman Number 1,

14  is that correct, that's your best memory as you sit here

15  today?

16  A.  I can't dispute that.  I think that's probably

17  right.

18  Q.  It's fair to say you're probably not used to being a

19  witness, you're more used to being sort of a little bit

20  to the left of where you are, is that correct?

21  A.  In an entirely different court.

22  Q.  All right.

23       Now, Ms. Gralinsky -- I mean Ms. Dintaman, excuse

24  me, where was she working at the time of that interview?

25  A.  I think she was -- I think she was in the Family and

1    Probate Court or the District Court.  I'm not certain.

2    Q.  All right.  Well, she had worked for many years in

3    District Court, is that correct?

4    A.  That's right.

5    Q.  And that's how you came to know her, is that true?

6    A.  Yes.

7    Q.  And then you're aware of the fact that she had

8    transferred to the Probate Court, is that correct?

9    A.  Yes.

10   Q.  And in neither of those courts do people, um,

11   supervise folks that are convicted of serious felony

12   cases, is that correct?

13   A.  Well, the Probate and Family Court doesn't have any

14   supervision of -- excuse me, of criminals, that's a

15   family and probate -- it's of family matters.  The

16   District Court does supervise people who have been

17   convicted of criminal offenses that are within the

18   jurisdiction of the District Court, which can be

19   punishable for sentences of up to 2 1/2 years in the

20   House of Corrections.  So they don't fit within the

21   classification of "felonies," but they are serious

22   offenses.

23   Q.  Well, correct me if I'm wrong, but the District

24   Court has jurisdiction over minor felonies and

25   misdemeanors, is that correct?

1    A.   That's right.

2    Q.   And so the supervision is of people convicted of

3    minor felonies or misdemeanors, is that correct?

4    A.   That's right.

5    Q.   Now, on the other hand the juvenile court has

6    jurisdiction over offenders that run the gamut from

7    minor misdemeanors all the way up to very serious felony

8    cases, isn't that correct?

9    A.   You mean --

10   Q.   Juvenile court.

11   A.   You mean delinquency proceedings?

12   Q.   Delinquency proceedings, yes.

13   A.   Of children who are found delinquent by reason of --

14   Q.   It could be armed robbery, right?

15   A.   That's true.

16   Q.   Serious drug offenses, is that correct?

17   A.   That's right.

18   Q.   Assault with intent to commit murder, is that

19   correct?  Shooting people like in a town like

20   Springfield --

21            THE COURT:  Well, we're not going to go

22   through the criminal code.

23            MR. AMABILE:  No, no, we're not, but I'm just

24   trying to make a point here.

25            THE COURT:  I think you've made it.  Go ahead.

1   Q.  So in other words, in juvenile court in Springfield,

2   you're supervising very serious youthful offenders, is

3   that correct?

4   A.  I'm sorry I can't say that that's correct.

5   Q.  Why can't you say that's correct, what's your

6   hesitation in saying that's correct?

7   A.  Because generally if a child has been found

8   delinquent by reason of that kind of a serious offense,

9   they're committed to the Department of Youth Services

10  and they're not on probation.

11  Q.  Oh -- all right.  And even if it's a first offense?

12  A.  I'm not saying in all cases, I'm just saying that I

13  can't agree with the wholesale of what you just said.

14  That's all.

15  Q.  Well, so, in other words, just like in an adult

16  court, in Superior Court most offenders -- or a lot of

17  offenders get sentenced to prison, is that correct?

18  A.  Yes.

19  Q.  And the probation department then doesn't have any

20  role in supervising them, is that correct?

21  A.  If there's a, um, probation term as part of the

22  sentence, which oftentimes there may be, then they do,

23  but otherwise not.

24  Q.  Okay.  So, for example, if somebody was in the

25  Greenfield Superior Court on an armed robbery charge and

1    it was a first offense, they might be given a suspended

2    sentence, is that correct?

3    A.   I don't think they can get a suspended sentence on

4    that.

5    Q.   Well, how about attempted murder, they might get a

6    suspended sentence?

7    A.   They can get a suspended sentence to the House of

8    Correction, but you cannot suspend a sentence to state

9    prison.

10   Q.   All right.  I'm not talking about your own practice

11   here and --

12   A.   No, no, and I'm not either.

13   Q.   Okay.  And similarly in juvenile court someone

14   charged with attempted murder could receive a suspended

15   sentence to the Department of Youth Services, is that

16   correct?

17   A.   Yes.

18   Q.   And if someone's sentence is suspended, they then

19   are under the supervision of the probation department,

20   is that correct?

21   A.   Yes.

22   Q.   So would it be fair to say that Mr. Glenowicz had

23   more experience dealing with serious criminal offenders

24   than did Ms. Dintaman?

25   A.   I don't know whether that's fair to say.

1    Q.  Is it unfair to say?

2    A.  I don't know whether --

3    Q.  I'm sorry?

4    A.  No, no, go ahead.  I'm sorry.

5    Q.  Is that a reasonable thing to say?

6              MR. FISHER:  Your Honor --

7    A.  I don't really know, to be honest.  I just can't

8    endorse it.  I'm not sure.

9    Q.  Is that because you just don't really know much

10   about juvenile court or why can't you endorse it, what's

11   the issue?

12   A.  I would need to have more information in order to

13   feel comfortable saying that that was the case.

14   Q.  Now, when you conducted this interview for the

15   Assistant Chief in the Greenfield Superior Court, you

16   knew Sheila Dintaman, is that correct?

17   A.  Yes.

18   Q.  And you've known her for many years, is that

19   correct?

20   A.  Yes.

21   Q.  And she had used you as a reference for the job, is

22   that correct?

23   A.  Yes.

24   Q.  And you factored that into the way you ranked her,

25   is that correct?

1    A.   I'm not sure my knowledge of her affected anything.

2    Q.   Well, how could it not, is that correct?

3    A.   Well, yes.

4    Q.   I mean the fact that you were acting as a reference

5    factored in, is that correct?  Well, it had to, right?

6    A.   I don't know.  I don't know how to divide that.  I

7    viewed her as a good candidate, um, because of what I

8    knew of her and from that I was a reference.

9    Q.   Well, I mean the way this process was set up, it was

10   kind of hard to kind of slice and dice what part of your

11   evaluation came from the actual interview and what part

12   came from your acting as a reference and your prior

13   knowledge of the candidate, is that correct?

14   A.   Um, I wouldn't put it that way, but I agree that

15   certainly my knowledge of whomever came in for

16   interviews and what I knew of them professionally, um,

17   was certainly a factor as well as how that person did,

18   um, in the interview itself.

19   Q.   All these things sort of amalgamated into your

20   ranking, is that fair?

21   A.   I think that's fair.

22            THE COURT:  There's a juror question to me,

23   which I should answer right away.

24            Neither Sheila Dintaman nor the, um --

25            Who's the other person on the tie?

1              THE WITNESS:  Michael Gralinsky.

2              THE COURT:  Michael?

3              THE WITNESS:  Gralinsky.

4              THE COURT:  Gralinsky.

5         Neither Sheila Dintaman or Michael Gralinsky is a

6    charged hire.  Frank Glenowicz is a charged hire.

7         Go ahead.

8    Q.  Now, you're aware of the fact that the process that

9    you were participating in was dictated by the trial

10   court policies and procedures manual, is that correct?

11              MR. FISHER:  Objection, your Honor.

12              THE COURT:  Well, she can be asked whether she

13   knows.

14   Q.  Did you know that?

15   A.  I presume it.

16   Q.  All right.  And you're familiar with that manual, is

17   that correct?

18   A.  No.

19   Q.  You've never looked at it?

20   A.  I've looked at it, but I can't say I'm familiar with

21   it.

22   Q.  But you would agree that it was the document that

23   set forth the procedures?

24   A.  I presume it did.

25   Q.  And as far as you know those procedures were

1    followed, is that correct?

2    A.   As far as I know?  I have no -- I don't know whether

3    they were or they weren't.  I presume that they were.

4    Q.   All right.  In other words, everything you saw was

5    done right in front of you, is that correct?

6            MR. FISHER:  Objection, your Honor.

7    A.   Everything that I -- I'm sorry?

8            THE COURT:  Well, the question is a little

9    tautological, "Everything that you saw was done right in

10   front of you, is that correct?"

11           (Laughter.)

12   A.   I did not see things that were not done in front of

13   me.

14           (Laughter.)

15           THE COURT:  Are you about done with this

16   witness, Mr. Amabile?

17           MR. AMABILE:  No, your Honor.  I don't have

18   much more, but I do have a little more.

19           THE COURT:  And I need the break and we will

20   take it.

21       All right.  Ladies and gentlemen, you've not heard

22   all the evidence.  Please therefore -- I recognize we

23   have documents being passed and you're quite right, when

24   that happens, just put them on the seats where no one

25   goes into your box, put them on the seats, and you may

1    have them again after the break.  We'll take the break

2    now.

3          Keep your minds suspended, do not discuss the case

4    either among yourselves nor with anyone else.  You may

5    stand in recess for 15 minutes.  I'll remain on the

6    bench.

7                    (Jury leaves, 11:00 a.m.)

8                    THE COURT:  You may step down, ma'am, please,

9    and be seated.

10          This is just general, but actually specific for

11   Mr. Amabile.

12          Mr. Amabile, I have a series of some medical

13   appointments of no great consequence, but I have to go

14   to them.  On Monday the 30th, see we've been starting at

15   10:00, but I can't make it, so I want to start at 9:00.

16   Now, I've accommodated you, so I propose to tell the

17   jury that on that week, if we're still going, we'll

18   start at 9:00 and have the normal trial day.

19                    MR. AMABILE:  I will report as ordered by the

20   Court.

21                    THE COURT:  I thank you.  We'll recess for 15

22   minutes.

23                    (Recess, 11:00 a.m.)

24                    (Jury enters, 11:20 a.m.)

25                    THE COURT:  Proceed, Mr. Amabile.

1           MR. AMABILE:   Thank you, your Honor.

2    Q.   Judge Josephson, do you know a Richard Hogan?

3    A.   Yes.

4    Q.   Who is Richard Hogan?

5    A.   He is a probation officer -- I don't think he's

6    actually a probation officer anymore --

7    Q.   He's retired?

8    A.   Right, I think he's retired from the Greenfield

9    District Court.

10   Q.   Right.  He was the chief probation officer in the

11   Greenfield District Court, is that correct?

12   A.   You're absolutely right, Mr. Amabile.

13   Q.   And as such he was Sheila Dintaman's supervisor, is

14   that correct?

15   A.   Yes, he was.

16   Q.   Now, getting back to the list there, the five people

17   or the six people that were sent forward.

18        You're aware that the purpose of this interview

19   was to screen qualified candidates and send a number of

20   them forward for a final interview, is that correct?

21   A.   I think that's right.

22   Q.   Okay.  And it's true that every one of the six

23   people on that list were qualified, is that correct?

24   A.   Yes.

25   Q.   And it would be a fair statement to say that

1    determining who the most qualified was is a subjective

2    determination, isn't that correct?

3    A.   To a certain extent, yes.

4    Q.   It's a matter of opinion, isn't it?

5    A.   To a certain extent, yes.

6    Q.   And on that panel there were three people, is that

7    correct?  Do you know?

8    A.   On my panel, yes.

9    Q.   You and Mr. Siano and Mr. Burke, is that correct?

10   A.   That's right.

11   Q.   And all three of you had a different opinion about

12   who would be the best person to serve in that capacity,

13   is that correct?

14   A.   As to who our top candidate was?

15   Q.   Sure.

16   A.   Yes.

17   Q.   All right.  Now, you said you knew a number of those

18   candidates and that you listed them off.  The top four

19   that you had ranked were all people you knew, is that

20   correct?

21   A.   That's true.

22   Q.   Okay.  And Mr. Glenowicz was ranked Number 5 and you

23   did not know him, is that correct?

24   A.   That's right.

25   Q.   We have to agree that that factored into your

1   ranking him Number 5, is that correct, the fact that you

2   had no knowledge of him before this interview, is that

3   correct?

4   A.   I don't think I can say that's correct, I think --

5   Q.   You don't think you can say that's correct?

6   A.   I don't think, no.

7   Q.   That had nothing to do with your ranking of him, is

8   that your testimony?

9   A.   No, I think that the fact that I didn't know him,

10  um, didn't give me, you know, more information obviously

11  than I would have had had I known him, but I also --

12  with Jill Moriarty I really didn't know her, it was

13  simply she was someone I think I was familiar with in

14  some way.  But I'm not even sure of that.

15  Q.   Where did you know Sheila Moriarty from?

16  A.   I'm not sure if she went through another interview,

17  um --

18  Q.   She was coming from Cape Cod at that time, is that

19  correct?

20  A.   Um, I may be mistaken because she is now the -- I

21  know her now, but I can't say I knew her then.

22  Q.   In fact she is now the Chief in Greenfield, is that

23  correct?

24  A.   That's right.

25  Q.   All right.  And you're also aware of the fact that,

1   um, these candidates had interviewed at various other

2   places, is that correct?

3   A.   I presume it.

4   Q.   And, um, there was a standard set of questions, is

5   that correct?

6   A.   There were, um --

7   Q.   Everyone was asked the same exact questions at the

8   interview, is that correct?

9   A.   At different interviews or at that interview?

10  Q.   No, at this particular interview.

11  A.   Yes.

12  Q.   And for each type of posting there was a standard

13  set of questions, is that correct?

14  A.   I think that's right.

15  Q.   All right.

16              THE COURT:   Just so I'm clear, and I asked you

17  this before, I think.

18       You don't have a recollection as to where

19  personally you ranked Mr. Glenowicz?

20              THE WITNESS:   Aside from to say he was either

21  last or second to last, no.

22              THE COURT:   All right.

23  Q.   All right.   Last or second to last of the final six,

24  is that correct?

25  A.   You know, I'm sorry, I should have said it.   I don't

1    know if he was in my final six or not.  I know he was at

2    the -- he was lower than, um, the people certainly who

3    are ahead of him on this sheet.

4    Q.  The interview process, it would be fair to say, was

5    perfunctory, is that a fair characterization?

6    A.  No.

7    Q.  You went through a standard set of questions, is

8    that correct?

9          THE COURT:  Well, have in mind her answer, her

10   answer was "No."

11   Q.  You went through a standard set of questions, is

12   that correct?

13   A.  We did.

14   Q.  The interview took about 15 minute, is that correct?

15   A.  I don't recall what it took.

16   Q.  Well, you say that you thought there were up to nine

17   people interviewed, is that correct?

18   A.  Yes.

19   Q.  You don't know how long the interviews took?

20   A.  I don't.

21   Q.  Was it an hour?  Was it two hours?  Three hours?

22   A.  No, it was not that long.

23   Q.  Was it an afternoon?

24   A.  Per interview?  No.

25   Q.  Per the entire interviews.

A.   It may well have been.

Q.   An afternoon, was that correct?

A.   It could have been or could have been -- I'm sorry,
I don't remember how long it took.

Q.   Now, in terms of knowledge of the candidates, you
know that Billy Burke was the Deputy Commissioner for
Western, Massachusetts at the time that this interview
took place, is that correct?

A.   I don't doubt that.  I can't say -- and I'm not
trying to, um, parse my words, but I just don't know
what his title was and I'm sorry I really -- in fact I
don't dispute that that was the right title, I just
can't recall what it was.

Q.   All right.  Well, you knew he was in a supervisory
capacity within the Western Massachusetts Probation
Department, is that correct?

A.   Yes.

Q.   And he had been in that capacity for a number of
years?

A.   That's right.

Q.   And you had known him in that capacity?

A.   Yes.

Q.   And you had seen him in that capacity, is that
correct?

A.   Yes.

1    Q.   And you had interacted with him many many times in

2    that capacity, is that correct?

3    A.   Yes.

4    Q.   Maybe dozens of times over the years, hundreds of

5    times, going back to your days in the District

6    Attorney's Office?

7    A.   Not necessarily in that capacity, but I certainly

8    saw Mr. Burke very -- along the lines that you're

9    talking about in our, um, travels throughout the trial

10   court.

11   Q.   Very frequently, isn't that true?

12   A.   Um, frequently.

13   Q.   And that was true during this time frame as well,

14   isn't that correct?

15   A.   Yes.

16   Q.   And in that time frame, if I'm to understand what

17   we've discussed before, you essentially rotated between

18   Hampden County, which is Springfield, and Franklin

19   County, which is Greenfield, is that correct?

20   A.   Not entirely.

21   Q.   All right.  I don't want to put words in your mouth.

22   But tell the jury where you would sit?

23   A.   I would sit in Hampden County, Springfield, which

24   has seven different Superior Courts in it, for probably

25   about six months out of the year, and then I would sit

1   about probably, um, the other months divided between

2   Franklin County, Superior Court, which is Greenfield,

3   and Hampshire County Superior Court, which is North

4   Hampton.

5   Q.  Okay.  And is that still your rotation?

6   A.  Pretty much, yes.

7   Q.  All right.  And when you say there's seven Superior

8   Courts in Hampden County, you mean there are seven

9   sessions in the Superior Court?

10  A.  Right, at that time.

11  Q.  Which is in the Hall of Justice, is that correct?

12  A.  That's correct.

13  Q.  Okay.  And you would see Billy Burke in Hampden

14  County, is that correct?

15  A.  Mostly, yes.

16  Q.  But you'd see him in Hampshire County as well, is

17  that correct?

18  A.  Sometimes, yes.

19  Q.  Well, he had an office in the courthouse at

20  Hampshire County, is that correct?

21  A.  Right, but I saw him more frequently in Hampden

22  County because the different courts used the same areas

23  more in Hampden County than in Hampshire County.

24  Q.  And that's also because you were there for six

25  months and only three months in Hampshire, is that

1    correct?

2    A.   Fair enough, yes.

3    Q.   And three months in Franklin County, is that

4    correct?

5    A.   Pretty much.

6    Q.   And you would see him in Franklin County as well, is

7    that correct?

8    A.   Pretty much, yes.

9    Q.   And is the District Court and Superior Court in

10   Franklin County in the same building?

11   A.   It is.

12   Q.   Okay.  And the occasions you'd see him was because

13   he, as the supervisor of the whole Western part of the

14   state, would travel to all of the different courts in

15   the Western part of the state in the course of his

16   employment, is that correct?

17   A.   That's correct.

18   Q.   And he would interact with the judges, is that

19   correct?

20   A.   I don't know.

21   Q.   Well, did he interact with you?

22   A.   Yes.

23   Q.   All right.  So from that can you say that he

24   interacted with at least one judge?

25   A.   I think that's fair.

1    Q.  You never saw him interacting with any of other

2    judges?

3    A.  I don't know if he did or not.  I presume he did,

4    but I can't say that I saw him interacting with other

5    judges.

6    Q.  All right.  You have no present memory of him

7    interacting with other judges?

8              MR. FISHER:  Objection, your Honor.

9              THE COURT:  He may ask the question.  He may

10   ask it in that form.

11        Do you have any memory, present memory?

12             THE WITNESS:  I can't say that I do.

13             THE COURT:  There's a juror question, but it

14   doesn't go to any evidentiary matter, so I'll just ask

15   it.

16        You used the word "seven sessions of the Superior

17   Court sitting in the Hall of Justice."  Well, that's his

18   questions and your answers.

19        Explain to the jury what that means, "seven

20   sessions of the Superior Court sitting in the Hall of

21   Justice in Springfield"?

22             THE WITNESS:  Okay.

23        What that means is that there are, um -- there

24   were at that time, there were seven Superior Court

25   courtrooms with a judge in each Superior Court courtroom

1    conducting sessions.  There were, I think, at that time

2    five criminal sessions where we heard criminal cases,

3    four of those were hearing criminal trials, one was what

4    we called an "assigning session" that hears everything

5    else that's criminal and sends out those trials and

6    hears motions and so on, and then the other two

7    courtrooms were used for civil trials.

8                THE COURT:  Go ahead, Mr. Amabile.

9                MR. AMABILE:  Thank you, your Honor.

10   Q.  And you had occasion to see Billy Burke interacting

11   with chief probation officers, is that correct?

12   A.  I probably did, but I don't have a specific

13   recollection.

14   Q.  But you're sure you did?

15   A.  It would be highly unlikely that I wouldn't have.

16   Q.  All right.  And with assistant chief probation

17   officers, is that correct?

18   A.  Yes.

19   Q.  And with line probation officers, is that correct?

20   A.  Yes.

21   Q.  And that was because that was his job, to interact

22   with all these people and to supervise and monitor their

23   performance, isn't that correct?

24   A.  That's what I assume, yes.

25   Q.  Well, you're not just assuming that, you know that

1    to be true as a justice of the Superior Court and a

2    former justice of the District Court?

3              MR. FISHER:  Objection, your Honor.

4              THE COURT:  No, he may press it, but -- well,

5    we'll see how she answers.

6         Do you know it to be true?

7    A.  Well, in the way that the question was asked,

8    Mr. Amabile, you asked me if that's why he was

9    interacting with them, was that it was his

10   responsibility to?  I presume that's why he was

11   interacting with them, but I wasn't privy to what he was

12   doing with them.  I don't know how much was within his

13   job responsibilities and how much was something other

14   than that.  I presume it was because it was part of his

15   job.

16             THE COURT:  That's her answer.  Go ahead.

17   Q.  And you're aware of the fact that in his -- the

18   performance of his job, he got to know all of the people

19   that worked within the probation department in Western,

20   Massachusetts, is that correct?

21   A.  I don't know what he and who he knew.  I would

22   presume again that he certainly had contact with the

23   Probation Department and people in the Probation

24   Department in Western, Massachusetts in fulfilling his

25   job responsibilities, yes.

1   Q.  And he had been doing that for what -- well, he

2   retired in 2009, you recall that?

3   A.  I didn't, but I know he retired.

4   Q.  And you're aware of the fact that he worked for 37

5   years in the Probation Department in Western,

6   Massachusetts, is that correct?

7   A.  I know it was for a long time.

8   Q.  And your interactions with him date all the way back

9   to when you were an Assistant District Attorney working

10  for Mike Ryan, is that right?

11  A.  That's right.

12  Q.  Now, you're aware of the fact that he knew virtually

13  everybody that was interviewed in this particular

14  scenario, is that correct?

15  A.  I'm not aware of it, but I would not be surprised to

16  know that.

17  Q.  Well, what Sheila Dintaman did -- when she came into

18  the room, did she say, "Hi, Billy"?

19  A.  I don't recall.

20  Q.  You don't remember that?

21  A.  I don't remember that, but I again --

22  Q.  You would assume she probably did?

23              MR. FISHER:  Objection.

24              THE COURT:  Wait a minute.  The testimony is

25  she does not remember.  We'll leave it at that.  The

1    objection is sustained.

2    Q.  You don't remember that she -- that it was obvious

3    that Sheila Dintaman and Billy Burke knew each other, do

4    you recall that?

5           MR. FISHER:  Objection.

6           THE COURT:  He can press it, just don't assume

7    what's assumed in the questions.  It's always the

8    testimony of the witness.

9           MR. AMABILE:  Thank you, your Honor.

10          THE COURT:  Was that your impression?

11   A.  I don't have a specific recollection, but what I can

12   say perhaps to help is it's a small community, we --

13   it's Western, Massachusetts.  I would be very surprised

14   if somebody walked in and all of us did not -- if that

15   was somebody who had been in the Probation Department or

16   in the court system in Western, Massachusetts or lived

17   there, that we would not, um, have a friendly greeting

18   indicating that we knew that person.

19   Q.  All right.  And that would be the same with

20   Mr. Gralinsky, Billy Burke knew Frank -- or Michael

21   Gralinsky and they greeted each other as colleagues when

22   he came in there?

23   A.  Again I don't have a specific recollection, but that

24   wouldn't surprise me.

25   Q.  Now, are you aware of the fact that Billy Burke used

1    to go out on home visits with Mr. Gralinsky?

2    A.   No, I did not.

3    Q.   That topic didn't come up?

4    A.   Not that I recall.

5    Q.   All right.  And, um, Mr. Burke used to interact with

6    Dick Hogan, the Chief of the Greenfield District Court,

7    is that correct?

8    A.   Yes.

9    Q.   And you've seen that on many occasions, is that

10   correct?

11   A.   Yes.

12   Q.   And Dick Hogan was Sheila Dintaman's supervisor for

13   20 years, is that correct?

14   A.   I don't know how long, but that would sound right.

15   Q.   Okay.  So it would be fair to say that in terms of

16   knowledge going into this interview, Bill Burke was the

17   person that had the most knowledge about the most number

18   of these candidates, is that correct?

19              MR. FISHER:  Objection.

20              THE COURT:  Yeah, sustained on this

21   foundation.

22              MR. AMABILE:  I'll move on.

23   Q.   Now, would it be fair to say that Bill was a major

24   presence in the Probation Department in Western,

25   Massachusetts?

A.   Yes.

Q.   And your experience with him was that he was a very

responsive probation officer, is that correct?

A.   I never really dealt with him when he was a

probation officer.

Q.   Well, as a chief he was responsive if you ever

needed anything, is that correct?

A.   Yes.

Q.   He was accessible, is that correct?

A.   He was accessible.

Q.   And he was a very friendly person, is that correct?

A.   A very friendly person.

Q.   And he was very cordial and friendly to all of the

court personnel, isn't that correct?

A.   Yes, he was.

Q.   The court officers, the clerks --

          MR. FISHER:  Objection, your Honor.

          THE COURT:  Well, I don't know if that's a

question.  We'll have a question.

Q.   That he was very well liked, wasn't he?

          MR. FISHER:  Objection.

          THE COURT:  Sustained.

Q.   Well, you liked him, didn't you?  Didn't you like

him?  Don't you like him?

A.   I didn't dislike him.

```
 1    Q.  You like him, don't you?

 2                (Laughter.)

 3                MR. FISHER:  Your Honor?

 4                THE COURT:  No, he's entitled to have that

 5    because you're going to evaluate all these witnesses and

 6    take their testimony, so it's appropriate for anyone to

 7    inquire about hostility, friendship, and the like so you

 8    can evaluate whether in any way that colors their

 9    testimony.  It's an appropriate area for you to consider

10    and so it's appropriate to ask you the question.

11        Did you like him?

12    Q.  You like Billy Burke, don't you?

13    A.  It's hard not to like Mr. Burke.  He's a very

14    affable man.  I know his family.  I know his daughter.

15    Q.  And you know his wife, Maryanne, she's here in court

16    today?

17                MR. FISHER:  Your Honor, I object.

18                THE COURT:  That's sustained.

19    Q.  (Pause.)  Now, you've been a probation officer --

20    excuse me, a lawyer, a District Court judge, and a

21    Superior Court judge over the last how many years?

22    A.  Um --

23    Q.  I'm not trying to get personal here.

24    A.  No, I understand, but it's a math problem.  Since,

25    um -- since 1978 when I passed the bar.
```

1  Q.  Okay.  So you've had experience observing the

2  performance of the Probation Department over a 34 -- 36

3  year period, is that correct?

4  A.  Yes.

5  Q.  And is it true that between the period of 2000 and

6  2010, in your view the probation department in Western,

7  Massachusetts was performing effectively?

8              MR. FISHER:  Objection, your Honor.

9              THE COURT:  You object to that?

10              MR. FISHER:  I do, your Honor, yes, it's

11  outside the scope.

12              THE COURT:  Well, it's outside the scope, but

13  I will sustain it.

14              MR. AMABILE:  I would ask to be heard, your

15  Honor.

16              THE COURT:  You may be.

17

18              AT THE SIDEBAR

19              THE COURT:  We're not going to be asking them

20  about the performance of the Probation Department, we're

21  going to be asking them about specific bribes.

22              MR. AMABILE:  All right.  I'll withdraw the

23  question.  But I just want to say, just so you know why

24  I think I had a reason to do that, is because they

25  brought up this whole morale issue to Cremens.  But I'll

```
 1   withdraw it.
 2               THE COURT:  Very well.
 3               MR. AMABILE:  Thank you.
 4
 5               (In open court.)
 6   Q.  Judge Josephson, do you know -- do you know a man
 7   named Christopher Hoffman?
 8   A.  Yes.
 9   Q.  And how do you know Mr. Hoffman?
10   A.  He was a probation officer in the Hampden County
11   Superior and then became the Acting Chief or Chief, and
12   I apologize for not knowing which, um, in the Hampshire
13   Superior probation.
14   Q.  Well, all right, let's move back a little bit to the
15   beginning.  He was an associate probation officer in
16   Hampden Superior Court?
17   A.  You're right.
18   Q.  Is that correct?
19   A.  You're right.
20   Q.  And that's the place where you sit six months out of
21   the year, is that correct?
22   A.  That's right.
23   Q.  And, by the way, are you primarily in the criminal
24   session in the Hampden Superior Court?
25   A.  Um --
```

1    Q.   Could you give us a percentage?

2    A.   I tried to keep it 50/50.

3    Q.   All right.  So Hoffman was an associate probation

4    officer there, is that correct?

5    A.   Yes.

6    Q.   And then he was hired as a probation officer in

7    Hampden County, is that correct?

8    A.   That's right.

9    Q.   And at some point he was given an appointment as a

10   probation officer in Hampshire County, is that correct?

11   A.   That's right.

12   Q.   All right, so let's just -- keeping it in that time

13   frame from when he was an associate probation officer

14   until the point when he was appointed a probation

15   officer in Hampshire County, you knew him, is that

16   correct?

17   A.   Yes.

18   Q.   And you observed his work performance, is that

19   correct?

20   A.   Yes.

21   Q.   And that included his performance as an associate PO

22   in the Hampden County Superior Court, is that correct?

23              MR. FISHER:  Objection.

24              THE COURT:  No, overruled.

25   Q.   Is that correct?

1    A.   Yes.

2    Q.   All right.  And do you believe that he performed his

3    function as an associate probation officer in the

4    Hampden County Superior Court well?

5    A.   Yes.

6    Q.   In fact would "very well" be a fair

7    characterization?

8    A.   No, I thought he was good.

9    Q.   How about "exemplary," could we go there?

10   A.   Um -- I suppose.

11   Q.   That's a word you'd be comfortable with?

12   A.   Um, it's not the one that comes to mind, but I think

13   he was good at -- um, when he was an associate probation

14   officer in Hampden County, yes.

15   Q.   All right.  Well, what's the biggest compliment

16   you'd be comfortable with?

17   A.   He was very good.

18   Q.   "Very good."  Okay, we'll go with "very good"

19   instead of "exemplary."

20        Okay.  So given that he was a very good associate

21   probation officer in Hampden County, um, is it true that

22   you, um, recommended him for his position as a -- when

23   he applied to be a probation officer in Hampden County?

24   A.   I think that's true.

25   Q.   Okay.  And did you either write a letter or call or

1   somehow contact the Commissioner of Probation's Office

2   regarding Christopher Hoffman's ascension to probation

3   officer in Hampden County?

4   A.  I don't think I did.  I think I told Chris Hoffman

5   that he could list me as a reference.  I don't have a

6   memory of contacting anyone or writing a letter.

7   Q.  Well, do you have a memory, um, before his

8   appointment -- well, when he was an associate probation

9   officer, he was in your session quite often, is that

10  correct?

11  A.  Yes.

12  Q.  And on a daily basis, is that correct?

13  A.  Pretty much, yes.

14  Q.  So you had a lot of ability to observe his skill and

15  ability, is that correct?

16  A.  Yes.

17  Q.  His work ethic, is that correct?

18  A.  Yes.

19  Q.  His dedication to what he was doing, is that

20  correct?

21  A.  In the courtroom, absolutely.

22  Q.  And you were aware that he was a military veteran,

23  is that correct?

24  A.  I don't think I was, but --

25  Q.  You didn't know that he was in the Gulf War?

1          MR. FISHER:  Your Honor, objection to the

2     leading.

3          THE COURT:  Yes, you are beyond the scope now,

4     so do not lead this witness.

5          MR. AMABILE:  Okay.

6     Q.  Well, do you recall, at some point, whether or not

7     in the courtroom you called him up to your bench and

8     informed him that you had made a call to the

9     Commissioner's office?

10         MR. FISHER:  Your Honor, objection.

11         THE COURT:  Yeah, sustained.  You're leading.

12    Don't lead the witness.

13    Q.  All right.  Did you have any conversation with him

14    about any contact with the Commissioner's office that

15    you can remember?

16    A.  I don't remember that.

17    Q.  You don't remember it?

18    A.  No.

19    Q.  You don't deny that, but you don't remember it?

20         MR. FISHER:  Objection, your Honor.

21         THE COURT:  Sustained.

22    Q.  But you do recall that you agreed to either be

23    listed as a reference or to support his candidacy, is

24    that correct?

25    A.  Yes.

1    Q.  And you thought his appointment to the Hampden

2    County Superior Court was a very good thing, is that

3    correct?

4              MR. FISHER:  Objection, leading.

5              THE COURT:  It is.  Sustained.

6    Q.  Well, how would you characterize your views of his

7    appointment as a probation officer?

8    A.  I thought he was a good probation officer.

9    Q.  Okay.  Are you aware of the fact that you appear on

10   some of these -- on one of these sponsor lists as a

11   sponsor for Christopher Hoffman with the Commissioner of

12   Probation?

13   A.  I am now aware.

14             THE COURT:  I didn't get the answer?

15             THE WITNESS:  I'm sorry.

16   A.  I am now aware of it.

17   Q.  But you don't recall how that came about?

18   A.  I don't.

19   Q.  (Pause.)  Now, are you aware of the fact that there

20   was political influence in probation hiring prior to the

21   year 2000?

22             MR. FISHER:  Objection, your Honor.

23             THE COURT:  No, she may be asked about that.

24        Did you have a belief about that subject?

25             THE WITNESS:  Um, yes.

1           THE COURT:  And I messed it up by asking -- by

2     interjecting myself.

3           And so what's the answer to his question, were you

4     aware that there was political influence in hiring prior

5     to 2001?

6     A.   I don't know that I knew that there was -- I don't

7     know that I knew that there was influence that was

8     successful influence, but I certainly knew that there

9     was, um --

10    Q.   Attempted influence?

11    A.   Or it was -- that there was a factor of some sort.

12    Q.   Okay.  Well, elaborate to the jury, if you would.

13    I'm going to ask that in a nonleading way, your Honor.

14    Elaborate what you know?

15           MR. FISHER:  Objection, your Honor.

16           THE COURT:  She may tell us what she knows

17    herself.

18           THE WITNESS:  Of my own?

19           THE COURT:  Yes.

20    A.   Of my own personal knowledge, and I am assuming that

21    you're talking about before 2000?

22    Q.   Yeah.

23    A.   That there was a political component to the hiring

24    process based on people's, um, who people may have had

25    as references, who people may have had supporting their

1    candidacy, and I just assumed and believed that there

2    was a political aspect to hirings.

3    Q.   And that occurred up and down from the janitor to

4    the judges, is that true?

5    A.   Well, I suppose that's true.

6    Q.   Well, you know that's true, don't you?

7            MR. FISHER:  Objection, your Honor.

8    A.   Well, I know that --

9            THE COURT:  Well, he may press it, in that

10   form.

11   A.   I don't know it in every case certainly.

12   Q.   Well, you know it in terms of judicial appointments?

13   A.   I know certainly there's a political component, yes.

14   Q.   And you knew that it was true with respect to, um,

15   probation employees?

16   A.   Yes.

17   Q.   You knew it was true with the court security

18   officers?

19   A.   I think that's right.

20   Q.   And you knew it was true with maintenance personnel

21   in the various courthouses, is that correct?

22   A.   Again I can't tell you that I have specific

23   knowledge regarding that, but I assume it.

24   Q.   And clerical personnel as well, is that correct?

25   A.   I think that's probably true.

1    Q.   Well, you know it's true, isn't that correct?

2    A.   Well, again, I mean when you're talking about much

3    broader --

4    Q.   Western, Massachusetts is a small place, it's a

5    tight community and everybody knows everybody, right?

6    A.   That's right.

7    Q.   So in other words you would know if family members

8    were involved and people who were connected with various

9    politicians, or whatever the heck might be the case, you

10   know that, right, before 2000, don't you?

11   A.   Well, I certainly know -- you're right, I certainly

12   would know people's families, people's, um -- you know,

13   the communities, as I said, are small, there are

14   oftentimes people who have had family members who work

15   in the court and of course you know their family

16   members.  And again it's a small community.

17   Q.   Bill's daughter, Mindy Burke, worked in the court,

18   is that correct?

19   A.   Yes, she did.

20   Q.   She still does.

21   A.   Well, she worked in the D.A.'s office.

22   Q.   Oh, she worked in the D.A.'s office?

23   A.   Well, um, Tracy worked there.

24   Q.   Oh, Tracy.  And then Mindy was -- is still working

25   in the electronic monitoring office, is that correct?

1    A.   I don't really know Mindy.

2    Q.   Okay.  Fine.

3         And did you ever have any specific involvement

4    before 2000 where you were involved in the hiring

5    process and there was either political influence or an

6    attempt to assert political influence on probation

7    hiring?

8    A.   Yes.

9    Q.   Okay.  Well, could you describe that to the jury?

10   A.   Um --

11   Q.   Just your best memory here.  It's a long time ago.

12   A.   Okay.

13        Well, there was a time where, um, being on the

14   Superior Court probation, um --

15   Q.   "Hiring committee," was it called?

16   A.   Yeah, it was called the "Superior Court, um,

17   Probation Committee" that also did screenings for

18   hirings and, um, there was one occasion where I recall

19   before doing a series of interviews for a number of

20   positions and receiving a call from someone who I didn't

21   know but who I knew was a legislator in Western,

22   Massachusetts.

23   Q.   Was that Petrolati?

24   A.   It was Mr. Petrolati, yes, and I got a message

25   simply that he had called.  I did not call him back

1    until after the interviews took place and we had made

2    our selections and then I called him back, but he and I

3    never spoke.

4    Q.  All right.  And was there an occasion when you spoke

5    to Chief Judge Suzanne Del Vecchio?

6    A.  Yes.

7    Q.  Okay.  And would you allay that scenario to the

8    jury.

9    A.  Before a hiring or interviews of -- I think it might

10   has been seventy different candidates for a number of

11   different probation officer positions, um, she indicated

12   to me that there were four candidates that she was

13   hopeful would make it through the process.

14   Q.  Did those four candidates make it through the

15   process?

16   A.  No.

17   Q.  Okay.  And did you later have a conversation with

18   her in her office about that?

19   A.  Yes.

20   Q.  And did you -- is it true that you heard her --

21                MR. FISHER:  Objection.

22                THE COURT:  Yeah, come to the sidebar.

23

24                AT THE SIDEBAR

25                THE COURT:  Well, isn't this interesting.  And

1    I say that in all honesty.

2         What do you think she's going to answer?

3              MR. FISHER:  I know what she's going to say

4    and I objected to it because I don't want her testifying

5    to it.

6              THE COURT:  Well, what's she's going to say?

7              MR. FISHER:  She's going to say that Judge Del

8    Vecchio called Sal DiMasi and told him he's not going to

9    get the names on the list and Judge Del Vecchio told Sal

10   DiMasi, "You should send me some qualified candidates

11   for now who can make it through the interviews."

12             THE COURT:  And how do you think that's

13   admissible?

14             MR. AMABILE:  I think it's admissible, your

15   Honor, not necessarily for the truth, but to show the

16   state of mind and present intention on the part of the

17   judges and with respect to the hiring process.

18             THE COURT:  Well, Del Vecchio was the Chief

19   Justice of the Superior Court and she was succeeded by,

20   um --

21             MR. FISHER:  Judge --

22             THE COURT:  The current Chief Justice

23   succeeded her, did she -- wasn't Judge Mulligan the

24   Chief Justice?

25             MR. FISHER:  She's --

1          MR. AMABILE:  He just told us about it this

2     morning, Judge.  In other words, apparently we didn't

3     know anything about it and they properly, and I wanted

4     to commend them, revealed what is clearly potentially

5     exculpatory evidence and I want to commend the

6     government's attorneys for promptly doing this.

7          MR. FISHER:  Judge, she learned of this

8     conversation this morning, so I told my brother.

9          THE COURT:  Oh, I'm very grateful.  I think

10    you should have.

11         But the fact that it was said, is the speech --

12    then the issue before me is is the speech relevant?

13    Now, this is a Chief Justice who's never been Chief

14    Justice of Administration and Management.

15         MR. FISHER:  Yes, and my understanding, from

16    what Judge Josephson told us this morning, is Judge Del

17    Vecchio was the Chief Justice of the Superior Court at

18    the time.

19         THE COURT:  Oh, I think I can take judicial --

20    Oh, I see that.  When it happened I know she was the

21    Chief Justice of the Superior Court.

22         MR. FISHER:  Yes.

23         THE COURT:  And in Josephson's presence she

24    has a telephone call ostensibly with DiMasi?

25         MR. FISHER:  With Sal DiMasi, correct, Judge.

1   Judge Josephson was not on the call, she only heard the

2   call with Judge Del Vecchio.

3           THE COURT:  Well, she may have it for the fact

4   that it occurred because now she's testified -- here

5   is -- I continue to have problems with where the line is

6   drawn with respect to what's criminal.  Here we have the

7   Chief Justice, if she's believed, the Chief Justice of

8   the Superior Court, saying, "I'm interested in these

9   names," but presumably if the system works appropriately

10  these people don't get through.  Then there's a later

11  interaction between this associate justice and the Chief

12  Justice.

13          Now, unlike the federal system, the state system,

14  where we can say we have -- the federal system is a weak

15  Chief Judge, the Chief Judge is the spokesperson for the

16  court, but the judges make all the policy for the court

17  by majority vote.  The state system is different, the

18  Chief Justice is a separate -- well, today it's selected

19  by the Chief -- by the Supreme Judicial Court and has

20  significant powers, among which is the power to assign a

21  justice where the associate justice sits.  So that's a

22  superior position, all of which leads me to say that if

23  he wants it, he ought to get it, it seems to me.

24          MR. FISHER:  Sure.

25          THE COURT:  Fine.

1          MR. AMABILE:  I want to say one thing.  I

2    object to the characterizing of the Chief here as not

3    powerful especially during the years your Honor was the

4    chief.

5          MR. SINNIS:  I don't object to that.

6          THE COURT:  Those sort of comments, of course,

7    have no bearing and I stand by what I said.

8          MR. AMABILE:  I withdraw the objection.

9          THE COURT:  Enough said.

10

11          (In open court.)

12          THE COURT:  It isn't rocket science what I

13    talked to them about.  Really, as the judge, and in

14    terms of the law of evidence, I'm trying to keep us

15    focused on what are the specific issues in this case,

16    but to allow enough background and other testimony,

17    without using the legal words, to allow you to evaluate

18    all the central issue.

19          Now, we're somewhat far afield here, but if we

20    limit it to what she said and what the then Chief

21    Justice of the Superior Court, Suzanne Del Vecchio said,

22    not for whether any of it was true, but for the fact

23    they had this conversation, I'm going to admit it.

24          So with that in mind, you had a conversation with

25    the Chief Justice of the Superior Court and tell us

1    again who that was at that time?

2              THE WITNESS:  Suzanne Del Vecchio.

3              THE COURT:  Okay, so limiting it, um, what was

4    said?

5              THE WITNESS:  Before the interviews, um, Chief

6    Del Vecchio indicated or gave me, um, a piece of paper

7    that had four names on it and indicated that she was

8    hopeful that those people would make it through the

9    interview process.  This was before we were going to

10   have the interview by the committee.  I said, "I can't

11   tell the committee what to do," and she, um, appeared to

12   accept that.  And we had our interviews.  Um, I never,

13   um, even read the names, I just saw that they were

14   names, and, um, those people were not the ones --

15   apparently were not selected when we gave our

16   recommendations as to who should, um, be out of that

17   group, out of that group of 70.

18             THE COURT:  What was your position on the

19   probation committee?

20             THE WITNESS:  I was the chair.

21             THE COURT:  You were the chair.

22             THE WITNESS:  Yes.

23             THE COURT:  And can you give us a temporal --

24   what time period this was?

25             THE WITNESS:  I think it was between 2000 and

```
 1    2001.
 2                THE COURT:  So in that period?
 3                THE WITNESS:  Yes.
 4                THE COURT:  All right.  Go from there,
 5    Mr. Amabile.
 6    Q.  Was there a subsequent conversation with Judge Del
 7    Vecchio when she was on the telephone call?
 8    A.  Yes.
 9                THE COURT:  This, too, is limited for the fact
10    that she heard it, not anything that was said is true or
11    not, just for the fact that it occurred.
12         Go ahead.
13                MR. AMABILE:  Okay.
14    Q.  And what did you hear at that time?
15    A.  I heard her say to the person at the other end of
16    the phone, "Well, they didn't make it through."
17    Q.  And did you hear -- did she say who the other person
18    on the other end of the phone was?
19    A.  I don't know specifically what she said, but it was
20    my belief that it was, um, the Speaker of the House.
21    Q.  Well --
22                THE COURT:  And at that time who was the
23    Speaker of the House.
24    A.  Sal DiMasi.
25    Q.  Well, you believed it was Sal DiMasi, is that
```

```
 1    correct?
 2    A.   That's right.
 3    Q.   And --
 4              THE COURT:   Well, I'm letting her testify to
 5    her belief, but she doesn't know who was on the other
 6    end of the line.   And go from there.
 7    Q.   What did you base that belief on?
 8    A.   Something that the Chief had said, either a name or
 9    a position in the conversation.
10    Q.   What did you hear her say to the person you believed
11    was the Speaker of the House, Sal DiMasi, at that time?
12    A.   Something to the effect -- "Well, they didn't make
13    it through."   "Well, next time send me Goddamn
14    candidates who can make it through the interview," or
15    something to that effect.
16              MR. AMABILE:   All right.   I have no further
17    questions, your Honor.
18              THE COURT:   Mr. Denner, any questions for this
19    witness?
20              MR. DENNER:   No, sir.
21              THE COURT:   No questions.
22         Mr. Sinnis, any questions?
23              MR. SINNIS:   No, your Honor.
24              THE COURT:   Mr. Fisher, any redirect?
25              MR. FISHER:   Very briefly, your Honor.
```

1

2    REDIRECT EXAMINATION BY MR. FISHER.

3    Q.  Now, Judge Josephson, there were some questions

4    asked of you and you explained that you were listed as a

5    reference on Ms. Dintaman's application.  Do you

6    remember that?

7    A.  Yes.

8    Q.  Now, being her reference, do you remember anybody

9    from probation contacting you to ask you questions about

10   it?

11   A.  No.

12   Q.  Well, you testified on direct that, um, that you had

13   a conversation with Mr. Burke after the selection of

14   Mr. Glenowicz?

15   A.  Yes.

16   Q.  And he made, and correct me if I'm wrong, um, a

17   statement about how the decision had been made and that

18   someone else makes that decision, correct?

19   A.  I'm sorry, I couldn't hear you?

20   Q.  Again, tell us what Mr. Burke said to you during

21   that conversation, um, after Mr. Glenowicz was selected

22   as a CPO?

23   A.  Um --

24            MR. AMABILE:  Your Honor, asked and answered.

25            THE COURT:  No, overruled.  He may have it.

1    A.   My memory of it is that when I expressed my -- for

2    lack of a better word, "dismay" that Mr. Glenowicz had

3    been in the final selection, I believe Mr. Burke said to

4    me, "Well, that's somebody else's decision and

5    essentially that's just the way it is."

6    Q.   Well, did -- since you were listed in the reference

7    of one of the people that applied for that job, did

8    anybody -- did that decision-maker contact you?

9    A.   No.

10   Q.   Well, you were the First Justice of that court,

11   correct?

12   A.   No, I was -- of which court?

13   Q.   For the interviews, you were the First --

14   A.   I was the designee for the Superior Court.  The

15   Superior Court doesn't have First Justices.

16   Q.   But that is the court you sat in, correct?

17   A.   That was one of the courts, yes, I sit in.

18   Q.   And no one contacted you?

19   A.   No.

20   Q.   You were also asked a series of questions about

21   Mr. Glenowicz and the types of cases he worked on or the

22   types of cases that were heard in juvenile court.  Do

23   you remember that?

24   A.   Yes.

25   Q.   Do you know what types of cases Mr. Glenowicz

1    supervised in juvenile court?

2    A.  No, I don't.

3    Q.  You were also asked, I believe by Mr. Amabile, if

4    you understood the interview process to be perfunctory.

5    Do you remember that?

6    A.  Yes.

7    Q.  Did you understand that your role in this was

8    perfunctory?

9    A.  I didn't expect it was supposed to be.

10   Q.  What did you expect your role to be?

11   A.  I expected that we were conducting interviews to

12   determine who the best candidate would be for that

13   particular position and to make a recommendation or

14   recommendations based on that.

15   Q.  Now, you were asked questions about a Mr. Hogan?

16   A.  Yes.

17   Q.  And you answered you understood he was

18   Ms. Dintaman's supervisor, correct?

19   A.  Yes.

20   Q.  Did he call you at all, did you speak to him about

21   her performance?

22   A.  No.

23   Q.  (Pause.)  You were also asked a series of questions

24   about a Mr. Christopher Hoffman, correct?

25   A.  Yes.

1   Q.  Do you know what his relationship was to Mr. Burke?

2   A.  I don't.  Well, I mean I didn't at the time and --

3            MR. SINNIS:  Objection.  She learned after the

4   interview.

5            THE COURT:  No, that's her answer, she didn't

6   at the time.

7   Q.  Does he still work in probation?

8            MR. SINNIS:  Objection.

9            THE COURT:  Sustained.

10  Q.  Judge Josephson, from your experience working in the

11  courts of the Commonwealth, is the job of an APO

12  different than the job of a PO or an ACPO?

13  A.  Yes.

14  Q.  And there's many different responsibilities,

15  correct?

16  A.  Yes.

17  Q.  And someone who's a good APO or a PO may not make a

18  good supervisor, correct?

19  A.  I think that's fair.

20  Q.  You were also asked about a political component to

21  judicial appointments.  Do you remember that?

22  A.  Yes.

23  Q.  And you went through that process to become a

24  justice, correct?

25  A.  Twice.

1    Q.   When you went through that process, were you scored

2    and ranked?

3              MR. SINNIS:   Objection.

4              THE COURT:   No, I'm going to sustain that.

5    I mean in Massachusetts, as an indeed in the federal

6    system, the determination -- the nomination is made by a

7    constitutional officer, the Governor, and then it goes

8    before a constitutional body, in Massachusetts the

9    Executive Council.   Those are all called out in the

10   Massachusetts Constitution.

11         So I'm -- so that got in without objection, but

12   how judicial officers are selected is not part and

13   parcel of this case.   We can go into other roles, but

14   not that one.

15         Go ahead.

16   Q.   You also testified that you knew Mr. Burke for many

17   years, correct?

18   A.   Yes.

19   Q.   Did you understand that he was the Deputy

20   Commissioner of Probation for the Western part of the

21   state?

22   A.   Yeah, again I don't know what his specific title

23   was, but I knew he was in charge of Western

24   Massachusetts for probation.

25   Q.   During your time on the bench, have you ever

1    contacted anybody of a higher rank than him in

2    probation?

3             MR. SINNIS:  Objection, your Honor.  Asked and

4    answered.

5             THE COURT:  It is, but I'll let her answer

6    that "yes" or "no."

7    A.  I don't -- I don't think I have.  I don't -- I'm not

8    clear on where everybody is in the hierarchy of

9    probation.

10            THE COURT:  Let's ask a more specific question

11   and this one I'll allow.

12        Have you ever had occasion to contact or interact

13   with anyone at the top echelons, however you conceive

14   it, of the Department of Probation about candidates,

15   hirings, promotions, have you, while you served as a

16   judge?

17            THE WITNESS:  I don't think I have.

18            THE COURT:  All right.  That's her answer.

19   Q.  Now, Judge Josephson, you also stated, just on

20   cross-examination, about a phone call you got from

21   Mr. Petrolati?

22   A.  Yes.

23   Q.  At the time you got that phone call and prior to

24   that, what was your relationship with Mr. Petrolati?

25   A.  I had none.

1    Q.   Had you ever spoken to him before?

2    A.   No.

3    Q.   Had he ever called you before?

4    A.   No.

5    Q.   And this phone call, when was it in relation to in

6    terms of the interviews?

7    A.   It was -- the day before we were going to be

8    conducting these mass interviews of 70 people over the

9    course of two days, 18 judges sitting on a -- I want to

10   say 18 people -- 18 judges, but it may have been fewer,

11   but not fewer of these 70 candidates over the course of

12   a couple of days.

13   Q.   And then again what was your role on that panel?

14   A.   I was the chair of that committee.

15   Q.   So therefore you ran the interview process?

16   A.   I did.

17   Q.   And you stated you didn't call him back, correct?

18   A.   I did not.

19   Q.   When did you call him back?

20   A.   After we had conducted all the interviews and given

21   our recommendations or our selections.

22   Q.   And did you speak to him then?

23   A.   No.

24   Q.   Did you ever speak to him on the phone or in person

25   about that subject?

1    A.   No.

2    Q.   Now, you were also asked questions about

3    Mr. Glenowicz.

4    A.   Yes.

5    Q.   Before the interview did you have the opportunity to

6    look through his resume?

7    A.   Before?

8    Q.   Before.

9    A.   Oh, before the interview?  Oh, yes.  Yes.

10   Q.   And was it customary for you to look through the

11   resumes and the applications?

12   A.   Sure, yes.

13   Q.   And of course you were part of the panel that asked

14   questions of him, correct?

15   A.   That's correct.

16   Q.   So you read the information on his application and

17   the answers he gave, correct?

18   A.   Yes.

19   Q.   And it was your determination he was not the most

20   qualified for that job?

21            MR. SINNIS:  Objection.

22            THE COURT:  Yeah, don't lead the witness.

23   Q.   What was your determination after reviewing his

24   application, resume, and meeting with him during the

25   interview?

 1   A.   There were other candidates which were much more

 2   qualified.

 3   Q.   And did you also consider their applications and

 4   interview?

 5   A.   Yes.

 6             MR. FISHER:   Nothing further for this witness,

 7   your Honor.

 8             THE COURT:   Nothing further for this witness,

 9   Mr. Amabile?

10             MR. AMABILE:   No, your Honor.   Thank you.

11             THE COURT:   Mr. Denner?

12             MR. DENNER:   No sir.

13             THE COURT:   Mr. Sinnis?

14             MR. SINNIS:   Nothing further, your Honor.

15             THE COURT:   You may step down.   Thank you.

16             (Witness steps down.)

17             THE COURT:   Call your next witness.

18             (*EXCERPT* ends.)

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3

4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5   hereby certify that the foregoing record is a true and

6   accurate transcription of my stenographic notes, of the

7   aforementioned *EXCERPT*, before Judge William G. Young,

8   on Friday, June 13, 2014, to the best of my skill and

9   ability.

10

11

12
    /s/ Richard H. Romanow 12-04-14
13  _____
    RICHARD H. ROMANOW  Date
14

15

16

17

18

19

20

21

22

23

24

25